UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————x

JEANNETTE FULLER HAUSLER as Successor
Personal Representative of the Estate of
ROBERT OTIS FULLER ("BOBBY
FULLER"), Deceased, on behalf of THOMAS
CASKEY as Personal Representative of the
Estate of LYNITA FULLER CASKEY,
surviving daughter of ROBERT OTIS FULLER,
THE ESTATE OF ROBERT OTIS FULLER,
FREDERICK FULLER, FRANCIS FULLER,
GRACE LUTES, JEANNETTE FULLER
HAUSLER, and IRENE MOSS,

                 Petitioner,

          -against-

JPMORGAN CHASE BANK, N.A.,
CITIBANK, N.A., UBS AG, THE ROYAL
BANK OF SCOTLAND N.V. (FORMERLY
KNOWN AS ABN AMRO BANK N.V.), and
BANK OF AMERICA, NATIONAL
ASSOCIATION,

           Garnishee-Respondents.

————————————————————————x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

09 Civ. 10289 (VM)

Related to the JPM Chase/Citibank
Turnover Proceeding

In Respect of a Judgment
Entered in the State of Florida,
Case No. 02-12475-CA-09

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISMISS PETITION SEEKING
TURNOVER OF BLOCKED WIRE TRANSFERS**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York  10017
(212) 450-4000
*Attorneys for Bank of America, National
Association, Citibank, N.A., JPMorgan Chase
Bank, N.A., The Royal Bank of Scotland N.V.
(formerly known as ABN AMRO Bank N.V.),
and UBS AG*

## TABLE OF CONTENTS

PAGE

Preliminary Statement................................................................................................1

Statement of the Case ...............................................................................................1

    A.    Petitioner Hausler.................................................................................1

    B.    The Wire Transfers Subject to the Turnover Petition.............................................2

    C.    The Garnishee-Respondent Banks and the Blocked Wire Transfers at Issue..........5

    D.    The Blocking Regime Applicable to Transactions Involving Cuba ........................6

        1.    The Trading with the Enemy Act    6

        2.    The Cuban Asset Control Regulations    7

        3.    Terrorism Risk Insurance Act    7

ARGUMENT......................................................................................................8

I. NEW YORK LAW DEFINES THE SUBSTANTIVE PROPERTY RIGHTS MADE
    SUBJECT TO EXECUTION BY TRIA..............................................................8

II. THE CUBAN JUDGMENT DEBTORS POSSESS NO EXECUTABLE OWNERSHIP
    INTEREST IN THE BLOCKED EFTs ...........................................................10

    A.    The Blocked EFTs Are Not "Property" or "Assets" of the Cuban Bank
        Beneficiaries or Their Banks Under Article 4-A ....................................10

    B.    Article 4-A Expressly Addresses "Ownership" and the Rights of Creditors.........12

    C.    Article 4-A Has Comprehensive Rules that Govern the Rights of Parties to an
        Interrupted and Failed Wire Transfer .................................................14

    D.    The Unwinding Rules of Article 4-A Require an Intermediary Bank to Return  a
        Failed Payment to the Originating Bank...............................................16

III. PETITIONER CANNOT MEET HER BURDEN TO ESTABLISH THE CUBAN
    JUDGMENT DEBTORS' ENTITLEMENT TO POSSESSION OF THE BLOCKED
    EFTs AS REQUIRED BY N.Y. C.P.L.R. § 5225(b)........................................19

    A.    New York's Turnover Statute Places the Burden on Petitioner to Establish the
        Judgment Debtor's Right to Possession of the Blocked EFTs ...............................19

    B.    Garnishees are "Interested Persons" ...................................................21

## TABLE OF AUTHORITIES

PAGE

### Cases

*Banca Commerciale Italiana v. N. Trust Int'l Banking Corp.*, 160 F.3d 90 (2d Cir. 1998)......... 11

*Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362 (1991) ................................................. 10, 11

*Barnhill v. Johnson*, 503 U.S. 393 (1992) ....................................................................................... 9

*Beauvis v. Allegiance Sec. Inc.*, 942 F.2d 838 (2d Cir. 1991) ...................................................... 19

*Centrifugal Casting Machine Co., Inc. v. American Bank & Trust Co.*, 966 F.2d 1348
    (10th Cir. 1992)......................................................................................................................... 9

*Consub Del. LLC v. Schakin Eugentaria Limitada*, 676 S. Supp. 2d 162 (S.D.N.Y. 2009)......... 17

*Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003)........................................................................ 4

*Erin Capital Mgmt., LLC v. Celis*, 854 N.Y.S.2d 640 (N.Y. Dist. Ct. 2008) ...............................20

*Export-Import Bank of the United States v. Asia Pulp & Paper Co., Ltd.*
    *("Asia Pulp & Paper")*, No. 09-2254-cv, 2010 U.S. App. LEXIS 12748
    (2d Cir. June 22, 2010) ...................................................................... 9, 10, 11, 12, 14

*Goodearth Maritime Ltd. v. Calder Seacarrier Corp.*, No. 08 Civ. 2028 (RMB), Letter to
    Judge Berman from Baja Ferries USA LLC, at Docket No. 27
    (S.D.N.Y. Nov. 6, 2009) ....................................................................................... 17, 18

*Goodearth Maritime Ltd. v. Calder Seacarrier Corp.*, No. 09-5068-cv, 2010 U.S. App.
    LEXIS 14450 (2d Cir. July 14, 2010) ................................................................................... 17

*Grain Traders Inc. v. Citibank, N.A.*, 160 F.3d 97 (2d Cir. 1998)........................................ 14, 17

*MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218 (1994)........................................................... 8

*Phoenician Trading Partners LP v. Iseson*, 2004 U.S. Dist. LEXIS 26938 (E.D.N.Y. 2004)......20

*Reibor Int'l Ltd. v. Cargo Carriers (KACZ-Co.), Ltd.,* 759 F.2d 262 (2d Cir. 1985)................... 13

*Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte. Ltd.*, 585 F.3d 58
    (2d Cir. 2009)........................................................................................... 2, 9, 11, 14

*Sigmoil Res., N.V. v. Pan Ocean Oil Corp. (Nigeria)*, 234 A.D.2d 103 (1st Dep't 1996) ........... 11

*Sochor v. Int'l Bus. Machines*, 60 N.Y.2d 254 (1983)................................................................. 20

*Swezey v. Merrill Lynch*, Index No. 104734/09, 2009 N.Y. Misc. LEXIS 5144
(N.Y. Sup. Ct. Nov. 5, 2009) ...........................................................................................21

*The Bank of New York v. Norilsk Nickel*, 14 A.D.3d 140 (1st Dep't 2004)................................. 18

*United States v. Craft*, 535 U.S. 274 (2002) ............................................................... 10

*Weininger v. Castro*, 462 F. Supp. 2d 457 (S.D.N.Y. 2006) ........................................................ 4

## Statutes and Rules

Section 201 of the Terrorism Risk Insurance Act of 2002 ("TRIA"),
28 U.S.C. § 1610 note.................................................................................... 1, 2, 7, 8

