UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

JEANNETTE HAUSLER,               :
                                 :
              Petitioner,         :
         v.                      :
                                 :
JP MORGAN CHASE, N.A.,           :    No. 09 Civ. 10289 (VM)
CITIBANK, N.A., UBS AG, ABN      :
AMRO BANK, N.V., and BANK OF     :
AMERICA CORPORATION,             :
                                 :
              Respondents.        :
                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM OF LAW FOR *AMICUS CURIAE* THE CLEARING HOUSE ASSOCIATION L.L.C. IN OPPOSITION TO THE PETITION

H. Rodgin Cohen
Bruce E. Clark
David L. Breau
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
(212) 558-4000
ClarkB@Sullcrom.com

*Counsel for The Clearing House Association L.L.C.*

July 29, 2010

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ..................................................................................... 1

BACKGROUND ............................................................................................................. 4

ARGUMENT .................................................................................................................... 8

I.  U.S. SANCTIONS AGAINST CUBA EXTEND TO TRANSACTIONS THAT INVOLVE PROPERTY IN WHICH CUBA HAS ANY INTEREST OF ANY NATURE WHATSOEVER, DIRECT OR INDIRECT ........................................ 8

II.  TRIA IS LIMITED TO THE TURNOVER OF ASSETS THAT ARE THE PROPERTY OF A TERRORIST PARTY OR ITS AGENCIES OR INSTRUMENTALITIES ..................................................................................... 10

    A.  Under Applicable State Law, EFTs in the Hands of Intermediary Banks Are Not Property of Either Originators or Beneficiaries ........................... 11

    B.  TRIA Does Not Conflict With—and Thus Cannot Preempt—the Property Interests Established Under Article 4A of the U.C.C. ........................... 18

    C.  The Amounts in the Blocked Accounts at Issue Are Not Subject to Turnover Under TRIA Because They Are Not the Property of the Cuban Beneficiaries Against Whom Petitioner Holds a Judgment ...................... 21

CONCLUSION................................................................................................................. 22

## <u>TABLE OF AUTHORITIES</u>

*Page(s)*

### Cases

*Aqua Stoli Shipping Ltd.* v. *Gardner Smith Pty Ltd.*,
    460 F.3d 434 (2d Cir. 2006) ..................................................................................1

*Bank of N.Y.* v. *Norilsk Nickel*,
    14 A.D.3d 140 (N.Y. App. Div. 2004) ........................................................... *passim*

*Banque Worms* v. *BankAmerica Int'l*,
    77 N.Y.2d 362 (1991).................................................................................5, 19

*Butner* v. *United States*,
    440 U.S. 48 (1979).....................................................................................2, 11

*Chem. Bank* v. *Affiliated FM Ins. Co.*,
    196 F.3d 373 (2d Cir. 1999) ..................................................................................1

*Consub Delaware LLC* v. *Schahin Engenharia Limitada*,
    543 F.3d 104 (2d Cir. 2008) ..................................................................................1

*Crosby* v. *Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000).........................................................................................18

*Det Bergenske Dampskibsselskab* v. *Sabre Shipping Corp.*,
    341 F.2d 50 (2d Cir. 1965) ................................................................................20

*European Am. Bank* v. *Bank of Nova Scotia*,
    12 A.D.3d 189 (N.Y. App. Div. 2004) ..........................................................14, 20

*Export-Import Bank of the U.S.* v. *Asia Pulp & Paper Co., Ltd.*,
    No. 09-2254-cv, 2010 WL 2490392 (2nd Cir. June 22, 2010)......................... *passim*

*Global Relief Found., Inc.* v. *O'Neill*,
    315 F.3d 748 (7th Cir. 2002) ..............................................................................19

*Goodearth Maritime Ltd.* v. *Calder Seacarrier Corp.*,
    No. 08 Civ. 2028 (RMB), 2010 WL 2856533 (S.D.N.Y. July 21, 2008)................15

*Goodearth Maritime Ltd.* v. *Calder Seacarrier Corp.*,
    No. 09-5068-cv, 2010 WL 2758695 (2d Cir. July 14, 2010) ........................... *passim*

*Grain Traders, Inc.* v. *Citibank, N.A.*,
    160 F.3d 97 (2d Cir. 1998) .........................................................................1, 16, 20

*Havana Club Holding, S.A.* v. *Galleon S.A.*,
    203 F.3d 116 (2d Cir. 2000) ................................................................................9

## TABLE OF AUTHORITIES
*(continued)*

*Pages(s)*

*Heaton* v. *United States*,
   353 F.2d 288 (9th Cir. 1965) ............................................................................10

*Holy Land Found. for Relief & Dev.* v. *Ashcroft*,
   219 F. Supp. 2d 57 (D.D.C. 2002) ....................................................................9

*Holy Land Found. for Relief & Dev.* v. *Ashcroft*,
   333 F.3d 156 (D.C. Cir. 2003) .........................................................................19

*In re Rodgers*,
   333 F.3d 64 (2d Cir. 2003) ..............................................................................12

*Jones* v. *Rath Packing Co.*,
   430 U.S. 519 (1977) ....................................................................................18, 19

*Madeira* v. *Affordable Hous. Found., Inc.*,
   469 F.3d 219 (2d Cir. 2006) ............................................................................18

*N.Y. Tel. Co.* v. *N.Y. State Dep't of Labor*,
   440 U.S. 519 (1979) ........................................................................................18

*Phillips* v. *Washington Legal Found.*,
   524 U.S. 156 (1998) ........................................................................................11

*Regan* v. *Wald*,
   468 U.S. 222 (1984) ......................................................................................2, 9

*Reibor Int'l Ltd.* v. *Cargo Carriers (KACZ-CO.) Ltd.*,
   759 F.2d 262 (2d Cir. 1985) ..........................................................................5, 20

*Secs. & Exchange Comm'n* v. *Credit Bancorp, Ltd.*,
   279 F. Supp. 2d 247 (S.D.N.Y. 2003) ............................................................12

*Shipping Corp. of India Ltd.* v. *Jaldhi Overseas Pte Ltd.*,
   585 F.3d 58 (2d Cir. 2009) ..................................................................... *passim*