International Emergency Powers Act ("IEEPA"),
50 U.S.C. § 1701 ....................................................................................................... 6

Trading with the Enemy Act ("TWEA"),
50 U.S.C. App. § 1 ..................................................................................................... 6

Section 6(j) of the Export Administration Act of 1979,
50 U.S.C. App. 2405(j) ............................................................................................... 2

12 C.F.R. § 210.25 .................................................................................................... 12

31 C.F.R. § 500.579 .................................................................................................. 18

31 C.F.R. § 515.201 .................................................................................................... 7

31 C.F.R. § 515.521 .................................................................................................... 8

31 C.F.R. § 515.557 .................................................................................................... 8

31 C.F.R. § 585.526 .................................................................................................. 18

31 C.F.R. § 585.529 .................................................................................................. 18

31 C.F.R. § 586.518 .................................................................................................. 19

Fed. R. Civ. P. 69 ...................................................................................................... 12

Fed. R. Civ. P. Supp. R. B(1)(a) .............................................................................. 11

Second Circuit Rule § 32.1.1 .................................................................................... 18

N.Y. C.P.L.R. § 5225 ............................................................................... 12, 18, 19, 20, 21

N.Y. C.P.L.R. § 5239 ................................................................................................ 21

N.Y. U.C.C. § 4-A ............................................................................................... *passim*

N.Y. U.C.C. § 4-A-102 cmt. ...................................................................... 11, 17

N.Y. U.C.C. § 4-A-103 ............................................................................... 14

N.Y. U.C.C. § 4-A-104 ............................................................................... 14

N.Y. U.C.C. § 4-A-209 ............................................................................... 14

N.Y. U.C.C. § 4-A-211 ............................................................................... 15

N.Y. U.C.C. § 4-A-212 ............................................................................... 15

N.Y. U.C.C. § 4-A-301 ............................................................................... 14

N.Y. U.C.C. § 4-A-402 ..................................................................... 16, 17, 18

N.Y. U.C.C. § 4-A-404 ............................................................................... 13

N.Y. U.C.C. § 4-A-502 cmt. 4 .................................................................. 14

N.Y. U.C.C. § 4-A-502 ............................................................................... 13

N.Y. U.C.C. § 4-A-503 ............................................................................... 13

## Other Authorities

AMERICAN HERITAGE COLLEGE DICTIONARY 82 (3d ed. 1997) ..................................... 8

BLACK'S LAW DICTIONARY 125-26 (9th ed. 2009).......................................................... 8

Pascal Fletcher, *Cuba's Financial Sector Undergoing Facelift*, FIN. POST, June 18, 1996, at 57.................................................................................................................... 5

Thomas C. Baxter et al., THE ABCS OF THE UCC (ARTICLE 4A: FUNDS TRANSFERS) ................ 13

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 131, 1565 (1993)....................... 8

WORLD BANK DIRECTORY 649 (2009-2010) .................................................................. 5

The Garnishee-Respondents,[1] which are the originating and intermediary banks in respect of the wire transfers made subject to turnover pursuant to Petitioner's Turnover Petition III, respectfully submit this memorandum of law in support of their motion to dismiss Turnover Petition III insofar as it seeks turnover and execution against blocked wire transfers in respect of which the alleged Cuban Government party is either the beneficiary's bank or the beneficiary.

## Preliminary Statement

In her Turnover Petition III, Petitioner seeks to enforce a judgment she holds against the Republic of Cuba by executing against blocked wire transfers held by the above-named garnishee-respondents in their capacities as either originating or intermediary banks in a wire transfer chain.  This Court should dismiss Turnover Petition III because the Republic and its agencies or instrumentalities have no ownership interest in the blocked wire transfers subject to this motion, whether viewed in the light of controlling Second Circuit case law, or the laws of the State of New York governing the rights and obligations of parties to wire transfers.  The garnishee-respondents should not be required to commence burdensome interpleader proceedings when there are no "assets of a terrorist party" to be interpleaded.

## Statement of the Case

A.    Petitioner Hausler

Petitioner Hausler is the successor personal representative of the Estate of Robert Otis Fuller, and brings this proceeding pursuant to Section 201(a) of the Terrorism Risk Insurance Act of 2002 ("TRIA"), 28 U.S.C. § 1610 note, to execute a judgment against the Republic of

---

[1] The originating and intermediary banks are ABN AMRO Bank N.V. (now known as The Royal Bank of Scotland N.V.) ("ABN AMRO"), Bank of America, National Association ("Bank of America"), Citibank, N.A. ("Citibank"), JPMorgan Chase Bank, N.A. ("JPM Chase"), and UBS AG ("UBS").

Cuba, Fidel and Raul Castro, and the Cuban Revolutionary Armed Services ("Defendants") for the torture and extra-judicial killing of Mr. Fuller.

A Florida State Court awarded compensatory damages to Petitioner in the amount of $100 million following the Defendants' default. The judgment was first recognized by the United States District Court for the Southern District of Florida, and then given full faith and credit by this Court on September 26, 2008.

In issuing its judgment, the Florida State Court determined that the Republic of Cuba was a terrorist party within the meaning of Section 201(a) of TRIA because it had been designated as a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979, codified at 50 U.S.C. App. 2405(j). The Republic of Cuba is therefore a "terrorist party" within the meaning of TRIA.

B.   The Wire Transfers Subject to the Turnover Petition

In this proceeding, Petitioner seeks to execute against the proceeds of thirty international electronic funds transfers ("EFTs" or "wire transfers") that have been blocked pursuant to the Cuban Assets Control Regulations, 31 C.F.R. Part 515 (the "CACRs"), and the question for the Court is whether the proceeds so-blocked are "the blocked assets of a terrorist party," or the blocked assets of one of the other parties to the wire transfers at issue that are subject to blocking pursuant to the CACRs.

Each wire transfer is a chain of debits and credits leading from the originator to the beneficiary.[2]

There are typically five parties to an international wire transfer: the originator of the wire transfer, the originator's bank, one or more intermediary banks, the beneficiary's bank, and the

---

[2] A clear explanation of the complex yet straightforward nature of a wire transfer is contained in the Second Circuit's opinion in *Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte. Ltd.*, 585 F.3d 58, 60 n.1 (2d Cir. 2009).

2

ultimate beneficiary of the wire transfer.[3]  Each party in the chain makes use of a deposit debt[4] owed to it by the next party in the chain to move the "funds" forward to the beneficiary even though no actual "funds" or "money" passes from one party or bank to another.  The originator is owed a deposit debt by the originator's bank, and the originator, by instructing its bank to transfer funds, authorizes that bank to debit its account in consideration for that bank's agreement to authorize the debiting of its own correspondent account with the next entity in the chain, the first intermediary bank, in the amount of the transfer.

The intermediary bank, if it accepts the transfer, in turn authorizes either another intermediary bank or the beneficiary's bank to debit its account with that bank in order to credit the account of the beneficiary's bank or the beneficiary.[5]  The wire transfer comes to rest when the beneficiary's bank, having debited the account of the prior intermediary bank, credits the beneficiary's account, thereby recognizing a deposit debt owed to the beneficiary.