*United States* v. *Quong*,
   303 F.2d 499 (6th Cir. 1962) ...........................................................................10

*Weininger* v. *Castro*,
   462 F. Supp. 2d 457 (S.D.N.Y. 2006) .........................................................10, 11

*Winter Storm Shipping, Ltd.* v. *TPI*,
   310 F.3d 263 (2d Cir. 2002) ............................................................................14

# TABLE OF AUTHORITIES
*(continued)*

*Pages(s)*

## Statutes, Regulations and Rules

28 U.S.C. § 3205.................................................................................................13

31 C.F.R. § 515.201.........................................................................................9, 21

31 C.F.R. § 515.311.........................................................................................9, 18

31 C.F.R. § 515.312.......................................................................................18, 21

31 C.F.R. § 515.319.............................................................................................9

31 C.F.R. § 585.303...........................................................................................19

31 C.F.R. Part 515.............................................................................................2

50 U.S.C. § 1701...............................................................................................9

50 U.S.C. app. § 5(b).........................................................................................2

FED. R. CIV. P. supp. B.......................................................................................12

Federal Reserve System Regulation J, 12 C.F.R. Pt. 210.......................................5

N.Y. U.C.C. § 4A-104.............................................................................2, 3, 6, 16

N.Y. U.C.C. § 4A-209.......................................................................................16

N.Y. U.C.C. § 4A-211.......................................................................................14

N.Y. U.C.C. § 4A-402...................................................................................14, 16

N.Y. U.C.C. § 4A-403.........................................................................................3

N.Y. U.C.C. § 4A-502.................................................................................7, 12, 14

TRIA § 201, 28 U.S.C. § 1610 note.............................................................10, 11, 18

## Other Authorities

CHIPS Annual Statistics from 1970 to 2010 (Reported June 2010).............................5

PEB Commentary No. 16 Sections 4A-502(d) and 4A-503 (July 1, 2009).....................7

Presidential Determination No. 2009-27, 74 Fed. Reg. 47,431 (Sept. 11, 2009)............9

## PRELIMINARY STATEMENT

The Clearing House Association L.L.C. ("The Clearing House") is an association of leading commercial banks which, through an affiliate, provides payment, clearing and settlement services to its member banks and numerous other financial institutions.[1]  Courts have often accepted amicus curiae briefs from The Clearing House in matters involving electronic funds transfers ("EFTs" or "funds transfers") and other issues of significance to the banking community.[2]

The Clearing House respectfully requests that the Court consider this memorandum of law addressing the important systemic banking issues raised by the petition under Section 201 of the Terrorism Risk Insurance Act of 2002 ("TRIA") for the turnover of the amounts of EFTs from Cuban originators or *en route* to Cuban beneficiaries that Respondents, acting as intermediary banks, placed in blocked accounts as required by U.S. economic sanctions against Cuba.  The Clearing House objects to the turnover of the funds Petitioner seeks because such a result would conflict with the law that governs funds transfers adopted by all 50 states and the Federal Reserve System (the "Federal Reserve").

TRIA authorizes the execution of a judgment against a terrorist party to garnish the blocked assets of that terrorist party or its agencies or instrumentalities.  Analysis of whether

---

[1]  The members of The Clearing House are:  Bank of America, N.A.; The Bank of New York Mellon; Capital One, N.A.; Citibank, N.A.; Deutsche Bank Trust Company Americas; HSBC Bank USA, N.A.; JPMorgan Chase Bank, N.A.; The Royal Bank of Scotland N.V.; UBS AG; U.S. Bank N.A.; and Wells Fargo Bank, N.A.  The Respondents here, including The Royal Bank of Scotland N.V., formerly known as ABN AMRO Bank N.V., are members of The Clearing House.

[2]  *See, e.g., Shipping Corp. of India Ltd.* v. *Jaldhi Overseas Pte Ltd.*, 585 F.3d 58 (2d Cir. 2009); *Consub Delaware LLC* v. *Schahin Engenharia Limitada*, 543 F.3d 104 (2d Cir. 2008); *Aqua Stoli Shipping Ltd.* v. *Gardner Smith Pty Ltd.*, 460 F.3d 434 (2d Cir. 2006); *Chem. Bank* v. *Affiliated FM Ins. Co.*, 196 F.3d 373 (2d Cir. 1999); *Grain Traders, Inc.* v. *Citibank, N.A.*, 160 F.3d 97 (2d Cir. 1998).

property may be garnished under TRIA should start with consideration of underlying state law and then proceed to consideration of whether that law is preempted by a clear mandate of federal law. *See Butner* v. *United States*, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law.").  Petitioner claims that these blocked assets are assets of the supposed beneficiaries of the transfers but, as shown below, neither the originator nor the beneficiary of an EFT has any property right with respect to the proceeds of an EFT held under the Cuban Assets Control Regulations (the "CACRs") by an intermediary bank in the funds-transfer process. [3] Nothing in the language or legislative history of TRIA or the CACRs suggests that they preempt the application of state law to determine who has property interests in the amounts of fund transfers held at an intermediary bank.

Under New York law—indeed, under every state's law—the underlying property rights and interests of parties to commercial electronic funds transfers are governed by Article 4A of the Uniform Commercial Code ("U.C.C."). *Shipping Corp. of India Ltd.* v. *Jaldhi Overseas Pte Ltd.*, 585 F.3d 58, 70 (2d Cir. 2009).  Under that Article, a funds transfer is defined as a "series of transactions, beginning with the originator's payment order . . . . [and] includ[ing] any payment order issued by the originator's bank or an intermediary bank intended to carry out the originator's payment order." N.Y. U.C.C. § 4A-104(1).  In typical funds transfers, such as those at issue here, an originator sets the process in motion by instructing its bank to send a payment order to the beneficiary's bank or, if the originator's bank and beneficiary's bank are not members of the same payments system, which often is the case in international funds

---

[3]    In 1963, the United States imposed economic sanctions against Cuba.  To implement those sanctions, the Office of Foreign Assets Control ("OFAC") promulgated the CACRs, 31 C.F.R. Part 515, pursuant to Section 5(b) of the Trading With the Enemy Act of 1917 ("TWEA"), 40 Stat. 415, *codified as amended at* 50 U.S.C. app. § 5(b); *see Regan* v. *Wald*, 468 U.S. 222, 225-29 (1984).