When a wire transfer is interrupted by an order of attachment or blocking order issued by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), the correspondent account of the sending (or originator's) bank is debited, but the next step in the process, the acceptance of the transfer by authorizing a debit of the intermediary bank's account with the next bank in the chain, does not take place.  Under these circumstances, the intermediary bank has not given consideration for the debiting of its customer's account, and is obligated, pursuant to the

---

[3] Article 4-A of New York's Uniform Commercial Code (the "N.Y. U.C.C.") provides a comprehensive set of rules for governing the rights and obligations of these parties.

[4] When a bank's customer deposits funds into its account, the bank takes title to the funds and becomes indebted to the depositor in the amount of the deposit, creating a "deposit debt."

[5] This step is perhaps best exemplified in Exhibit E to the Petition, which identifies as the "credit bank" the next intermediary bank in the chain.  The "credit bank" or next intermediary can never be one of the Cuban Government banks because no U.S. bank can have a direct demand deposit relationship with a Cuban Government bank.

rules set forth in Article 4-A of the Uniform Commercial Code (*see* pp. 16-19 *infra*), to return the funds to the originator's bank upon the *vacatur* of the attachment or the lifting of the OFAC blocking order. Significantly, an intermediary bank in this situation never under any circumstances owes an obligation to the next bank in the chain.

In the case of the wire transfers at issue on this motion, there are twenty-one separate identified originators from fifteen different foreign countries. Seven of these originators are banks, and the remainder are corporate parties. Twenty-eight foreign banks operating out of thirty foreign offices (not counting the Cuban banks) served in various capacities in respect of these wire transfers, and there are nine non-bank beneficiaries located in seven different countries. The salient details of these wire transfers, including the roles played by the various parties to each wire transfer and their identities, are reflected on Exhibits B-F to the petition (as filed under seal).[6]

Petitioner takes the position that all of these blocked wire transfers are subject to execution under TRIA because the four Cuban banks that were parties to those wire transfers are alleged to be more than 50% directly owned by Cuba, and are thus agencies or instrumentalities of Cuba. Those Cuban banks are Banco Nacional de Cuba ("Banco Nacional"), Banco Financiero Internacional, S.A. ("Banco Financiero"), Banco Internacional de Comercio ("Banco Internacional"), and Banco Popular de Ahorro ("Banco Popular").[7] None of these banks is

---

[6] The information set forth in this paragraph is substantially derived from information contained in Exhibits B-F to the Petition, as described in the accompanying declaration of James L. Kerr dated July 28, 2010 that is submitted in support of this motion (the "Kerr Decl.").

[7] Petitioner has the burden of establishing that the four Cuban entities referenced in Turnover Petition III are subject to TRIA because they are in fact agencies or instrumentalities of the Republic of Cuba. *See Weininger v. Castro*, 462 F. Supp. 2d 457, 495-96 (S.D.N.Y. 2006) (evaluating whether an entity was an "agency or instrumentality" of Cuba by referring to "FSIA's statutory definition"); *see also Dole Food Co. v. Patrickson*, 538 U.S. 468, 473-77 (2003) (holding that an entity indirectly owned by a foreign state is not an agency or instrumentality of the foreign state).

alleged to have originated any of the twenty-eight wire transfers that are subject to this motion, and none served as an originator's bank.[8]  But significantly, in nine of the transactions, the Cuban bank served only as the beneficiary's bank.  In twelve transactions, the Cuban bank was identified as the beneficiary of the transfer.  In the remaining transactions, the Cuban bank was both the beneficiary's bank and the beneficiary.  (Kerr Decl., ¶10.)

C.    The Garnishee-Respondent Banks and the
      Blocked Wire Transfers at Issue

Petitioner Hausler served writs of execution on New York offices of the garnishee-respondent banks during June and July of 2009.  Following the termination of parallel garnishment proceedings brought by the Hauslers in the State of Florida against the corporate parents or affiliates of the garnishee-respondents, the parties engaged in discovery without need for involvement by the Court.[9]  (Kerr Decl., ¶11.)

Each of the five garnishee-respondent banks holds proceeds from blocked wire transfers that are subject to the Petition.  The garnishee-respondents were generally acting as intermediary banks, and the accounts that were debited to give effect to the CACRs were the accounts of the

---

In fact, two of the entities may not be agencies or instrumentalities of the Republic because they may not meet the "FSIA's statutory definition" as interpreted by *Dole*.  In this regard, the WORLD BANK DIRECTORY reports that 100% of Banco Financiero's shares are owned by two private Cuban corporations, and also reports that the majority shareholder of Banco Internacional is Grupo Nueva Banca S.A., a bank holding company.  See WORLD BANK DIRECTORY 649 (2009-2010); *see also* Pascal Fletcher, *Cuba's Financial Sector Undergoing Facelift*, FIN. POST, June 18, 1996, at 57 ("[Banco Nacional de Cuba President] Sobern describes the new constellation of institutions in the Grupo Nueva Banca as 'non-state.'").

These two institutions are involved in twenty (20) of the thirty (30) blocked wire transfers at issue.  Banco Popular is involved in three (3), and Banco Nacional is involved in six (6).  No Cuban bank was identified as a participant in one (1) transaction.

[8] This motion is not directed at two of the Citibank wire transfers where a Cuban Government bank was either the originator or the originator's bank.

[9] Each bank produced its most recent annual report to OFAC, and also produced a schedule reflecting the salient information available from wire transfer messages for all of its blocked wire transfers involving Cuba, including information concerning the critical role of each party to the wire transfer.  Three of the banks, Citibank, JPM Chase and UBS, then produced documents with respect to various specified target accounts pursuant to supplemental subpoenas duces tecum. The filing and service of Petition III followed.

originators' banks.  In a few instances, the garnishee-respondents were the originating banks. (Kerr Decl., ¶12.)

If a determination cannot be made at this point that neither the beneficiary of a wire transfer nor the beneficiary's bank can, as a matter of law, have a property interest or a claim to the wire transfer proceeds blocked in the hands of an originating or intermediary bank, the garnishee-respondent banks will have no choice but to interplead all of the known parties to the wire transfers at issue in order to protect themselves from claims from the rightful owners of the blocked funds.  The extent of the burden imposed is made plain by the fact that each garnishee-respondent may need to bring claims in the nature of interpleader against as many as 48 parties, virtually all of which are located in foreign countries.  (Kerr Decl., ¶13.)

D.     The Blocking Regime Applicable to Transactions
       Involving Cuba

       1.     The Trading with the Enemy Act

The statutory basis for the blocking regime regulated by the Cuban Assets Control Regulations (the "CACRs," as previously defined), as issued by the U.S. Treasury Department Office of Foreign Assets Control ("OFAC"), is the Trading with the Enemy Act ("TWEA"), 50 U.S. C. App. § 1 *et seq.*  Section 5(b)(1) of TWEA provides in part as follows:

> "During the time of war or during any other period of national emergency declared by the President, the President may, through any agency that he may designate . . .
>
> (A)     investigate, regulate, or prohibit, any transactions in foreign exchange, transfers of credit or payment between, by, through, or to any banking institution . . . and
>
> (B)     investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest . . . ."