transfers, to an intermediary bank.  N.Y. U.C.C. § 4A-104(2).  There is no "fund" or money that

belongs to the originator or the beneficiary that passes from one bank to the other.  Instead, the

originator's bank debits the originator's account before sending a corresponding payment order

(thus exchanging a debt owed to the originator for an obligation in the same amount to the

beneficiary's bank or an intermediary bank), and in the next step pays the beneficiary's bank or,

if necessary, an intermediary bank (in exchange for an obligation by that intermediary bank to

pay the amount of the funds transfer to the next bank in the funds-transfer chain).[4]

      Under this process, an intermediary bank never holds property of the originator or

beneficiary.  *Jaldhi*, 585 F.3d at 71.  The intermediary bank's relationships are only with, and its

obligations are only to, other banks.  Neither the originator nor the beneficiary has a claim

against the intermediary bank for the amount of the funds transfer.

      These undisputed rules are not preempted by anything in TRIA or the CACRs.

TRIA does not create property rights with respect to blocked assets nor does it purport to define

them in any way.  And although the CACRs require the seizure of any assets in which Cuba or a

Cuban national has an interest of any nature whatsoever, the CACRs do not redefine the rights

and liabilities with respect to the property that is seized.  In effect, banks as a practical matter

simply have blocked anything "Cuban" so as not to be in violation.  When an intermediary bank

is required to block the proceeds of a funds transfer pursuant to the CACRs, the funds-transfer

process is simply frozen in place, but the rights and liabilities of the parties established by Article

4A of the U.C.C. otherwise remain unaffected.  *Bank of New York* v. *Norilsk Nickel*, 14 A.D.3d

140, 147 (N.Y. App. Div. 2004).  Therefore, because the amounts held in the blocked accounts at

---

[4]     A sender may pay the receiving bank by crediting an account of the receiving bank on the
sender's books, by authorizing the receiving bank to debit an account of the sender on the
receiving bank's books, by causing another bank to credit an account of the receiving bank, or by
settlement through a funds-transfer system or a Federal Reserve Bank.  N.Y. U.C.C. § 4A-403(1).

issue here are not the property of either the originators or the beneficiaries of the EFTs, Petitioner is not entitled to turnover of those funds under TRIA.

The question whether TRIA and the CACRs preempt Article 4A's provisions regarding property rights in funds held by an intermediary bank has important policy implications for the entire funds-transfer system. The rules that govern the funds-transfer system in the United States must be uniformly applied to ensure that the system operates with certainty, speed and efficiency. "Undermining the efficiency and certainty of fund transfers in New York could, if left uncorrected, discourage dollar-denominated transactions and damage New York's standing as an international financial center." *Jaldhi*, 585 F.3d at 62. The impact of the Second Circuit's now-overturned decision in *Winter Storm* provides a cautionary example of the negative consequences that can result from creating rights outside of Article 4A. Allowing the judgment creditor of an intended beneficiary to attach funds held by an intermediary bank—in direct contravention of Article 4A—would undermine the uniformity so crucial to the system's operation and could lead to consequences similar to those that followed *Winter Storm*.

The Clearing House understands that this case, which seeks a monetary remedy for alleged extrajudicial torture and murder, presents a particularly sympathetic case for relief. But unless the integrity of the funds-transfer system is upheld consistently, including in difficult cases, then the benefits of the system are at risk. This is particularly true where, as here, the underlying judgment is an out-of-state default judgment being used in an attempt to appropriate amounts being held in blocked accounts at New York intermediary banks.

## BACKGROUND

### 1. The Clearing House's Interest

The Clearing House has a substantial interest in the questions presented in this case. The U.S. dollar is the world's leading currency for international trade, and a large portion

-4-

of international funds transfers involving U.S. dollars is routed through The Clearing House banks because of their positions as leading financial institutions and their widespread correspondent bank networks.   Numerous other banks hold accounts with The Clearing House banks, which often act as intermediary banks in U.S.-dollar funds transfers.   The Second Circuit has recognized that The Clearing House has an important role in funds transfers.   *See Reibor Int'l Ltd.* v. *Cargo Carriers (KACZ-CO.) Ltd.*, 759 F.2d 262, 264 n.1 (2d Cir. 1985).   The Clearing House's payments affiliate, The Clearing House Payments Company L.L.C., operates the Clearing House Interbank Payments System ("CHIPS"), a funds-transfer system that serves 49 U.S. and foreign banks and that each day processes on average over 350,000 payment orders, with an average daily value of $1.434 trillion as of June 30, 2010.[5]

Funds transfers have long been an integral component of business transactions and the general economy.   The operation of the funds-transfer system in the United States requires a uniform set of rules.   *See Banque Worms* v. *BankAmerica Int'l*, 77 N.Y.2d 362, 372 (1991) ("National uniformity in the treatment of electronic funds transfers is an important goal [of Article 4A of the U.C.C.]").   Hence, all fifty states and every U.S. territory (with the exception of Guam), as well as the Federal Reserve, have adopted Article 4A of the U.C.C. to determine the rights, duties, and liabilities of parties involved in the funds-transfer process.   *See* Federal Reserve System Regulation J, 12 C.F.R. Pt. 210.   Thus, there is no concern here that applying Article 4A of the U.C.C. in turnover proceedings under TRIA would enmesh the government in conflicting state laws or undercut the need for consistency.   To the contrary, the uniformity that is critical to the efficient operation of the funds-transfer system would be undercut if Article 4A were preempted in such proceedings.

---

[5]       *See* CHIPS Annual Statistics from 1970 to 2010 (Reported June 2010), *at* http://www.chips.org/docs/000652.pdf.