6

In 1977, Congress amended Section 5(b) so that its applicability no longer extended to national emergency situations during peacetime. *See* International Emergency Economic Powers Act ("IEEPA") of December 28, 1977, Pub. L. No. 95-223, 91 Stat. 1625 (1977).[10] Section 101(b) of TWEA, however, contained a clause permitting economic measures taken pursuant to § 5(b) prior to 1977 to be continued: "Upon a determination . . . [that such] extension . . . is in the national interest of the United States." The CACRs have been extended each year on this basis.

2.      The Cuban Asset Control Regulations

President Kennedy embargoed all trade with Cuba in 1963, and on July 8, 1963 promulgated the CACRs. Among other things, the CACRs block all property in the United States or under the control of a U.S. person in which the Government of Cuba has an "interest, including present, future or contingent interests." 31 C.F.R. § 515.201(a) and (a)(1); *see* 31 C.F.R. § 515.311. In defining what is a blockable interest, the CACRs cast a wide net, and define an "interest" in property as "an interest of any nature whatsoever, direct or indirect." 31 C.F.R. § 515.312. The CACRs have been construed to require the blocking of wire transfers, and the blocked wire transfers at issue here have been blocked pursuant to the CACRs.

3.      Terrorism Risk Insurance Act

Section 201(a) of the TRIA provides in pertinent part as follows:

> "Notwithstanding any other provision of law . . . , in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable."

TRIA § 201(a), codified at 28 U.S.C. § 1610 note.

---

[10] The President's power to take economic measures in peacetime is now governed by the International Emergency Powers Act. Pub. L. 95-223, § 201 *et seq.*, 91 Stat. 1626 (1977) (codified at 50 U.S.C. § 1701 *et seq.*).

7

## ARGUMENT

### I.

### NEW YORK LAW DEFINES THE SUBSTANTIVE
### PROPERTY RIGHTS MADE SUBJECT TO EXECUTION BY TRIA

Under TRIA, property may be attached if a judgment creditor meets three conditions: (1) the property against which the judgment creditor seeks execution must be an "asset"; (2) it must be the "asset" "of" a "terrorist party," or an "agency or instrumentality of that terrorist party";[11] and (3) it must be an "asset" that is "blocked." *See* TRIA § 201(a), codified at 28 U.S.C. § 1610 note. TRIA also authorizes a court to enter an order executing against blocked assets notwithstanding that the transfer of blocked property would otherwise be prohibited by federal law pursuant to blocking regulations like the CACRs. *See* TRIA § 201(a); 31 C.F.R. Part 515.

TRIA nowhere defines what an "asset" is or who has a property interest in an "asset" because it was not intended for TRIA to create ownership interests in property or to define substantive property rights.[12] Rather, as is often the case, interests in property are generally, if not presumptively, to be determined by reference to state law:

---

[11] In common usage, "asset" is defined by reference to an ownership interest in property. *See* BLACK'S LAW DICTIONARY 125-26 (9th ed. 2009) (defining "asset" as "an item that is owned"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 131 (1993) (defining "asset" as "an item of value owned"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1565 (1993) (defining "of" as "a function word indicating a possessive relationship"); AMERICAN HERITAGE COLLEGE DICTIONARY 82 (3d ed. 1997) (defining "asset" as "valuable item that is owned"). *See generally MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 225-28 (1994) (Scalia, J.) (looking to multiple dictionaries to ascertain a statutory phrase's meaning).

[12] TRIA *does not* define or modify any party's substantive rights in property or "assets." Section 201(d)(2)(A) of TRIA defines "blocked asset," in relevant part, as "any asset seized or frozen by the United States under . . . the Trading With the Enemy Act . . . or under . . . the International Emergency Economic Powers Act." This definition makes plain what it means for an asset to be blocked, but its use of the word "asset" to define "blocked asset" does not illuminate what property constitutes an "asset." Similarly, the CACRs, which required garnishee-respondents to block the EFTs at issue, do not define the term "asset." The CACRs make use of the term "asset," but do not explain its meaning. *See, e.g.,* 31 C.F.R. § 515.521(a) (allowing specific licenses to unblock the shares of U.S. residents in "U.S. located-assets of corporations formed under the laws of Cuba" if certain conditions are met); § 515.557(a) (allowing specific licenses for Cuban partnerships to "unblock[] the assets of the partnership").

"[i]n the absence of a superseding federal statute or regulation, state law generally governs the nature of any interests in or rights to property that an entity may have." *Export-Import Bank of the United States v. Asia Pulp & Paper Co., Ltd.* *("Asia Pulp & Paper")*, No. 09-2254-cv, 2010 U.S. App. LEXIS 12748, at *14 (2d Cir. June 22, 2010) (citing *Barnhill v. Johnson*, 503 U.S. 393, 398 (1992)).

In *Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd. ("Jaldhi")*, 585 F.3d 58 (2d Cir. 2009), the Second Circuit was called upon to consider the ownership of a midstream EFT in the context of an attempted attachment under maritime law:

"When there is no federal maritime law to guide our decision, we generally look to state law to determine property rights. Accordingly, we now look to state law to determine whether EFTs can be considered a 'defendant's' property for purposes of attachment under Rule B."

*Id.* at 70. In *Asia Pulp & Paper,* the Second Circuit reached a similar conclusion, and rejected the argument of the Export-Import Bank of the United States ("Ex-Im Bank") that interests purportedly reached by the Federal Debt Collection Procedures Act (the "FDCPA") should govern its attempt to execute against a midstream EFT.[13]

*Jaldhi* and *Asia Pulp & Paper* are also fully consistent with precedent in an OFAC sanctions context similar to that under consideration here because it is well recognized that a blockable interest under OFAC regulations is much broader than and different from an ownership interest. In *Centrifugal Casting Machine Co., Inc. v. American Bank & Trust Co.*, 966 F.2d 1348, 1351 (10th Cir. 1992), the Tenth Circuit looked to Oklahoma law and industry rules governing letters of credit to define the nature of the interests of different parties in a letter of credit to deny an attempt by the Office of Foreign Assets Control to block an account holding a down payment drawn from a letter of credit. *Id.* As the court has stated, "[w]e . . . are not at

---

[13] The FDCPA "broadly defines 'property' to 'include [] any present or future interest, whether legal or equitable, in real, personal (including choses in action), or mixed property, tangible or intangible, vested or contingent, wherever located and however held . . . .'" *Asia Pulp & Paper*, 2010 U.S. App. LEXIS 12748, at *12 (citation omitted). Unlike the FDCPA, TRIA does not create a federal enforcement mechanism, but simply removes certain jurisdictional obstacles to execution.

liberty to restructure the essential characteristics of a letter of credit in order to create a property interest that would not be recognized under the rules applicable to that internationally recognized financing instrument." *Id.*

Indeed, as was the case under federal maritime law and the FDCPA, TRIA and the CACRs "create[] no property rights but merely attach[] consequences, federally defined, to rights created under state law." *Asia Pulp & Paper*, 2010 U.S. App. LEXIS 12748, at *15 (in considering rights and interest under the FDCPA, and quoting *United States v. Craft*, 535 U.S. 274, 278 (2002) (internal quotation marks omitted)).