2.  **The Mechanics of Funds Transfers**

Properly understood, a funds transfer is a "series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order." N.Y. U.C.C. § 4A-104(1).  There is no "fund" or money that belongs to the originator that passes from one bank to another.  The Second Circuit recently explained this process as follows:

> An EFT is nothing other than an instruction to transfer funds from one account to another. When the originator and the beneficiary each have accounts in the same bank that bank simply debits the originator's account and credits the beneficiary's account.  When the originator and beneficiary have accounts in different banks, the method for transferring funds depends on whether the banks are members of the same wire transfer consortium.  If the banks are in the same consortium, the originator's bank debits the originator's account and sends instructions directly to the beneficiary's bank upon which the beneficiary's bank credits the beneficiary's account.  If the banks are not in the same consortium—as is often true in international transactions—then the banks must use an intermediary bank.  To use an intermediary bank to complete the transfer, the banks must each have an account at the intermediary bank (or at different banks in the same consortium).  After the originator directs its bank to commence an EFT, the originator's bank would instruct the intermediary to begin the transfer of funds. The intermediary bank would then debit the account of the bank where the originator has an account and credit the account of the bank where the beneficiary has an account.  The originator's bank and the beneficiary's bank would then adjust the accounts of their respective clients.

*Jaldhi*, 585 F.3d at 60 n.1.

Article 4A of the U.C.C. makes clear that, under this process, an intermediary bank never holds property of the originator or beneficiary.  Relying on Article 4A, the Second Circuit held in *Jaldhi* that "a beneficiary has no property interest in an EFT because 'until the funds transfer is completed by acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary, the beneficiary has no property interest in the funds transfer which the

beneficiary's creditor can reach.'" 585 F.3d at 71 (quoting N.Y. U.C.C. § 4A-502 cmt. 4).[6]  The

reason this is so, according to commentary of the Permanent Editorial Board for the U.C.C. upon

which another recent Second Circuit panel relied, is that

> "[t]he intermediary bank has no contractual obligation to the
> originator or to the beneficiary, and neither the originator nor the
> beneficiary has any contractual obligation to or rights flowing from
> the intermediary bank.  Thus, credits in an intermediary bank are
> credits in favor of the originator's bank, *and are not property of
> either the originator or the beneficiary*."

*Export-Import Bank of the U.S.* v. *Asia Pulp & Paper Co., Ltd.*, No. 09-2254-cv, 2010 WL

2490392, at *6 (2nd Cir. June 22, 2010) (quoting PEB Commentary No. 16 Sections 4A-502(d)

and 4A-503, at 2 (July 1, 2009)) (emphasis added).[7]  If, as here, a funds transfer is not

completed, the intermediary bank has no obligation to either the originator or the beneficiary (or

their creditors) precisely because, as the Second Circuit has repeatedly held, the intermediary

bank holds no property of either the originator or the beneficiary.  *See Asia Pulp & Paper*, 2010

WL 2490392, at *6; *Jaldhi*, 585 F.3d at 70-71.

### 3.  The Present Proceeding under TRIA

Petitioner Jeannette Hausler obtained a default judgment in Florida state court for

$100 million in compensatory damages and $300 million in punitive damages against The

Republic of Cuba, Fidel Castro Ruz, Raul Castro Ruz, the Cuban Revolutionary Armed Forces

and El Ministerio del Interior for the extrajudicial torture and killing of her brother, Robert Otis

Fuller.  On August 20, 2008, the United States District Court for the Southern District of Florida

gave full faith and credit to the Florida state court judgment, and on September 24, 2008, the

---

[6]     *Jaldhi* characterized comment 4 to U.C.C. § 4A-502 as "authoritative."  585 F.3d at 71.

[7]     PEB Commentary No. 16 Sections 4A-502(d) and 4A-503 (July 1, 2009) is also available at
        http://extranet.ali.org/directory/files/COMMENTARY-4A-502(d)%20and%204A-503-final.pdf.

district court's judgment was registered in the United States District Court for the Southern District of New York.

In May 2009, the Clerk of this Court levied a writ of execution upon certain financial institutions in New York, including Respondents, pursuant to Section 201 of TRIA. In response to the levy, Respondents advised that until a court determined whether any of the blocked assets held by Respondents was subject to execution under TRIA, those assets remained frozen and could not be turned over to the United States Marshall. In response to Petitioner's subpoenas, Respondents produced documents listing 30 blocked accounts held by Respondents pursuant to the CACRs which contain the proceeds of funds transfers for which Respondents were the intermediary banks and in which a Cuban bank had an interest sufficient to require seizure under the CACRs. Of these 30 blocked transfers, Cuban banks were the beneficiaries, the beneficiaries' banks, or both for 27. On July 6, 2010, Petitioner filed Petition III For Turnover Order Pursuant to Federal Rule of Civil Procedure Rule 69 and CPLR § 5225(b) (the "Petition") under Section 201 of TRIA in which Petitioner seeks the turnover of funds held in these accounts. This memorandum of law addresses issues of particular importance to The Clearing House raised by the Petition.

## ARGUMENT

### I.   U.S. SANCTIONS AGAINST CUBA EXTEND TO TRANSACTIONS THAT INVOLVE PROPERTY IN WHICH CUBA HAS ANY INTEREST OF ANY NATURE WHATSOEVER, DIRECT OR INDIRECT.

The CACRs as amended prohibit certain types of transactions that are "by, or on behalf of, or pursuant to the direction of" Cuba or a Cuban national or that "involve property in which [Cuba or a Cuban national] has at any time on or since [July 8, 1963] had any interest of

any nature whatsoever, direct or indirect." 31 C.F.R. § 515.201(a).[8] The list of prohibited types of transactions includes "all payments between, by, through, or to any banking institution or banking institutions" subject to the jurisdiction of the United States. *Id.* § 515.201(a)(1).

The CACRs are not limited to transactions involving property owned by Cuba or a Cuban national. Rather, the CACRs prohibit a transaction whenever Cuba or a Cuban national "has an interest of 'any nature whatsoever, direct or indirect,'" in the property involved in the transaction. *Havana Club Holding, S.A.* v. *Galleon S.A.*, 203 F.3d 116, 122 (2d Cir. 2000) (quoting 31 C.F.R. § 515.311). Accordingly, intermediary banks are required to place the proceeds of an EFT in an interest-bearing blocked account[9] whenever the transaction is "by, or on behalf of, or pursuant to the direction of" Cuba, 31 C.F.R. § 515.201(a), without determining when Cuba or a Cuban national has an actual property interest in those funds.