## II.

### THE CUBAN JUDGMENT DEBTORS POSSESS NO EXECUTABLE OWNERSHIP INTEREST IN THE BLOCKED EFTs

A.     The Blocked EFTs Are Not "Property" or "Assets" of the Cuban Bank Beneficiaries or Their Banks Under Article 4-A

Article 4-A of New York's Uniform Commercial Code governs the rights and obligations of parties to EFTs, including the rights of the creditors of EFT participants to attach funds involved in an EFT. Under Article 4-A, the proceeds of a blocked wire transfer in the hands of an originating or intermediary bank are not, as a matter of law, an "asset" of the beneficiary or the beneficiary's bank.

The New York State Legislature enacted Article 4-A in 1990[14] because "attempts to define rights and obligations in funds transfers by general principles or by analogy to [other more traditional areas of law] have not been satisfactory." *Asia Pulp & Paper*, 2010 U.S. App. LEXIS 12748, at *19 (quoting *Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 369 (1991)

---

[14] In fact, "Article 4-A has been adopted by every state, as well as the Board of Governors of the Federal Reserve System. Article 4-A, and its intent to shield EFTs from midstream attachment, thus [also] governs funds transfers made via the Federal Reserve's Fedwire system." *Asia Pulp & Paper*, 2010 U.S. App. LEXIS 12748, at *20 n.7 (citation omitted).

(quoting N.Y. U.C.C. § 4-A-102 cmt.)) (alteration in original). What resulted was "a body of unique principles of law that would address every aspect of the electronic funds transfer process and define the rights and liabilities of all parties involved in such transfers." *Banque Worms*, 77 N.Y.2d at 371. "[T]he drafters [of Article 4-A] made 'a deliberate decision . . . to write on a clean slate and to treat a funds transfer as a unique method of payment to be governed by unique rules that address the particular issues raised by this method of payment.'" *Banca Commerciale Italiana v. N. Trust Int'l Banking Corp.*, 160 F.3d 90, 95 (2d Cir. 1998) (quoting N.Y. U.C.C. § 4-A-102, cmt.).

Two recent and controlling Second Circuit cases have held that, under Article 4-A, neither the originator nor the beneficiary has any rights in a midstream EFT in the hands of an intermediary bank. In *Jaldhi*, the Second Circuit examined several provisions of Article 4-A of the New York Uniform Commercial Code, and concluded that, "[t]aken together, these provisions of New York law establish that EFTs are neither the property of the originator nor the beneficiary while briefly in the possession of an intermediary bank." *Jaldhi*, 585 F.3d at 70; *see also id.* at 71 ("'Neither the originator who initiates the payment nor the beneficiary who receives it holds title to the funds in the account at the correspondent bank.'" (quoting *Sigmoil Res., N.V. v. Pan Ocean Oil Corp. (Nigeria)*, 234 A.D.2d 103, 104 (1st Dep't 1996)).

In *Jaldhi* "the question of ownership [was] critical" because the text of Admiralty Rule B, pursuant to which the EFTs had been attached, authorized attachment only of "defendant's . . . property." 585 F.3d at 69, 71 (quoting Fed. R. Civ. P. Supp. R. B(1)(a)). The Second Circuit looked to the text of Rule B to determine whether attachment was authorized. *Asia Pulp & Paper* followed *Jaldhi's* lead in its examination of an execution under the FDCPA. "*Jaldhi* instructs that whether or not midstream EFTs may be attached or seized depends upon the nature

11

and wording of the statute pursuant to which attachment or seizure is sought." *Asia Pulp &*
*Paper*, 2010 U.S. App. LEXIS 12748, at *11.

Here, Petitioner has brought a turnover petition pursuant to N.Y. C.P.L.R. § 5225(b), as
authorized by Fed. R. Civ. P. 69. Accordingly, the terms of § 5225(b), which permits turnover
solely of a judgment debtor's "property," determine whether or not the blocked EFTs may be
made subject to turnover.[15]

The Second Circuit's opinion in *Asia Pulp & Paper* further forecloses any argument that
an intended beneficiary or originator holds an executable property interest in a midstream EFT.
In rejecting an attempt by the Ex-Im Bank to execute what it argued was an interest of the
judgment debtor in a mid-stream EFT, the Second Circuit concluded that "an originator or
intended beneficiary's interests and rights in a midstream EFT, *if any*, are not sufficiently
'essential,' 'material,' 'firmly or solidly established,' 'weighty,' or 'direct and tangible,' to
constitute a 'substantial . . . interest' under the FDCPA." *Asia Pulp & Paper*, 2010 U.S. App.
LEXIS 12748, at *30 (emphasis added).

B.     Article 4-A Expressly Addresses
       "Ownership" and the Rights of Creditors

Article 4-A expressly addresses the ownership of the "funds" involved in a wire
transfer.[16] This is accomplished directly in those sections of Article 4-A that govern the
remedies of attachment and execution available to creditors of participants in a wire transfer.

---

[15] N.Y. C.P.L.R. § 5225(b) provides, in pertinent part as follows: "where it is shown that the judgment
debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior
to those of the transferee, the court shall require [the garnishee] to pay the money, or so much of it as is sufficient to
satisfy the judgment to the judgment creditor. . . ."

[16] A parallel set of federal regulations issued by the Federal Reserve Board provides that attachment,
execution and other creditor remedies with respect to EFTs executed over Fedwire, the funds-transfer system
operated by the Federal Reserve Banks, are to be governed by Reg J. *See* 12 C.F.R. § 210.25(b)(3). Reg J in turn
incorporates the uniform provisions of Article 4-A of the UCC, which are set forth in Appendix B to Subpart B of
Reg J. The provisions governing creditor remedies found in Reg J are identical to the analogous provisions of
Article 4-A adopted in New York.

12

In particular, Article 4-A-502(4) identifies the entities from which a creditor can properly seek the attachment or garnishment of funds involved in a funds transfer:

> "Creditor process with respect to a payment by the originator to the beneficiary pursuant to a funds transfer may be served only on the beneficiary's bank with respect to the debt owed by that bank to the beneficiary [once a funds transfer has been initiated].  Any other bank served with the creditor process is not obligated to act with respect to the process." [17]

The Official Comment to Article 4-A-502 explains the reach of creditor process as follows:

> "A creditor of the originator can levy on the account of the originator in the originator's bank before the funds transfer is initiated, but that levy is subject to the limitations stated in subsection (b) [subsec. (2)].  The creditor of the originator cannot reach any other funds because no property of the originator is being transferred.  A creditor of the beneficiary cannot levy on the property of the originator and *until the funds transfer is completed by acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary, the beneficiary has no property interest in the funds transfer which the beneficiary's creditor can reach.*  A creditor of the beneficiary that wants to reach the funds to be received by the beneficiary must serve creditor process of the beneficiary's bank to reach the obligation of the beneficiary's bank to pay the beneficiary which arises upon acceptance by the beneficiary's bank under § 4A-404(a) [§ 4-A-404(1)]."