Courts have recognized the breadth of OFAC regulations with respect to defining the interest in property that subjects that property to seizure, and "have repeatedly upheld OFAC's authority to interpret broadly the term 'any interest' in the identical provisions of the IEEPA,[10] and its predecessor statute, the TWEA." *Holy Land Found. for Relief & Dev.* v. *Ashcroft*, 219 F. Supp. 2d 57, 67 (D.D.C. 2002); *Heaton* v. *United States*, 353 F.2d 288, 291 (9th

---

[8]     Congress amended TWEA in 1977 to limit presidential authority under TWEA solely to times of war, and enacted the International Emergency Economic Powers Act ("IEEPA"), Pub. L. No. 95-223, 91 Stat. 1626, *codified at* 50 U.S.C. § 1701 *et seq.*, to authorize the peacetime imposition of economic sanctions, *Wald*, 468 U.S. at 227-28. However, sanctions in effect at that time, such as those against Cuba, were grandfathered, subject to annual reauthorization by the President. *See id.* Presidents have reauthorized the exercise of TWEA Section 5(b) authority with respect to Cuba every year since 1977, most recently on September 11, 2009. *See* Presidential Determination No. 2009-27, 74 Fed. Reg. 47,431 (Sept. 11, 2009).

[9]     A "blocked account" is "an account in which [Cuba or a Cuban national] has an interest, with respect to which account payments, transfers or withdrawals or other dealings may not be made or effected" without a license. 31 C.F.R. § 515.319.

[10]     *See supra* note 8.

Cir. 1965) (holding that sanctions against China apply "without regard to who may hold title to the goods"); *United States* v. *Quong*, 303 F.2d 499, 503 (6th Cir. 1962) ("The term 'any interest' [in the Chinese sanctions regulations] must be defined in the broadest sense and includes any interest whatsoever, direct or indirect."). Thus, OFAC blocking regulations are "based on interests in property and the use to which such property [is] put, not based on who own[s] the property in question." *Bank of N.Y.* v. *Norilsk Nickel*, 14 A.D.3d 140, 147 (N.Y. App. Div. 2004).

## II.   TRIA IS LIMITED TO THE TURNOVER OF ASSETS THAT ARE THE PROPERTY OF A TERRORIST PARTY OR ITS AGENCIES OR INSTRUMENTALITIES.

Congress enacted TRIA in 2002 "in order to 'deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism in any court of competent jurisdiction by enabling them to satisfy such judgments through the attachment of blocked assets of terrorist parties.'" *Weininger* v. *Castro*, 462 F. Supp. 2d 457, 483 (S.D.N.Y. 2006) (Marrero, J.). Section 201(a) of TRIA provides, in relevant part:

> Notwithstanding any other provision of law . . ., in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a), *codified at* 28 U.S.C. § 1610 note.[11]

---

[11]   This Court has previously held that Cuba is a "terrorist party" under TRIA. *Weininger*, 462 F. Supp. 2d at 479.

TRIA defines a "blocked asset" as "any asset seized or frozen by the United States under section 5(b) of [TWEA] or under sections 202 and 203 of [IEEPA]." *Id.* § 201(d)(2). But TRIA does not make *all* assets seized or frozen under TWEA or IEEPA subject to execution or attachment. Rather, by its terms, such assets, including funds held in blocked accounts pursuant to the CACRs, are subject to attachment or execution under TRIA only if such funds are the property of a terrorist party or its agencies or instrumentalities. *Id.* § 201(a); *see, e.g.*, *Weininger*, 462 F. Supp. 2d at 462-63 (applying TRIA § 201(a) to funds held in deposit accounts owned by instrumentalities of the Cuban government). As discussed in more detail below, the funds in the blocked accounts at issue here are not the property of Cuba.

We recognize that TRIA, TWEA and the CACRs create a special regulatory regime in both defining what assets can be blocked and what interest in the assets is sufficient for blockage. Nonetheless, it is possible to recognize the special considerations that account for this federal scheme without infringing upon the fundamental state law concept of property interests.

### A. Under Applicable State Law, EFTs in the Hands of Intermediary Banks Are Not Property of Either Originators or Beneficiaries.

When federal law refers to "property" without explicitly defining particular interests in such property, courts look to state law to do so. *See, e.g.*, *Phillips* v. *Washington Legal Found.*, 524 U.S. 156, 164 (1998) ("Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'" (citation omitted)); *Asia Pulp & Paper*, 2010 WL 2490392, at *4 ("In the absence of a superseding federal statute or regulation, state law generally governs the nature of any interests in or rights to property that an entity may have."). Federal courts rely on state law to establish property rights in a variety of fields. *See Butner*, 440 U.S. at 56 (bankruptcy); *In re Rodgers*, 333 F.3d 64, 66

(2d Cir. 2003) (tax); *Secs. & Exchange Comm'n* v. *Credit Bancorp, Ltd.*, 279 F. Supp. 2d 247, 261 (S.D.N.Y. 2003) (receivership).

      In accordance with these principles, the Second Circuit looks to New York law to determine whether the proceeds of an EFT held by an intermediary bank can be subject to attachment or execution under federal law. *See Asia Pulp & Paper*, 2010 WL 2490392, at *3 (Fair Debt Collection Procedures Act); *Jaldhi*, 585 F.3d at 70 (Admiralty Rule B).  In New York and every other state, Article 4A of the U.C.C. governs the rights and liabilities that arise in the funds-transfer process.  Article 4A of the U.C.C. makes clear that "a beneficiary has no property interest in an EFT because 'until the funds transfer is completed by acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary, *the beneficiary has no property interest in the funds transfer* which the beneficiary's creditor can reach.'" *Jaldhi*, 585 F.3d at 71 (quoting N.Y. U.C.C. § 4A-502 cmt. 4 (court's emphasis)); *see also Asia Pulp & Paper*, 2010 WL 2490392, at *7 ("[A]n originator and intended beneficiary have no legal claim or contractual rights against an intermediary bank in the event that a funds transfer is not completed.").  And if neither the originator nor the beneficiary has a property interest in a funds transfer at an intermediary bank, then neither can the funds transfer be considered an originator's or a beneficiary's asset.