Article 4-A-502, Official Comment 4 (McKinney 2000) (emphasis added).  *See also* Thomas C. Baxter et al., THE ABCS OF THE UCC (ARTICLE 4A: FUNDS TRANSFERS) at 65 (citing *Reibor Int'l Ltd. v. Cargo Carriers (KACZ-Co.), Ltd.*, 759 F.2d 262, 266 (2d Cir. 1985)).[18]  The Second Circuit followed these rules to the letter in *Asia Pulp & Paper*, expressly relying on the language

---

[17] "'[C]reditor process' means levy, attachment, garnishment, notice of lien, sequestration, or similar process issued by or on behalf of a creditor or other claimant with respect to an account."  N.Y. U.C.C. § 4-A-502(1).

[18] The limitations that Article 4-A places on injunctive relief in the context of a funds transfer are similar:

> "For proper cause and in compliance with applicable law, a court may restrain (i) a person from issuing a payment order to initiate a funds transfer, (ii) an originator's bank from executing the payment order of the originator, or (iii) the beneficiary's bank from releasing the funds to the beneficiary or the beneficiary from withdrawing the funds.  *A court may not otherwise restrain a person from issuing a payment order, or otherwise acting in respect of a funds transfer.*"  Article 4A-503 (emphasis added).  *See also* Article 4-A-503, Official Comment (McKinney 2000).

from Official Comment 4 quoted above, 2010 U.S. App. LEXIS 12748, at \*20 (quoting N.Y. U.C.C. § 4-A-502 cmt. 4).[19]  Moreover, "[a]n originator and intended beneficiary have *no legal claim or contractual rights* against an intermediary bank in the event that a funds transfer is not completed." *Asia Pulp & Paper*, 2010 U.S. App. LEXIS 12748, at \*27 (emphasis added) (citing *Grain Traders, Inc. v. Citibank, N.A.*, 160 F.3d 97, 101-02 (2d Cir. 1998)).

When these rules are applied here, it is clear that there is no basis for executing against any of the blocked proceeds at issue on the ground they constitute "assets" of one of the Cuban Government beneficiary banks or beneficiaries.

C.     Article 4-A Has Comprehensive Rules
       that Govern the Rights of Parties to an
       Interrupted and Failed Wire Transfer

The starting point for understanding the comprehensive scheme of Article 4-A is its definition of "funds transfer." A "funds transfer" is not one transaction but a "series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order." N.Y. U.C.C. § 4-A-104(1). A "payment order" is an "instruction of a sender to a receiving bank . . . to pay, or to cause another bank to pay, a fixed or determinable amount of money to a beneficiary." N.Y. U.C.C. § 4-A-103(1)(a). A receiving bank "accepts a payment order when it executes the order." N.Y. U.C.C. § 4-A-209(1). "A payment order is 'executed' by the receiving bank when it issues a payment order intended to carry out the payment order received by the bank." N.Y. U.C.C. § 4-A-301.

Article 4-A defines the process by which a funds transfer reaches the intended beneficiary, but also determines when a transfer has failed and cannot be completed.

---

[19] In both *Jaldhi* and *Asia Pulp & Paper* separate panels of the Second Circuit have described the Official Comment to Article 4-A as "authoritative" and have relied on it in their opinions. *See Asia Pulp & Paper*, 2010 U.S. App. LEXIS 12748, at \*20 (quoting *Jaldhi*, 585 F.3d at 71).

Significantly, "[a]n unaccepted payment order is cancelled by operation of law at the close of the fifth funds-transfer business day of the receiving bank after the execution date or payment date of the order." N.Y. U.C.C. § 4-A-211(4). Here, the garnishee-respondents received the payments from the originating banks but did not "accept" the payment orders by "executing" them because they were prohibited from doing so by the CACRs. Accordingly, the payment orders were "unaccepted" and, after the passage of five funds-transfer business days, were cancelled by operation of law pursuant to § 4-A-211(4). As a result of the cancellation, the funds transfers failed.

Insofar as Petitioner's argument that the Cuban beneficiary banks and beneficiaries have an interest in the funds depends on the assumption that they will be entitled to receive the EFTs from the garnishee-respondent intermediary banks if and when they are unblocked, the cancellation effected by § 4-A-211(4) is fatal to Petitioner's theory. Under Article 4-A, "[a] cancelled payment order cannot be accepted." N.Y. U.C.C. § 4-A-211(5). Because the only way to complete a blocked funds transfer would be for the intermediary bank to "accept" the payment order by "executing" it, Article 4-A provides no means for a blocked, and hence "cancelled," transfer to continue on to its intended beneficiary.

Nor could the Cuban Government banks that are either beneficiaries of wire transfers or beneficiary's banks maintain a claim against the garnishee-respondent intermediary banks for failing to accept the funds transfers. Absent an express agreement creating such a duty, "a receiving bank . . . does not . . . have any duty to accept a payment order or, before acceptance, to take any action, or refrain from taking action, with respect to the order." N.Y. U.C.C. § 4-A-212. "A receiving bank is not the agent of the sender or beneficiary of the payment order it accepts, or of any other party to the funds transfer, and the bank owes no duty to any party to the funds transfer." N.Y. U.C.C. § 4-A-212. Section 4-A-212 reinforces the animating principle of

15

Article 4-A — the only rights created and recognized in a funds transfer are those created between parties in privity of contract.

D.   The Unwinding Rules of Article 4-A
     Require an Intermediary Bank to Return
     a Failed Payment to the Originating Bank

Article 4-A anticipates the possibility that a funds transfer may be interrupted and fail, and provides a framework for unwinding failed transfers.  Section 4-A-402(4) provides that when a bank that has received a payment (such as one of the intermediary banks involved here) by debiting the account of an originating bank sender who was not obligated to make the payment because the intermediary receiving bank did not, for whatever reason, "accept" the sender's payment order by sending it on,[20] that intermediary bank is obliged to refund payment to the originating bank sender.[21]  Such a circumstance could arise, for example, where applicable law, such as an OFAC blocking order, both prevents the intermediary bank from "accepting" the payment order and from returning the payment to the originating bank.  Under § 4-A-402(5), the so-called "money back guarantee" provision of Article 4-A, the first sender who included an instruction to route the payment order to the intermediary bank bears the risk that the intermediary bank will be unable to issue the refund to the bank that sent it the payment order.  Where an intermediary bank is obligated to refund a payment, but is unable to do so "because [it is] not permitted by applicable law," which is the case here, the bank that sent the intermediary bank the payment order (the originating bank) is generally permitted to retain the payment it

---

[20] "[A]cceptance of the order by the receiving bank obliges the sender to pay the bank the amount of the sender's order. . . . The obligation of that sender to pay its payment order is excused if the funds transfer is not completed by acceptance by the beneficiary's bank of a payment order instructing payment to the beneficiary of that sender's payment order."  N.Y. U.C.C. § 4-A-402(3).