      In *Jaldhi*, the Second Circuit held that Rule B of the Admiralty Rules, which provides for attachment of "the defendant's . . . property," FED. R. CIV. P. supp. B(1)(a), did not permit attachment of the proceeds of EFTs in the hands of intermediary banks for which the defendant was the intended beneficiary because the proceeds of such EFTs are not the beneficiary's property while held by the intermediary bank. *Jaldhi*, 585 F.3d at 71.  Likewise, in *Asia Pulp & Paper*, the Second Circuit held that the proceeds of an EFT in the hands of an

intermediary bank are not subject to attachment under the Fair Debt Collection Procedures Act, 28 U.S.C. § 3205(a)—which authorizes garnishment of property in which a judgment debtor has a "substantial . . . interest"—because such funds are not the originator's or the beneficiary's property that their creditors can reach. *Asia Pulp & Paper*, 2010 WL 2490392, at *5-*6.

      *Jaldhi* and *Asia Pulp & Paper* held that the proceeds of EFTs in the temporary possession of an intermediary bank are not subject to attachment by the originator's or beneficiary's creditors. *Id.* at *6; *Jaldhi*, 585 F.3d at 71. The length of time that the intermediary bank holds the funds is not relevant, and the reasoning in *Jaldhi* and *Asia Pulp & Paper* is equally applicable to preclude an originator or beneficiary or their creditors from attaching EFTs frozen or seized by an intermediary bank for an extended period of time under federal law. If a person has no property interest at the outset in an asset held by a third party, the person does not somehow acquire a property interest because the third party holds the asset for a prolonged period of time. For example, in *Bank of New York* v. *Norilsk Nickel*, the First Department was asked to resolve competing claims to the proceeds of an EFT originated by a Serbian company that had been held by the intermediary bank for nearly a decade pursuant to OFAC sanctions against Serbia. 14 A.D.3d 140, 143 (N.Y. App. Div. 2004). After those sanctions were lifted in 2004, the intended beneficiary asked the intermediary bank to release the funds. *Id.* at 144. In the interim, however, the originator's creditors served process on the intermediary bank in an effort to attach the funds. *Id.*

      The *Norilsk Nickel* court held that a creditor's right to attach property "is only the same as the defendant's own interest in it," and that the defendant's interest in the proceeds of an EFT in the hands of an intermediary bank is governed by Article 4A of the U.C.C. 140 A.D.3d at 145. Because under Article 4A, title to the funds passed from the Serbian originator when the

originator's bank accepted the originator's payment order and sent a corresponding payment order onward to the intermediary bank, the court held that the originator's creditors could not attach the proceeds of the EFT held by the intermediary bank. *Id.*

The Second Circuit recently relied on *Norilsk Nickel* to resolve competing claims to the proceeds of an EFT held by the intermediary bank pursuant to an order of attachment by the originator's creditor. *Goodearth Maritime Ltd.* v. *Calder Seacarrier Corp.*, No. 09-5068-cv, 2010 WL 2758695, at *2 (2d Cir. July 14, 2010) (unpublished opinion). The attachment order was vacated after the Second Circuit's decision in *Jaldhi* overruled *Winter Storm Shipping, Ltd.* v. *TPI*, 310 F.3d 263 (2d Cir. 2002), under which an originator's creditors could use Admiralty Rule B to attach EFTs held by an intermediary bank. In *Goodearth*, the originator claimed it was entitled to the funds on the ground that the EFT "was 'cancelled by operation of law' and '[a] cancelled payment order cannot be accepted.'" *Goodearth*, 2010 WL 2758695, at *2 (quoting N.Y. U.C.C. § 4A-211(4) & (5)).[12]

*Goodearth* rejected this argument, holding that the EFT was "interrupted" rather than cancelled and that, in any event, the so-called "money back guarantee" provision of Article 4A did not give the originator a right to a refund of the proceeds of a cancelled EFT directly from the intermediary bank. *Id.* Rather, the originator could seek a refund only from the originating bank, *id.* (citing N.Y. U.C.C. § 4A-402), consistent with Article 4A's provisions that the proceeds of an EFT in the hands of an intermediary bank are not the property of the originator or the beneficiary, *see also European Am. Bank* v. *Bank of Nova Scotia*, 12 A.D.3d 189, 190 (N.Y. App. Div. 2004) (holding that N.Y. U.C.C. § 4A-502 permits a beneficiary's

---

[12]   N.Y. U.C.C. § 4A-211(4) provides that "[a]n unaccepted payment order is cancelled by operation of law at the close of the fifth funds-transfer business day of the receiving bank after the execution date or payment date of the order," and § 4A-211(5) provides that "[a] cancelled payment order cannot be accepted."

-14-

creditor to levy against the proceeds of an EFT only when such proceeds are in the hands of the beneficiary's bank, not the intermediary bank).

Although both *Goodearth* and *Norilsk Nickel* held that the intended beneficiary that claimed the proceeds of EFTs blocked or frozen by an intermediary bank was entitled in those particular circumstances to the funds once the federal law freezing those funds was rescinded, these cases do not support Petitioner's contention here that, as the judgment creditor of the intended beneficiaries, she is entitled to turnover of the frozen EFTs held by the intermediary banks. Both *Goodearth* and *Norilsk Nickel* were faced with competing claims, between the originator's creditors on the one hand and the intended beneficiary on the other hand, to an EFT blocked by the intermediary bank under federal law and later released. *Goodearth Maritime Ltd.* v. *Calder Seacarrier Corp.*, No. 08 Civ. 2028 (RMB), 2010 WL 2856533, at *1 (S.D.N.Y. July 21, 2008); *Norilsk Nickel*, 14 A.D.3d at 144. And both courts started their analysis by recognizing that, under New York law, neither the originator[13] nor the intended beneficiary had a legal property interest in the funds held by the intermediary bank. *See Goodearth*, 2010 WL 2758695, at *2 ("The question of who is entitled to the wrongly attached funds is difficult because . . . 'EFTs in the temporary possession of an intermediary bank are not property of either the originator or the beneficiary under New York law.'" (quoting *Jaldhi*, 585 F.3d at 70)); *Norilsk Nickel*, 14 A.D.3d at 145 (holding that the U.C.C. provides that title to the funds in question passed from the originator when the originator's bank accepted the payment order and that a beneficiary's creditors can levy only against the beneficiary's bank, not the intermediary bank). A plaintiff has no rights as a beneficiary's creditor until the funds transfer is