[21] "If the sender of a payment order pays the order and was not obliged to pay all or part of the amount paid, the bank receiving payment is obliged to refund payment to the extent the sender was not obliged to pay."  N.Y. U.C.C. § 4-A-402(4).

received,[22] subject to the originator's claim for a refund from that originating bank. But because the originating bank is entitled to retain the payment it received from the originator until it has received the refund it is entitled to receive, the originator is only subrogated to the originating bank's right to a refund from the intermediary bank. *See Consub Del. LLC v. Schakin Eugentaria Limitada*, 676 F. Supp. 2d 162, 167-68, n.39 (S.D.N.Y. 2009).

In *Grain Traders Inc. v. Citibank, N.A.*, 160 F.3d 97, 101 (2d Cir. 1998), the Second Circuit interpreted the "money back guarantee" provision of § 4-A-402 and held that the text of § 4-A-402 and the official commentary

> "makes plain the intent of the Article 4-A drafters to effect an orderly unraveling of a funds transfer in the event that the transfer was not completed, and accomplished this by incorporating a 'privity' requirement into the 'money back guarantee' provision so that it applies only between the parties to a particular payment order and not to the parties to the funds transfer as a whole."

As recognized in *Grain Traders*, the purpose of § 4-A-402 is to dictate how a failed transfer is to be unwound. Unwinding a funds transfer is accomplished by refunding payments to parties in privity of contract with the intermediary bank. *Grain Traders* correctly observes that, in the event of a failed EFT, the only party with a claim under § 4-A-402 against the funds is the party to the EFT in privity with the intermediary bank, the originating bank.[23]

---

[22] "If a funds transfer is not completed as stated in subsection (3) and an intermediary bank is obliged to refund payment as stated in subsection (4) but is unable to do so because not permitted by applicable law or because the bank suspends payments, a sender in the funds transfer that executed a payment order in compliance with an instruction . . . to route the funds transfer through that intermediary bank is entitled to receive or retain payment from the sender of the payment order that it accepted. The first sender in the funds transfer that issued an instruction requiring routing through that intermediary bank is subrogated to the right of the bank that paid the intermediary bank to refund as stated in subsection (4)." N.Y. U.C.C. § 4-A-402(5).

[23] In *Goodearth Maritime Ltd. v. Calder Seacarrier Corp.*, No. 09-5068-cv, 2010 U.S. App. LEXIS 14450, at *7-8 (2d Cir. July 14, 2010) (summary order), a Second Circuit panel directed that an EFT subject to a pre-*Jaldhi* Rule B attachment be released to the intended beneficiary. The beneficiary had, subsequent to the attachment, obtained an arbitral award against the originator in the full amount of the EFT, and had asked the district court to release the EFT to it. *See Goodearth Maritime Ltd. v. Calder Seacarrier Corp.*, No. 08 Civ 2028 (RMB), Letter to Judge Berman from Baja Ferries USA LLC, at Docket No. 27 (S.D.N.Y. Nov. 6, 2009). In balancing the equities, the panel determined that the EFT should be released to the beneficiary, not the originator, and reversed an order returning it to the originator. *Goodearth*, 2010 U.S. App. LEXIS 14450, at *7-8.

Significantly, the unwinding practices followed by OFAC in lifting blocking regimes in the past have generally followed the unwinding rules set forth in Article 4-A. For example, in lifting the restraint imposed on wire transfers blocked because of an interest of Vietnam or a Vietnamese national, OFAC issued the following regulations:

> "Banking institutions subject to the jurisdiction of the United States are authorized to unblock and return to the remitting party funds that were blocked pursuant to this part because of an interest of Vietnam or a Vietnamese national and that came into their possession or control by wire transfer or check remittance received after December 31, 1989, provided that no funds are released to the Government of Vietnam or any person in Vietnam."

31 C.F.R. § 500.579(a). *See also* 31 C.F.R. § 500.579(b) (permitting the issuance of specific licenses "authorizing the return to the remitting party of funds that were blocked . . . because of an interest of North Korea or a national thereof"). In addition, while the unblocking of wire transfers blocked pursuant to the Federal Republic of Yugoslavia (Serbia and Montenegro) Kosovo Sanctions Regulations was subject to limitations not present in the case of the Vietnamese and North Korean situations referred to above, the pertinent regulation authorized

---

The order in *Goodearth*, a summary order made non-precedential by Second Circuit Rule § 32.1.1, cited the text of § 4-A-402 and *Grain Traders* for the proposition that the originator could not receive the funds directly from the intermediary bank because they were not in privity, but failed to explain how the statutory command of § 4-A-402 would permit the funds to be released to the beneficiary, a party equally lacking in privity. The order also relied on *The Bank of New York v. Norilsk Nickel*, 14 A.D.3d 140 (1st Dep't 2004), for the proposition that New York law did not prevent a release of the funds to the beneficiary, reflecting an apparent reluctance on the part of the court to strictly construe the unambiguous unwind provisions of Article 4-A.

*Norilsk Nickel* itself involved a misreading of Article 4-A and Article 4-A's interaction with the relevant OFAC regulations. Specifically, the court appeared to rely on 31 C.F.R. § 585.529(a)(1), which authorized "all transactions that otherwise would be prohibited" to hold that the UCC then "required that the funds be transferred to the rightful owner, [the intended beneficiary of the failed transfer]," without any reference to the OFAC regulations unblocking wire transfers contained in 31 C.F.R. § 585.526, or the pertinent provisions of Article 4-A. *See Norilsk Nickel*, 14 A.D.3d at 143, 147. The court apparently did not recognize that 31 C.F.R. § 585.529(a)(1) spoke only to *prospective* transactions or that Article § 4-A-402(5), *not* the OFAC blocking regulations, eliminated the future completion of a wire transfer after OFAC regulations had halted the transfer for more than five funds-transfer days. 31 C.F.R. 585.526.

Moreover, there is no reason to assume, and there is no allegation here, that the originators of the wire transfers subject to this motion engaged in inequitable conduct, or that the originators have failed to discharge their contractual obligations to the Cuban Bank beneficiaries.

U.S. financial institutions, subject to those limitations, to unblock and return to the remitting

party funds blocked pursuant to this part.  31 C.F.R. § 586.518(a); *compare with* 31 C.F.R.

§ 585.529; *see also* 31 C.F.R. §§ 585.526 and 585.529.