---

[13]     The courts' analysis of the claims in *Goodearth* and *Norilsk Nickel* did not depend on the fact that the claims were asserted by the originator's creditors, not the originators themselves, because a creditor's right to attach property "is only the same as the defendant's own interest in it." *Norilsk Nickel*, 14 A.D.3d at 145.

completed "by acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary." N.Y. U.C.C. § 4A-104(1).[14]

As explained above, the *Goodearth* court held that the "money back guarantee" provision in U.C.C. § 4A-402 did not excuse the originator's payment obligation because the EFT was merely interrupted rather than cancelled and, even if it were cancelled, the originator's only claim for a refund would be against the originator's bank, not the intermediary bank. *Goodearth*, 2010 WL 2758695, at *2; *see also Grain Traders*, 160 F.3d at 101 (N.Y. U.C.C. § 4A-402 "incorporat[es] a 'privity' requirement into the 'money back guarantee' provision so that it applies only between the parties to a particular payment order and not to the parties to the funds transfer as a whole."). Then, having rejected the contention that New York law *required* the funds to be returned to the originator, the court concluded that in that action, a contest solely between the originator and the beneficiary, as a matter of fairness the beneficiary should receive the funds:

> Given that New York law apparently does not *require* the return of funds to the originator, and that *the equities in this case*—where the funds would have been transferred to [the beneficiary] long ago were it not for our erroneous decision in *Winter Storm*, where [the beneficiary] has not otherwise been paid, and where the record contains no evidence of a legitimate competing claim for the funds from another party—favor releasing the funds to the beneficiary.

*Goodearth*, 2010 WL 2758695, at *3 (emphasis added). As the court's reasoning makes clear, there was no rule of law that required the funds to be transferred to the beneficiary. Likewise, *Norilsk Nickel* held that, under the U.C.C., the originator had no property interest in the funds held by the intermediary bank and therefore those funds could not be attached by the originator's

---

[14]    Acceptance by a beneficiary's bank normally occurs when the bank pays the beneficiary, notifies the beneficiary that his account has been credited, or receives payment of the payment order, for example, by settlement through a funds-transfer system. N.Y. U.C.C. § 4A-209(2).

creditors.  Because the originator's creditors had no right to the now unblocked funds, the court held that the funds should proceed onward to the beneficiary as originally intended a decade earlier.  14 A.D.3d at 147.

By contrast, *Jaldhi* and *Asia Pulp & Paper* dealt with competing claims to funds held by the intermediary bank between the intended beneficiary and its own judgment creditors, or between the originator and its own judgment creditors.  *Asia Pulp & Paper*, 2010 WL 2490392, at *2; *Jaldhi*, 585 F.3d at 64.   In both cases, the originator's and beneficiary's respective creditors could not attach the funds because the statutory basis for the attachment required that the funds be the property of the originator or beneficiary, which was not the case under New York law as long as the funds were in the intermediary bank's possession.  Here, too, Petitioner's claim to funds held by the intermediary banks fails because TRIA is limited to the turnover of funds that are the property of the terrorist party (or its agencies or instrumentalities) against whom Petitioner obtained a judgment.  But as long as the funds are in the possession of the intermediary banks, the originators and the intended beneficiaries have no property interest in those funds which Petitioner can attach.

*Jaldhi* and *Asia Pulp & Paper*, together with *Norilsk Nickel* and *Goodearth*, stand for the proposition that, under New York law, EFTs in the hands of an intermediary bank— whether for an instant or a decade—are not the property of the originator or beneficiary and therefore cannot be attached by their respective creditors.  As discussed below, these property interests established by New York law are not preempted by TRIA or the CACRs, and therefore TRIA does not provide a judgment creditor of an originator or an intended beneficiary the right to turnover of proceeds of an EFT held by an intermediary bank pursuant to the CACRs.

**B.     TRIA Does Not Conflict With—and Thus Cannot Preempt—the Property Interests Established Under Article 4A of the U.C.C.**

Although there is no dispute that it is a "fundamental principle of the Constitution . . . that Congress has the power to preempt state law," *Crosby* v. *Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000), "courts do not readily assume preemption," *Madeira* v. *Affordable Hous. Found., Inc.*, 469 F.3d 219, 238 (2d Cir. 2006). Rather, "'in the absence of compelling congressional direction,' courts will not infer that 'Congress ha[s] deprived the States of the power to act.'" *Id.* (quoting *N.Y. Tel. Co.* v. *N.Y. State Dep't of Labor*, 440 U.S. 519, 540 (1979) (internal quotation marks omitted)). In particular, as the Supreme Court has cautioned, to invoke "conflict preemption"—which can occur "even if Congress has not occupied the field," *Crosby*, 530 U.S. at 372—a "clear demonstration of conflict . . . must exist before the mere existence of a federal law may be said to pre-empt state law operating in the same field," *Jones* v. *Rath Packing Co.*, 430 U.S. 519, 544 (1977).

As explained above, TRIA defines a "blocked asset" to include "any asset seized or frozen" under Section 5(b) of TWEA, which is the authorizing statute for the CACRs, but limits a judgment creditor of a terrorist party to the turnover of only the "blocked assets of that terrorist party" or its agencies or instrumentalities. TRIA §§ 201(a), (d)(2), *codified at* 28 U.S.C. § 1610 note. Because TRIA does not provide a basis for determining when such assets are the property of the terrorist party, courts should look to state law to make that determination. *See Asia Pulp & Paper*, 2010 WL 2490392, at *4; *Jaldhi*, 585 F.3d at 70.