Finally, while it is possible that exceptions could be made in appropriate cases, we

understand that it is the almost unvarying practice of OFAC, when issuing specific licenses to

unblock wire transfers, to return the funds to the originator or originating financial institution, a

practice fully in keeping with Article 4-A.[24]

## III.

### PETITIONER CANNOT MEET HER BURDEN TO ESTABLISH THE CUBAN JUDGMENT DEBTORS' ENTITLEMENT TO POSSESSION OF THE BLOCKED EFTs AS REQUIRED BY N.Y. C.P.L.R. § 5225(b)

A.      New York's Turnover Statute Places the Burden on
        Petitioner to Establish the Judgment Debtor's Right
        to Possession of the Blocked EFTs

The New York turnover statute authorizes a court to order turnover only "where it is

shown that the judgment debtor is entitled to the possession of such property or that the judgment

creditor's rights to the property are superior to those of the transferee."  N.Y. C.P.L.R. § 5225(b).

The Second Circuit has interpreted this provision as setting out a two-part test:

> "First, it must be shown that the judgment debtor 'has an interest' in the property
> the creditor seeks to reach.  Where this first step is satisfied, the trial court must,
> second, then make one of two findings: it must find either that the judgment
> debtor is 'entitled to the possession of such property,' or it must find that 'the
> judgment creditor's rights to the property are superior' to those of the party in
> whose possession it is. Only after both steps of the analysis are demonstrated may
> the trial court order the transferee to turn over the property to the judgment
> creditor . . . ."

---

[24] Underlying Article 4-A's unwinding rules and the practices followed by OFAC as outlined above is the
fundamental rule set out in Section 404 of Article 4-A to the effect that the originator's obligation to pay the
beneficiary is discharged only when the beneficiary's bank accepts its sender's payment order.  If the wire transfer is
interrupted and cancelled by operation of law, the presumption is that the originator will discharge its contractual
obligation in some other way.

*Beauvis v. Allegiance Sec. Inc.*, 942 F.2d 838, 840-41 (2d Cir. 1991).

For the reasons explained in Point II of this Memorandum of Law, Petitioner cannot meet her burden[25] because controlling authority in this Circuit holds that the Cuban judgment debtors have no legal interest in the EFTs against which Petitioner seeks to execute. Recognizing that establishing a judgment debtor's interest in the property is a basic condition to turnover, several courts have addressed the issue *sua sponte*. In *Phoenician Trading Partners LP v. Iseson*, 2004 U.S. Dist. LEXIS 26938, at *7 (E.D.N.Y. 2004), the court carefully found that both prongs of § 5225(b) were met even though both the judgment debtor and the garnishee had defaulted. In ordering turnover the court explained that "[l]iability for purposes of a § 5225 . . . proceeding can be established through default . . . [b]ut before a default judgment can be entered, the Court must satisfy itself that the facts alleged are sufficient to state a claim for relief." *See also Erin Capital Mgmt., LLC v. Celis*, 854 N.Y.S.2d 640, 642 (N.Y. Dist. Ct. 2008) (denying unopposed § 5225(a) petition because "[t]he court will not 'compel the judgment debtor to deliver property that has not clearly been shown to be in the judgment debtor's possession or control.'" (citation omitted)). The New York Court of Appeals also recognized a garnishee's right to challenge the judgment debtor's interest in the property in *Sochor v. Int'l Bus. Machines*, 60 N.Y.2d 254, 258 (1983) (denying turnover petition where garnishee former employer of judgment debtor contested non-party judgment debtor's interest in pension plan).[26]

---

[25] With respect to the fourth account identified in Exhibit E, Petitioner alleges no facts identifying Banco Financiero's role in the EFT. The bare assertion that this account is held in Banco Financiero's name is therefore insufficient to meet Petitioner's burden under N.Y. C.P.L.R. § 5225(b).

[26] This result is consistent with the statutory text. Section 5225(b) provides that "[c]osts of the proceeding shall not be awarded against a *person* who did not dispute the judgment debtor's interest or right to possession." N.Y. C.P.L.R. § 5225(b) (emphasis added). The statute contemplates that a "person" may dispute the judgment debtor's interest, risking the costs of the proceeding if she is unsuccessful. The Legislature chose to use the term "person" instead of "adverse claimant" to describe those who might contest the judgment debtor's interest, though "adverse claimant" is used just two sentences later in subsection (b). Unless a judgment debtor or adverse claimant were to intervene, the only other "person" who is a party to a § 5225(b) turnover proceeding is the garnishee.

B.    Garnishees are "Interested Persons"

Moreover, garnishee-respondents are "interested persons" within the meaning of Article 52 of the C.P.L.R. and are thus entitled to raise Petitioner's failure to meet her burden. *See* N.Y. C.P.L.R. § 5239 ("[A]ny interested person may commence a special proceeding against the judgment creditor or other person with whom a dispute exists to determine rights in the property or debt."). In *Swezey v. Merrill Lynch*, Index No. 104734/09, 2009 N.Y. Misc. LEXIS 5144, at *7 (N.Y. Sup. Ct. Nov. 5, 2009), the judgment creditors sought to attach the assets of a Panamanian corporation founded by the judgment debtor that were held by Merrill Lynch in New York.  The court allowed Merrill Lynch, as garnishee, to move to dismiss the § 5225(b) petition for failing to join certain relevant parties, and permitted two other parties to intervene to contest the judgment debtor's interest in the property.  *Id.*  The court specifically rejected the Petitioner's argument that only those who have "adverse claims" to such assets may intervene pursuant to § 5239:  "Intervention in a turnover proceeding is not limited only to parties claiming an ownership interest in the judgment debtor's property or debt.  CPLR 5239 permits 'any interested person . . . with whom a dispute exists to determine rights in the property or debt' to intervene." *Id.* at *23.

Similarly, garnishee-respondents are "interested persons" within the meaning of Article 52: they are in possession of the blocked EFTs, are already parties to the § 5225(b) turnover proceeding (and need not intervene), contend that other entities have interests in the EFTs that are superior to the interest of Cuban judgment creditors, and that, in any event, the Cuban judgment debtors do not have an interest in the blocked EFTs.  Garnishee-respondents are in actual possession of the blocked EFTs, have existing banking clients with superior claims to title to such funds pursuant to Article 4-A, and most importantly, were made parties to this proceeding by Petitioner's own volition.  It would be inconsistent with the New York courts'

21

construction of Article 52 to grant a petition compelling garnishee-respondents to turn over funds without recognizing the deficiencies in such petition, as articulated by garnishee-respondents.

## CONCLUSION

As a matter of New York law, neither a beneficiary nor a beneficiary's bank has a legally cognizable claim against an intermediary bank in an EFT for the funds held by that bank. The blocked EFTs cannot therefore be described as either "property" or "assets" of the Cuban judgment debtors or their agencies or instrumentalities, and the Petition for Turnover should therefore be dismissed as it relates to all such EFTs.

Dated:   New York, New York
         July 28, 2010

DAVIS POLK & WARDWELL LLP

By: _____
     James L. Kerr

450 Lexington Avenue
New York, New York 10017
(212) 450-4552
James.Kerr@davispolk.com
*Attorneys for Bank of America, National
Association, Citibank, N.A., JPMorgan
Chase Bank, N.A., The Royal Bank of
Scotland N.V. (formerly known as ABN
AMRO Bank N.V.), and UBS AG*

**Of Counsel**
Karen E. Wagner
Rajesh James
Ian C. Richardson