Unlike TRIA, however, the CACRs provide a long list of the types of property that can be seized, *see* 31 C.F.R. § 515.311, and broadly define the interest that Cuba must have in such property to permit seizure, *see id.* § 515.312 ("an interest of any nature whatsoever, direct or indirect"). Notwithstanding these definitions, however, the CACRs do not include

-18-

funds transfers within the list of seizable property or property interests, and do not preempt Article 4A with respect to ownership of frozen proceeds of EFTs held by intermediary banks.  In the *Norilsk Nickel* decision discussed above, the First Department held that Article 4A of the U.C.C. was not preempted by OFAC regulations that, like the CACRs, required seizure of property in which a sanctioned entity had "'an interest of any nature whatsoever, direct or indirect.'"  14 A.D.3d at 147 (quoting 31 C.F.R. § 585.303).  The court explained that "OFAC regulations focused on [the originator's] 'interest' in property and on how the funds would be used, not on the passage of title to the funds pursuant to the U.C.C."  *Id.*; *see also Global Relief Found., Inc.* v. *O'Neill*, 315 F.3d 748, 753 (7th Cir. 2002) ("The function of the IEEPA strongly suggests that beneficial rather than legal interests matter. . . . Thus the focus must be on how assets could be controlled and used, not on bare legal ownership."); *Holy Land Found. for Relief & Dev.* v. *Ashcroft*, 333 F.3d 156, 162-63 (D.C. Cir. 2003) (same).  In other words, "federal and state law did not conflict at all; they simply addressed different issues."  *Norilsk Nickel*, 14 A.D.3d at 147.  Accordingly, there is no "clear demonstration of conflict," *see Jones*, 430 U.S. at 544, that would warrant the conclusion that TRIA or the CACRs preempt Article 4A's provisions regarding property interests in EFTs.

There are also important policy reasons why TRIA and the CACRs should not preempt the clear provisions of Article 4A that neither an originator nor a beneficiary has a property right in funds held by an intermediary bank.  The operation of the funds-transfer system in the United States depends on the uniform observance of its rules.  *See Banque Worms*, 77 N.Y.2d at 372 ("National uniformity in the treatment of electronic funds transfers is an important goal [of Article 4A of the U.C.C.], as are speed, efficiency, certainty . . . and finality.").  The preemption of Article 4A would severely disrupt that uniformity and could undermine the

efficiency and certainty that are vital to system's operation, as happened in the wake of the Second Circuit's decision in *Winter Storm*.  Allowing an originator or beneficiary or their creditors to "skip over the bank with which it dealt directly, and go to the next bank in the chain would result in uncertainty as to rights and liabilities [and] would create a risk of multiple or inconsistent liabilities." *Grain Traders*, 160 F.3d at 102.  The alternative—in which originators and beneficiaries could both claim funds held by intermediary banks—would lead to constant uncertainty and "require intermediary banks to investigate the financial circumstances and various legal relations of the other parties to the transfer," which in turn would "impede the use of rapid electronic funds transfers in commerce by causing delays and driving up costs." *Id.*

The New York banking system is "particularly vulnerable to such disruption" because New York is the hub of international transactions denominated in U.S. dollars.  *Reibor Int'l*, 759 F.2d at 266; *see also id.* at 264 ("[T]he import of the decision only becomes clear upon realizing how common is the relationship between [the parties] in international trade, and how frequent, therefore, the need for a fund transfer through New York.").  Rather, it is "especially appropriate" to rely on New York law where "'a decision . . . contrary to the general rule of the state might have disruptive consequences for the state banking system.'" *Id.* at 266 (quoting *Det Bergenske Dampskibsselskab* v. *Sabre Shipping Corp.*, 341 F.2d 50, 52-53 (2d Cir. 1965)).  As the Second Circuit and New York Courts have repeatedly held, Article 4A provides the proper basis for determining the property rights to an EFT in the hands of an intermediary bank.  *See, e.g., Goodearth*, 2010 WL 2758695, at *2; *Asia Pulp & Paper*, 2010 WL 2490392, at *3; *Jaldhi*, 585 F.3d at 70; *Norilsk Nickel*, 14 A.D.3d at 145; *European Am. Bank*, 12 A.D.3d at 190.

**C.     The Amounts in the Blocked Accounts at Issue Are Not Subject to Turnover Under TRIA Because They Are Not the Property of the Cuban Beneficiaries Against Whom Petitioner Holds a Judgment.**

Here, Petitioner seeks turnover of 30 blocked accounts held by Respondents pursuant to the CACRs.  These accounts contain the proceeds of EFTs for which Cuba or a Cuban entity was the beneficiary or had some other interest in the funds transfer.  The CACRs require the Respondents to freeze the proceeds of these EFTs because Cuba had some interest in them, however slight.  *See* 31 C.F.R. §§ 515.201(a)(1), 515.312.  But Section 201(a) of TRIA does not authorize the turnover of all assets blocked pursuant to OFAC regulations in which Cuba has any interest of any nature, notwithstanding the fact that such a slight interest is sufficient for seizure under OFAC.  *See Norilsk Nickel*, 14 A.D.3d at 147 ("OFAC blocked assets based on interests in property and the use to which such property was put, not based on who owned the property in question.").  Rather, as explained above, only blocked interests that are the assets of Cuba (or its agencies or instrumentalities) are subject to turnover under TRIA.  Article 4A of the U.C.C. indisputably is the basis for determining whether Cuba has property rights to the funds held by Respondents in the blocked accounts at issue.  *See Goodearth*, 2010 WL 2758695, at *2; *Jaldhi*, 585 F.3d at 71.  Therefore, because these funds are not the assets of Cuba or its agencies or instrumentalities under Article 4A, Petitioner is not entitled to turnover of these funds under TRIA.

## CONCLUSION

For the reasons stated, The Clearing House respectfully urges the Court to deny

the Petition.

Dated: July 29, 2010
New York, New York

Respectfully submitted,

H. Rodgin Cohen
Bruce E. Clark
David L. Breau
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
(212) 558-4000
ClarkB@Sullcrom.com

*Counsel for The Clearing House Association L.L.C.*

To:     James W. Perkins
        GREENBERG TRAURIG, LLP
        200 Park Avenue
        New York, New York  10166
        (212) 801-9200
        perkinsj@gtlaw.com

        *Counsel for Petitioner*

        James L. Kerr
        DAVIS POLK & WARDWELL LLP
        450 Lexington Avenue
        New York, New York  10017
        (212) 450-4552
        James.Kerr@davispolk.com

        *Counsel for Respondents*