USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: *9-13-10*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
JEANNETTE HAUSLER,                    :
                                      :
                                      :    09 Civ. 10289(VM)
                          Petitioner, :
                                      :    **DECISION AND ORDER**
      - against -                     :
                                      :
JP MORGAN CHASE BANK, N.A.,           :
CITIBANK, N.A., UBS AG, THE ROYAL     :
BANK OF SCOTLAND, N.V. AND BANK OF    :
AMERICA, N.A.,                        :
                                      :
                         Respondents. :
------------------------------------X

**VICTOR MARRERO, United States District Judge.**

Petitioner Jeannette Hausler ("Hausler") brings this action as the successor and personal representative of the Estate of Robert Otis Fuller ("Fuller") pursuant to § 201(a) of the Terrorism Risk Insurance Act of 2002, 28 U.S.C. § 1610 note ("TRIA"), to execute a default judgment obtained by Hausler in Florida state court (the "Florida Judgment") against the Republic of Cuba, Fidel and Raul Castro, and the Cuban Revolutionary Armed Services (collectively, "Defendants") in an action alleging the torture and extrajudicial killing of Fuller. To enforce her judgment in this Court, Hausler brings three turnover petitions ("Petition I," "Petition II," and "Petition III," respectively) against JP Morgan Chase Bank, N.A., Citibank, N.A., UBS AG, The Royal Bank of Scotland, N.V. (f/k/a ABN

AMRO Bank, N.V.), and Bank of America, N.A. ("Respondents").

Respondents now move to dismiss Petition III insofar as it seeks to execute against blocked electronic funds transfers ("EFTs") in respect of which the Republic of Cuba or its agencies or instrumentalities (collectively, "Cuba") are the originator, originating bank, beneficiary's bank or beneficiary.

Upon review of Respondents' and Petitioners' opposing briefs, as well as the Memorandum of Law for Amicus Curiae the Clearing House Association[1] in Opposition to the Petition, dated July 29, 2010, the Court finds that the EFT proceeds are subject to execution under TRIA and thus denies Respondents' motion to dismiss.

## I.  BACKGROUND[2]

### A.  THE UNDERLYING JUDGMENT AGAINST CUBA

Hausler, acting on her own behalf and as representative of her deceased brother Fuller, seeks to

---

[1]  The Clearing House Association L.L.C. (the "Clearing House") is an association of leading commercial banks which, through an affiliate, provides payment, clearing and settlement services to its member banks and numerous other financial institutions.

[2]  The factual summary below is derived primarily from the following documents and any exhibits attached thereto:  Notice of Petition III for Turnover Order Pursuant to Federal Rule of Civil Procedure 69 and CPLR § 5225(b), dated July 6, 2010; Memorandum of Law in Support of Motion to Dismiss Petition Seeking Turnover of Blocked Wire Transfers, dated July 28, 2010; Petitioner's Memorandum of Law in Opposition to Garnishee Respondents' Motion to Dismiss Petition III for Turnover and Memorandum of Amicus, dated August 12, 2010.  Except where specifically referenced, no further citation to these sources will be made.

enforce the Florida Judgment for compensatory damages in the amount of $99,000,000. The Florida Judgment, recognized by the United States District Court for the Southern District of Florida and given full faith and credit by this Court on September 26, 2008, arose out of the alleged extrajudicial killing and torture of Fuller by Defendants in the aftermath of the Cuban revolution.

B.   CUBAN ASSET CONTROL REGULATIONS

President John F. Kennedy embargoed all trade with Cuba in 1962, and the United States Treasury Department's (the "Treasury Department") Office of Foreign Assets Control ("OFAC") issued the Cuban Asset Control Regulations (the "CACRs"), 31 C.F.R. Part 515, on July 8, 1963. Among other purposes, the CACRs seek to block transactions in which Cuba has "any interest of any nature whatsoever, direct or indirect." 31 C.F.R. § 515.201(a).

The statutory authority for the CACRs' blocking and sanctions regime derives from the Trading With the Enemy Act ("TWEA"), 50 App. U.S.C. App. §§ 1-44, enacted in 1917 to restrict trade with countries hostile to the United States. In 1963, § 5(b)(1) of TWEA ("§ 5(b)") provided in pertinent part:

> During the time of war or during any other period of national emergency declared by the President, the

President may, through any agency that he may
designate ...

(A) investigate, regulate, or prohibit, any
transactions in foreign exchange, transfers of credit
or payment between, by, through, or to any banking
institution ... and

(B) investigate, regulate, direct and compel,
nullify, void, prevent or prohibit, any acquisition
holding, withholding, use, transfer, withdrawal,
transportation, importation or exportation of, or
dealing in, or exercising any right, power, or
privilege with respect to, or transactions involving,
any property in which any foreign country or a
national thereof has any interest ....

TWEA § 5(b). In 1977, Congress passed the International

Emergency Powers Act (the "IEEPA"), which amended § 5(b) so

as to remove its application to national emergency

situations in peacetime. See IEEPA of December 28, 1977,

Pub. L. No. 95-223, 91 Stat. 1625 (codified at 50 U.S.C. §

1701). The IEEPA, which now governs the President's power

to issue sanctions and blocking measures in peacetime, does

however permit measures issued pursuant to § 5(b) prior to

1977 remain in effect. On this basis the CACRs have been

extended each year since 1977.

CACR § 515.201 sets forth the transactions authorized

to be blocked, including: "All transfers of credit and all

payments between, by, through, or to any banking

institution or banking institutions wheresoever located,

with respect to any property subject to the jurisdiction of

- 4 -

the United States or by any person (including a banking institution) subject to the jurisdiction of the United States," 31 C.F.R. § 515.201(a)(1); and "[a]ll dealings in, including, without limitation, transfers, withdrawals, or exportations of, any property or evidences of indebtedness or evidences of ownership of property by any person subject to the jurisdiction of the United States."   Id. § 515.201(b)(1).

Section 515.205 of the CACRs requires that certain types of blocked property, including funds resulting from transactions blocked pursuant to CACR § 515.201, be held in interest-bearing domestic bank accounts.

The EFTs at issue here were blocked by Respondents pursuant to the CACRs.

C.   TRIA

TRIA mandates that persons who have obtained a judgment based upon an act of terrorism perpetrated by a foreign government designated as a terrorist party can invoke the jurisdiction of state and federal courts to enforce the judgment.   The parties to the instant action do not dispute that Cuba has been properly designated as a terrorist party within the meaning of § 201 of TRIA ("TRIA § 201").

The instant dispute arises primarily from conflicting interpretations of TRIA § 201.   Section 201(a) of TRIA provides in relevant part:

> Notwithstanding any other provision of law, ... in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, ... the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a) (emphasis added).   The issue in dispute derives largely from the phrase highlighted above.

Section 201(d)(2) of TRIA defines "blocked asset" as, with exceptions not pertinent here, "any asset seized or frozen by the United States under [§ 5(b)] of the [TWEA] or under sections 202 and 203 of the [IEEPA]."   Id. § 201(d)(2).

D.   TURNOVER PETITIONS

In an effort to enforce the Florida Judgment, Hausler has filed and served turnover Petitions I, II, and III against Respondents pursuant to TRIA.[3]   At issue here is Petition III, under which Hausler seeks to execute against

---

[3]   Petitions I and II are distinct from Petition III as they seek to execute against Cuban bank accounts which the parties do not dispute are located in the United States.

the proceeds of thirty international EFTs[4] that Respondents blocked pursuant to the CACRs and placed in domestic bank accounts. Those EFTs were blocked between 1992 and 2009,[5] and were all allegedly remitted by Cuba or transmitted by their originators as intended for the benefit of Cuba.[6]

With their present motion, Respondents seek dismissal of Petition III on the ground that the proceeds of the blocked EFTs do not constitute the "assets" of Cuba and are thus not subject to execution under TRIA.

E.    RECENT SECOND CIRCUIT CASES REGARDING EFTS

---

[4] As explained by the Second Circuit in Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd., an EFT, also commonly referred to as a wire transfer, is

> [N]othing other than an instruction to transfer funds from one account to another. When the originator and the beneficiary each have accounts in the same bank that bank simply debits the originator's account and credits the beneficiary's account. When the originator and beneficiary have accounts in different banks, the method for transferring funds depends on whether the banks are members of the same wire transfer consortium .... If the banks are not in the same consortium -- as is often true in international transactions -- then the banks must use an intermediary bank .... After the originator directs its bank to commence an EFT, the originator's bank would instruct the intermediary to begin the transfer of funds. The intermediary bank would then debit the account of the bank where the originator has an account and credit the account of the bank where the beneficiary has an account.

585 F.3d 58, 60 n.1 (2d Cir. 2009).

[5] The blocked accounts holding the EFT proceeds relevant here were opened between October 1992 and February 2009. (See Petition III, Exs. B-F.)

[6] The originators and beneficiaries of the blocked EFTs are four Cuban banks: Banco Nacional de Cuba, Banco Financiero Internacional, S.A., Banco Internacional de Comercio, and Banco Popular de Ahorro. Hausler alleges that the banks are agencies or instrumentalities of Cuba, which the Court accepts as true for the purposes of this motion to dismiss.

Two recent Second Circuit cases -- Jaldhi, 585 F.3d 58, and Export-Import Bank of the United States v. Asia Pulp & Paper Co., Ltd., 609 F.3d 111 (2d Cir. 2010) -- animate Respondents' motion. In both cases, the Court of Appeals found that EFTs temporarily passing through intermediary banks ("Midstream EFTs") are not attachable property under the applicable federal statutes.

In Jaldhi, the Circuit Court overruled its decision in Winter Storm Shipping, Ltd. v. TPI, 310 F.3d 263 (2d Cir. 2002), where it had found that Midstream EFTs were attachable property of a defendant-beneficiary pursuant to Rule B of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure ("Rule B").[7] Rule B permits attachment of "the defendant's tangible or intangible personal property." Fed. R. Civ. P. Supp. R. B(1)(a). After careful reconsideration of Rule B and the underpinnings of Winter Storm, the Jaldhi Court found that "the beneficiary [of an EFT] has no property interest in the funds transfer which

---

[7] Under Winter Storm, maritime plaintiffs sought writs of attachment pursuant to Rule B "long before the defendant's property enter[ed] the relevant district, often based solely on the speculative hope or expectation that the defendant [would] engage in a dollar-denominated transaction that involves an EFT during the period the attachment order is in effect." Jaldhi, 585 F.3d at 70. The Jaldhi Court took account of this and other "unforeseen consequences" of Winter Storm particular to maritime attachments. See id. at 61-63.

the beneficiary's creditor can reach."    585 F.3d at 71 (emphasis omitted) (quoting N.Y. U.C.C. § 4-A-502 cmt. 4). The Circuit Court found no guidance in federal maritime law to determine the applicable property rights, and thus relied on New York State law, specifically the New York Uniform Commercial Code, Article 4-A ("Article 4-A"), to determine that Midstream EFTs are "neither the property of the originator nor the beneficiary while briefly in the possession of an intermediary bank."  Id.

Similarly, in Asia Pulp, the Second Circuit considered "whether an EFT temporarily in the possession of an intermediary bank in New York -- i.e., a midstream EFT -- may be garnished under the [Federal Debt Collection Procedures Act (the "FDCPA")] to satisfy judgment debts owed by either the originator or the intended beneficiary of the EFT."  609 F.3d at 114-15.  "In contrast to Rule B, which requires that funds be the 'defendant's ... property' in order to be attached, the FDCPA authorizes the issuance of writs of garnishment to any person in 'possession, custody or control' of property in which the debtor has a substantial ... interest.'"  Id. at 116 (emphasis in original) (quoting FDCPA, 28 U.S.C. § 3205(a)).   Again, finding no guidance in the FDCPA to determine whether the originator or beneficiary had a "substantial interest" in a

- 9 -

Midstream EFT, the Second Circuit looked to Article 4-A. Id. at 117 ("Although the FDCPA specifically defines the types of property potentially subject to garnishment, the FDCPA does not identify who has a right or interest in that property."). Upon consideration of Article 4-A, the Second Circuit concluded that "although an originator or intended beneficiary's lack of 'ownership' is not dispositive of whether they have an interest in a [Midstream EFT], it nevertheless suggests that whatever interest or rights exist, if any, are limited," and not does not amount to a "substantial interest" as required to attach property pursuant to the FDCPA. Id. at 121.

## II.  DISCUSSION

Though it arises from a grave historical event, and implicates matters of federalism and United States foreign policy, the instant dispute is largely a semantic controversy over the statutory interpretation of TRIA's phrase "the blocked assets of that terrorist party." TRIA § 201(a). Respondents argue that, properly interpreted, TRIA indicates that only assets blocked pursuant to the CACRs and owned by Cuba are subject to execution. In other words, Respondents contend that TRIA narrows, by a requirement of title or actual ownership interest in property, the assets blocked pursuant to the CACRs that may

be executed against by a judgment creditor.  Respondents rely primarily on Jaldhi, Asia Pulp, and Article 4-A to argue that Cuba does not own the EFT proceeds at issue here and thus Petition III must be dismissed.

Petitioners contest Respondents' interpretation, arguing that the phrase "blocked assets of that terrorist party" is to be read in conjunction with the definition of property and property interests in the CACRs, and that, subject to turnover proceedings under Rule 69 of the Federal Rules of Civil Procedure and New York's Civil Practice Law Rule ("CPLR") § 5225 ("§ 5225"),[8] any asset blocked pursuant to the CACRs may be executed against under TRIA.

## A.  TRIA AND THE CACRS PREEMPT STATE PROPERTY LAW

It is a "fundamental principle of the Constitution ... that Congress has the power to preempt state law."  Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372 (2000). Preemption can be achieved by explicit statutory language evincing Congressional intent to preempt state law, see English v. Gen. Elec. Co., 496 U.S. 72, 79 (1990), or by

---

[8]  Rule 69 of the Federal Rules of Civil Procedure provides that the procedure of execution in aid of a judgment in federal court "must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies."  Fed. R. Civ. P. 69.  Accordingly, since TRIA does not provide specific rules on execution of judgments, New York's CPLR applies.

implied preemption, where state law "stands as an obstacle
to the accomplishment and execution of the full purposes
and objectives of Congress." Crosby, 530 U.S. at 372-73.
Preemption may be inferred (1) because "[t]he scheme of
federal regulation may be so pervasive as to make
reasonable the inference that Congress left no room for the
States to supplement it," (2) because "the Act of Congress
may touch a field in which the federal interest is so
dominant that the federal system will be assumed to
preclude enforcement of state laws on the same subject," or
(3) because "the object sought to be obtained by federal
law and the character of obligations imposed by it may
reveal the same purpose." Fidelity Fed. Sav. & Loan Ass'n
v. de la Cuesta, 458 U.S. 141, 153 (1982) (quoting Rice v.
Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)). The
preemption doctrine applies with equal force to
Congressional statutes and federal regulations promulgated
by agencies. See Geier v. Am. Honda Motor Co., Inc., 529
U.S. 861 (2000); Fidelity Fed. Sav. & Loan Ass'n, 458 U.S.
at 153.

    In moving to dismiss, Respondents argue that TRIA
nowhere defines what an "asset" is or who has a property
interest in an "asset," and thus any interests in property
under TRIA must be determined by reference to state law.

As described above, Respondents point to Jaldhi and Asia Pulp, in which the Second Circuit considered state property law to determine whether judgment debtors had an attachable interest in Midstream EFTs.   In both cases, the Second Circuit found that the relevant federal law did not define property or property interests and thus, under Article 4-A, found that neither an originator nor a beneficiary of a blocked EFT holds a sufficient property interest to render a Midstream EFT attachable under Rule B or the FDCPA.   See Jaldhi, 585 F.3d at 71 (finding that a midstream EFT was not the "property" of judgment debtor); Asia Pulp, 609 F.3d at 122 (finding that judgment debtor did not have "substantial interest" in midstream EFT).

Respondents assert that TRIA and the CACRs, like the federal laws at issue in Jaldhi and Asia Pulp, also "create[] no property rights but merely attach consequences, federally defined, to rights created under state law."   Asia Pulp, 609 F.3d at 117 (quoting United States v. Craft, 535 U.S 274. 279 (2002)).   However, the Court finds that the plain language and purpose of the CACRs and TRIA are markedly different from the federal laws governing Jaldhi and Asia Pulp.

1.   The Plain Language of TRIA and the CACRs Indicate
     Preemption

As an initial matter, the Court notes that the
statutory section in dispute -- TRIA § 201(a) -- begins
with the phrase "[n]otwithstanding any other provision of
law" (the "Notwithstanding Clause"). TRIA § 201(a). Other
courts examining the scope of TRIA § 201(a) have concluded
that the Notwithstanding Clause specifically addresses
potential conflicts of sovereign immunity. See Weininger
v. Castro, 462 F. Supp. 2d 457, 488-89 (S.D.N.Y. 2006);
United States v. Holy Land Found. For Relief & Dev., 445
F.3d 771, 787 (5th Cir. 2006). Moreover, the legislative
history of TRIA § 201 indicates, in part, that the language
was included to address any Presidential waiver purporting
to bar or restrict enforcement of terrorism judgments. See
Ministry of Defense & Support of the Armed Forces of the
Islamic Republic of Iran v. Elahi, 129 S. Ct. 1732, 1744
(2009) (citing H.R. Conf. Rep. No. 107-779, at 27). But
despite its treatment to date, the Notwithstanding Clause's
plain language is not restricted only to issues of immunity
and jurisdiction, and TRIA § 201's legislative history also
evinces a broader Congressional purpose to "deal
comprehensively with the problem of enforcement of
judgments rendered on behalf of victims of terrorism in any

- 14 -

court of competent jurisdiction." H.R. Conf. Rep. No. 107-779 at 27 (emphasis added). Courts have routinely interpreted such "notwithstanding" provisions to supersede all other laws, see Weinstein v. Islamic Republic of Iran, 609 F.3d 43, 54 (2d Cir. 2010) (finding that TRIA § 201(a)'s Notwithstanding Clause would abrogate conflicting treaty) (citing Cisneros v. Alpine Ridge Group, 508 U.S. 10, 18 (1993)), and to indicate preemption, see, e.g., City of N.Y. v. Permanent Mission of India to the United Nations, No. 08-1805-cv, 2010 WL 3221889, at *15 (2d Cir. Aug. 17, 2010). Accordingly, the Court finds that, insofar as Article 4-A conflicts with TRIA, § 201(a)'s opening phrase weighs in favor of preemption.

Even more decisive is the plain language of the CACRs read in conjunction with TRIA. The CACRs define both property and interests in property, and TRIA specifically defines blocked assets in reference to the CACRs for the purposes of execution under § 201(a). "Any inquiry into the meaning of a statute generally ceases if the statutory language is unambiguous and the statutory scheme is coherent and consistent." Weinstein, 609 F.3d at 49 (citing Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450 (2002)). Respondents and the Clearing House argue that TRIA, like the FDCPA and Rule B, nowhere defines what

constitutes a property interest or asset.  The Court is not persuaded.

The CACRs, enacted pursuant to the TWEA, plainly define what constitutes Cuban property or interests in property for the purposes of blocking Cuba's assets as a designated terrorist party.   See C.F.R. 31 § 515.311 (defining "property" and "property interest"); id. § 515.312 ("The term 'interest' when used with respect to property shall mean an interest of any nature whatsoever, direct or indirect."); see also Asia Pulp, 609 F.3d at 120 n.9 ("Regulations that accompany the IEEPA often specifically define the terms 'property' and 'interest' in property ...."); Consarc Corp. v. Iraqi Ministry, 27 F.3d 695, 701 (D.C. Cir. 1994) ("We think that OFAC may choose and apply its own definition of property interest, subject to deferential judicial review ... The [OFAC] regulations define 'property' and 'property interest' to include 'letters of credit, 'bank accounts and deposits', and any 'present, future or contingent' interests therein." (citing 31 C.F.R. § 575.201)); Bank of N.Y. v. Norisk Nickel, 789 N.Y.S.2d 95, 100 (App. Div. 1st Dep't 2004) (recognizing that OFAC blocking regulations "defined property very broadly to include 'debts, indebtedness [and] obligations' ... [and] defined an 'interest' in property equally

- 16 -

expansively" (citation omitted)).  The CACR definitions are plainly intended to broadly demarcate the scope of and establish Cuba's interests in specified assets, not to attach consequences to property interests defined elsewhere.   Thus, upon blocking of its assets pursuant to the CACRs, Cuba was determined to have a sufficient property interest in the blocked EFTs at issue here.

Read in conjunction with the CACRs, the plain language of TRIA also supports preemption.   TRIA explicitly indicates that "blocked assets" are to be determined in reference to the CACRs.   As noted above, § 201(d)(2) of TRIA defines "blocked asset" as "any asset seized or frozen by the United States under [§ 5(b)] of the [TWEA] or under sections 202 and 203 of the IEEPA."   TRIA § 201(d)(2) (emphasis added); see also Smith ex rel. Estate of Smith v. Federal Reserve Bank of New York, 346 F.3d 264, 271 (2d Cir. 2003) (blocked assets in TRIA to be interpreted by reference to assets blocked under IEEPA).   Since the CACRs were enacted under § 5(b) of the TWEA, they are clearly referenced by TRIA.   Accordingly, the Court finds that Congress explicitly directed that TRIA and the CACRs are to be considered in tandem, which establishes a comprehensive statutory scheme that eschews any need for consideration of state definitions of property.

Respondents rely heavily on Asia Pulp to argue that state property law governs the inquiry here, and that TRIA indicates that only assets owned by a terrorist party as defined by state law are subject to execution.   Yet, Asia Pulp itself acknowledges the material difference between the FDCPA and the statutory scheme at issue here.   Finding that "[r]egulations that accompany the IEEPA often specifically define the terms 'property' and 'interest' in property," Asia Pulp, 609 F.3d at 120 n.9, the Second Circuit was careful to indicate that its findings pursuant to Jaldhi regarding attachment against Midstream EFTs under the FDCPA do not necessarily extend to EFTs blocked under OFAC regulations.   See id. ("[W]e express no opinion about whether the [IEEPA] and its accompanying regulations ... supersede state law governing substantive property rights.").

## 2.   Property Ownership Versus Interests in Property

The distinction between an "interest in property" and "title to" or "ownership of" property is significant in the context of EFTs.   See id. at 120 ("An interest in property is not necessarily synonymous with 'title to' or 'ownership of' property .... Indeed, we have recognized that it would be reasonable for a court to hold that an individual has an interest in property, even when he does not own that

property, so long as the property benefitted him as if he had received the property directly."). Respondents argue that only blocked property owned outright by Cuba should be deemed blocked assets for the purposes of TRIA. Yet, Respondents' statutory interpretation, which relies entirely on the word 'of' in the phrase "blocked assets of that terrorist party" as equating to title or actual ownership of property, is unsupported by the plain language of the statutory scheme, as well as cases that construe "blocked assets of that terrorist party" to include a terrorist party's interest in property as indicated in the applicable OFAC regulations.

"Jaldhi instructs that whether or not midstream [EFTs] may be attached or seized depends on the nature and wording of the statute pursuant to which attachment or seizure is sought." Id. at 116. In Jaldhi, the Second Circuit considered Rule B, which permits attachments against "the defendant's tangible or intangible property ... in the hands of garnishees." See Fed. R. Civ. P. Supp. R. B(1)(a). Yet, as recognized in Asia Pulp, the "holding and analysis in Jaldhi was based firmly on the specific wording and provisions of Rule B that limit attachment to property owned by the defendant." Asia Pulp, 609 F.3d at 116 (emphasis added). The Second Circuit thus recognized that

different federal statutes may require varying degrees of property interest attributable to the judgment debtor before a creditor can attach a Midstream EFT. For example, as described above, the FDCPA -- the relevant federal statute in Asia Pulp -- authorizes the issuance of writs of garnishment to any person in "possession, custody or control" of property "in which the debtor has a substantial ... interest." 28 U.S.C. § 3205(a) (emphasis added).

By contrast, here, blocked assets under TRIA are broadly defined as any asset seized or frozen by the United States under the CACRs, and the CACRs block any transactions involving property in which Cuba has any interest of any nature whatsoever, direct or indirect. See 31 C.F.R. § 515.201. The Court thus finds that TRIA's phrase "blocked assets of that terrorist party" contemplates execution, subject to appropriate turnover proceedings, against all assets blocked pursuant to the CACRs, including those in which Cuba possesses an interest in, rather than actual ownership or title to, a blocked asset.

For decades prior to the passage of TRIA, OFAC regulations have routinely included both property and interests in property among the assets authorized to be blocked. See, e.g., 31 C.F.R. § 575.201 (Iraq); 31 C.F.R.

- 20 -

§ 535.201 (Iran); 31 C.F.R. § 537.201 (Burma). Therefore, when drafting TRIA, Congress was presumably aware of the types of assets blocked under OFAC regulations, and could have easily drawn the distinctions Respondents argue for. As noted above, TRIA § 201(d)(2) defines "blocked assets" to include all assets blocked under the CACRs, and without further direction from Congress excepting interests in property from the blocked assets subject to execution, the Court is not persuaded that the word "of" equates to actual ownership or title and thus would operate to so limit the blocked assets subject to turnover proceedings.

The Supreme Court's recent analysis of TRIA also supports construing "blocked assets of that terrorist party" to include both owned property and interests in property as set forth in the applicable OFAC regulations. See Elahi, 129 S. Ct. at 1739. In Elahi, the petitioner sought to satisfy a terrorism judgment against Iran by executing against a separate arbitral judgment awarded to Iran. To determine whether the arbitral judgment constituted a blocked asset subject to execution under TRIA, the Court considered whether Iran had an "interest in the property" as required by the relevant OFAC regulations.[9]

---

[9] Similar to the CACRs, in 1981, the Treasury Department promulgated regulations pursuant to the IEEPA blocking all specified property and interests in property of the Government of Iran. See 31 CFR § 535.201.

Id. at 1739.   The Court thus construed "blocked assets" under TRIA to be determined by reference to the property interests provided for in the applicable OFAC regulations.

Respondents go to great lengths to argue that Article 4-A -- which governs property rights in EFTs under New York law -- should be applied to determine ownership of the EFT proceeds at issue here, contending that "[t]he drafter [of Article 4-A] made a 'deliberate decision ... to write on a clean slate and to treat a[n] [EFT] as a unique method of payment to be governed by unique rules that address the particular issues raised by this method of payment.'" Banca Commerciale Italiana v. N. Trust Int'l Banking Corp., 160 F.3d 90, 95 (2d Cir. 1998) (quoting N.Y. U.C.C. § 4-A-102, cmt.).   Among other EFT-specific rules, as discussed above, Article 4-A provides that "[n]either the originator who initiates the payment nor the beneficiary who receives it holds title to the funds in the account at the [intermediary] bank."   Jaldhi, 585 F.3d at 71; see also Goodearth Maritime Ltd. v. Calder Seacarrier Corp., No. 09-5068-cv, 2010 WL 2758695, at *2 (2d Cir. July 14, 2010).

Yet, even if Article 4-A were applicable here, which, as discussed above, the Court finds that it is not, Article 4-A does not address the issue of interests in as opposed to ownership of EFTs, and thus would not necessarily

- 22 -

foreclose execution under TRIA and the CACRs. See Asia Pulp, 609 F.3d at 120 ("[T]he Nickel court found no conflict between Article 4-A -- which, it says, governs only passage of 'title' -- and a different federal statute that authorized the freezing of certain entities' 'interests' in property."). Part and parcel of Respondents' argument that Cuba holds no ownership interest in the blocked EFTs is that, pursuant to Article 4-A, any wire transfer that is not completed within five business days is cancelled by operation of law. See N.Y. U.C.C. § 4-A-211(4). Under Respondents' theory, the EFTs at issue here have thus been effectively cancelled, which is fatal to any property interest Cuba may have in the blocked EFT proceeds.

The Court notes, however, that the cases relied upon by Respondents and the Clearing House appear to indicate that, contrary to Respondents' theory, intended beneficiaries retain some interest in blocked EFTs. Those decisions find that blocking orders interrupt rather than cancel EFTs. In Norisk Nickel, the First Department of New York's Appellate Division considered the resulting property interests of the originator and beneficiary of an EFT

- 23 -

blocked pursuant to OFAC regulations relating to Serbia.[10] See 789 N.Y.S.2d at 95. The funds were initially blocked because the originator, a national of Serbia, had an interest in the funds. Upon unblocking, the Norisk Nickel Court found that Article 4-A required the funds to be transferred to the rightful owner -- the intended beneficiary of the EFT. In other words, the court recognized that despite being blocked, the transfer was not cancelled, and the intended beneficiary retained an interest in the transfer and its proceeds. Similarly, in Goodearth Maritime Ltd., decided after Jaldhi, the Second Circuit found that "New York law does not require that funds be returned to the originator following a freeze of assets ..., the funds may rightfully go to the beneficiary." 2010 WL 2758695, at *3.[11]

---

[10] The Court notes that the Norisk Nickel Court, in determining property rights in blocked EFTs, concluded that OFAC regulations did not preempt state law. That court found that "the UCC did not stand as an obstacle to federal law because, while the UCC determined title to the funds at issue, federal law impeded movement of those funds beyond the locus." 789 N.Y.S.2d at 99. Insofar as Article 4-A would frustrate the execution of judgments against blocked EFTs within the reach of the CACRs and TRIA, this Court respectfully disagrees.

[11] Respondents point to Allied Maritime, Inc. v. Descatrade SA to argue that, even where an EFT is interrupted and not cancelled, the right to repayment of funds does not give rise to an attachable property interest. See No. 09-5329-cv, 2010 WL 3447882 (2d Cir. Sept. 3, 2010). In Allied Maritime, the Circuit Court found that Article 4-A's "money-back guarantee" provision -- whereby an originator can recover its funds in the event an EFT is not completed -- did not create an attachable property interest under Rule B. As in Scanscot Shipping Services (Deutschland) GmbH v. Metales Tracomex LTDA, No. 09-5280, 2010 WL 3169304, at * 2 (2d Cir. Aug. 12, 2010), the Allied Maritime Court

In consequence, even if the Court were to apply New York property law to determine the underlying property rights in dispute, Cuba nevertheless would likely be found to possess a sufficient interest in the EFTs at issue here, subject to the initiation of turnover proceedings, because the operative degree of property interest required under the CACRs is not necessarily congruent with the ownership interest required by Rule B.

### 3.   TRIA's Legislative History and Purpose Support Preemption

#### a.   TRIA's Remedial Purpose

TRIA's remedial purpose is plain from the face of the statute and is further supported by its legislative history. As articulated by Senator Tom Harkin, one of TRIA's sponsors, on the Senate floor prior to TRIA's passage:

---

found that Jaldhi's Rule B analysis does not change even where a judgment debtor is both the originator and beneficiary of an EFT. Nevertheless, the Court finds that both cases are inapposite here. As noted above, the requisite ownership interest for attachment under Rule B does not coincide with that required under the CACRs and TRIA. Nothing about Scanscot or Allied Maritime overrules Goodearth to indicate that the unblocked funds of an interrupted EFT must necessarily return to the originator under Article 4-A. Rather, the Circuit Court merely indicated that where a refund is due to the originator under Article 4-A, such a refund does not create an attachable property interest under Rule B. The Court also notes that, as discussed further below, the Allied Maritime Court's decision is grounded, in significant part, on jurisdictional considerations particular to Rule B attachments that are distinct from the circumstances presented here. See Allied Maritime, 2010 WL 344792, at *4.

> The purpose of [TRIA § 201] is to deal comprehensively with the problem of enforcement of judgments issued to victims of terrorism in any U.S. court by enabling them to satisfy such judgments from the frozen assets of terrorist parties.   As the conference committee stated, [TRIA § 201] establishes, once and for all, that such judgments are to be enforced against any assets available in the U.S., and that the executive branch has no statutory authority to defeat such enforcement under standard judicial processes, except as expressly provided in this act.

148 Cong. Rec. S11528 (daily ed. Nov. 19, 2002) (statement of Sen. Harkin).

Enacted to provide relief to victims of terrorism, TRIA's substantive remedial purpose stands in stark contrast to the procedural design of Rule B and the FDCPA, the federal laws at issue in Jaldhi and Asia Pulp.  Rule B is a procedural rule governing attachments in the maritime context, and the FDCPA "provides the exclusive civil procedures for the United States to recover a judgment on a debt."   28 U.S.C. § 3001(a)(1).   Indeed, in acknowledging that its finding vis-à-vis the FDCPA did not necessarily extend to EFTs blocked pursuant to the IEEPA, the Second Circuit recognized that the "IEEPA's purpose differs considerably from the procedural nature and purpose of the FDCPA."  Asia Pulp, 609 F.3d at 120 n.9.  When interpreting remedial statutes, courts generally adopt a "standard of liberal construction to accomplish [Congress'] objects." Atchison, Topeka, & Santa Fe Ry. Co. v. Buell, 480 U.S.

557, 562 (1987); see also Haberman v. Finch, 418 F.2d 664, 667 (2d Cir. 1969).

b.   Legislative History of TRIA § 201

The Court finds further counsel in legislative history indicating that the statutory definition of "blocked assets" was included to specifically address the frustrations of terrorism victims unable to enforce judgments against terrorist parties.   See 148 Cong. Rec. S11528 (indicating that H.R. 3210, the version of TRIA passed in 2002, amended earlier versions of TRIA legislation to include a definition of "blocked assets"); H.R. Conf. Rep. 107-779, at 27 ("In § 201(d), the Conferees ... defined the term "blocked assets.").   In his remarks prior to TRIA's passage, Senator Harkin identified § 201's definition of "blocked asset" as one of three amendments addressing statutory deficiencies that had "vexed" victims of terrorism seeking to satisfy judgments from the frozen assets of terrorist parties.   148 Cong. Rec. S11528.   As a result, Senator Harkin indicated that

> the term 'blocked asset' has been broadly defined to include any asset that has been seized by the United States in accordance with law ... includ[ing] any asset with respect to which financial transactions are prohibited or regulated by the U.S. Treasury under any blocking order under the [TWEA], the [IEEPA], or any proclamation, order, regulation, or license," and excepting only assets to which the United States claims ownership.

Id.

Respondents contend that prohibiting turnover proceedings for blocked assets that Cuba does not demonstrably own is necessary at this stage in order to avoid inequities to third parties whose assets may be comingled with the blocked funds. Yet, Respondents point to no statutory language or legislative history that supports their interpretation. In fact, the Court notes that where Congress wished to except property from execution under TRIA, it did so: TRIA § 201 defines "blocked assets" to not include certain property confiscated by the United States. See TRIA § 201(d)(2)(B); 148 Cong. Rec. S11528; Smith, 346 F.3d at 271-72 (concluding that the term "blocked assets" reaches broadly to include any property seized or frozen by the United State, but does not include confiscated property because confiscation pursuant to the IEEPA transfers ownership, as oppose to possession, of terrorist property). Instead, in support of their proffered interpretation, Respondents rely exclusively on a statement of interest filed by the United States Attorney's Office for the Southern District of New York (the "Executive Branch") in Rux v. ABN-AMRO Bank, N.V. See Statement of Interest of the United States of America

- 28 -

in Response to Petitioner's Motion for Immediate Turnover
of Funds at 9-11, <u>Rux v. ABN-AMRO Bank, N.V.</u>, No. 08 Civ.
6588 (S.D.N.Y. Jan. 12, 2009).

### 3. The Executive Branch's Interpretation of TRIA Does Not Control

In accord with Respondents' position here, the
Executive Branch in <u>Rux</u> argued that the plain meaning of
"blocked assets of that terrorist party" requires
ownership. <u>See</u> <u>id.</u> The petitioners in <u>Rux</u> sought to
satisfy a judgment arising out of the bombing of the U.S.S.
Cole by executing against EFTs remitted by the Government
of Sudan or one of its agencies or instrumentalities.
Notably, despite the Executive Branch's objections, and
following good and sufficient notice to any third parties
that may have had a claim to the blocked accounts, the
Court in this District entered an order directing turnover
of the blocked Sudanese funds to petitioners. <u>See</u> Judgment
and Order Directing Turnover of Funds to Petitioners and
Discharge of Respondents at 12-15, <u>Rux v. ABN-AMRO Bank,
N.V.</u>, No. 08 Civ. 6588 (S.D.N.Y. Apr. 14, 2009).[12]

Respondents argue that the Court's decision in <u>Rux</u>
should be disregarded as it pre-dated <u>Jaldhi</u>, and urge the

---

[12] The Court notes that Respondents would have this Court stop any
further proceedings before third parties have been given notice and
provided the opportunity to assert any superior claims to the blocked
assets pursuant to CPLR § 5225.

Court to adopt the Executive Branch's interpretation of TRIA as articulated in its amicus brief.  The Court is not persuaded and finds Respondents' treatment of the Executive Branch's interpretation as dispositive of the question at issue here to be misplaced.

"Courts must presume that a legislature says in a statute what it means and means in a statute what it says there," notwithstanding any contrary interpretation by the Executive Branch.  Carciery v. Salazar, 129 S. Ct. 1058, 1059-60 (2009) (rejecting the statutory interpretation of the Secretary of the Interior) (quoting Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992)).  The instant dispute stems primarily from TRIA, yet, even as to the CACRs, where OFAC is charged with administering the TWEA and IEEPA, when "Congress has directly spoken to the precise question at issue," and the statutory scheme is coherent and consistent, no further inquiry is required. See Chevron, U.S.A., Inc. v. Natural Res. Defense Council, 467 U.S. 837, 842-43 (1984).

Nothing about the Court's decision here is intended to minimize the Executive Branch's interest in preserving our nation's relations with foreign parties who may have superior claims to assets blocked pursuant to the CACRs. But the Constitution empowers Congress to regulate commerce

with foreign nations and to define and punish Offenses against the Law of Nations. U.S. Constitution, Art. 1, § 8. As such, Congressional action to protect and promote national security and foreign policy interests by deterring acts of terrorism must be given its due weight. With the TWEA, the IEEPA, and now TRIA, Congress has developed a comprehensive statutory scheme that manifestly seeks both to punish certain foreign states by restricting their trade, and to provide terrorism victims with ample avenues to compensation for acts perpetrated by state sponsors of terrorism. To treat the Executive Branch's statutory interpretation of TRIA as controlling and binding upon the courts would permit an undue accretion of executive authority and would frustrate the separation of powers principles upon which our nation was founded. See The Federalist No. 47 at 324 (J. Cooke ed., 1961) (James Madison) ("The accumulation of all powers legislative, executive and judiciary in the same hands ... may justly be pronounced the very definition of tyranny."); see also Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 594 (1952) (Frankfurter, J., concurring); id. at 637-38 (Jackson, J., concurring). Indeed, legislative history indicates that Congress specifically intended TRIA to

- 31 -

address the Executive Branch's reluctance to allow blocked funds to be used to compensate terrorism victims.[13]

### 4.   Congress Did Not Intend for TRIA to Benefit Banks

In blocking the EFTs at issue here, Respondents themselves acknowledged that EFTs constitute prohibited transactions under the CACRs.   Indeed, such a finding is plainly required by the CACRs, notwithstanding the electronic chain of bank debits and credits that Respondents argue renders EFTs a mere series of neutral instructions or Morse code-like transmissions in which no funds or money actually passes from one bank to another. In fact, "transfers of credit ... through ... any banking institution" are the first type of prohibited transactions listed in CACR § 201.   31 C.F.R. § 515.201.

---

[13]   Just before passage of TRIA, Senator Harkin indicated that despite the enactment of the Anti-Terrorism and Effective Death Penalty Act in 1996, which "actively encouraged [American victims of state-sponsored terrorism] to seek redress and compensation in our federal courts," United States Treasury and State Department officials have been

> flaunting the law, ignoring the clear intent of the Congress, and opposing the use of ... blocked assets of Saddam Hussein, the ruling mullahs in Iran, and other state sponsors of terrorism to compensate American victims of terrorist attacks ....   With the passage of this new legislation, the Congress is requiring that this misguided policy be abandoned.   Holding the blocked assets of state sponsors of terrorism in perpetuity might make sense in the pristine world of high diplomacy, but not in the real world after the September 11 terrorist attacks on America.

148 Cong. Rec. S11528.

Nonetheless, Respondents urge this Court to accept that the EFTs at issue, lawfully blocked by authority of the United States government as property in which Cuba was found to have an interest, should not be considered blocked assets of Cuba because of the peculiar electronic nature of EFTs.   Yet, the fallacy inherent in this argumentation is further revealed by considering the practical result of Respondents' position.   Respondents urge this Court to accept that EFTs are blockable transactions under the CACRs, yet their blocked proceeds can never be executed against under TRIA because of Article 4-A.   Implicit in this argument is that the proceeds of any blocked EFTs are to remain in Respondents' interest-bearing accounts in perpetuity, or until further direction from the federal government.

In essence, what Respondents argue is that the blocked proceeds are tantamount to unclaimed funds and should be treated in a manner which recalls the cy pres doctrine applicable to the law of trusts.   See Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am., 344 U.S. 94, 120 (1952); Van Gemert v. Boeing Co., 573 F.2d 733, 737 (2d Cir. 1978).   But, in their variation of the doctrine, rather than escheating to the state for public disposition, Respondents would have this Court leave the

assets in private hands and grant them indefinite possession, and potential beneficial use of the funds, for what could be years, decades, or even centuries. In the meantime, while the blocked funds would lie idle in the banks' vaults, benefitting no one except the financial institutions, claimants holding judgments against designated terrorist states and seeking to redress heinous crimes would remain thwarted in their efforts to obtain due compensation. The evident anomaly, or even inequity, of that circumstance is underscored by situations, such as may prevail in this case, in which, even after the passage of many years and repeated public notice about legal proceedings to execute against the blocked assets, both the originators and the beneficiaries of the EFTs have defaulted, none having stepped forward in court or in proceedings pursuant to the CACRs to oppose the judgment holder's claim or otherwise assert an interest in the frozen funds. In effect, under Respondents' reckoning of the rules, every time the match contenders double fault, the banks score a point. The Court is not persuaded that this self-serving result squares with the plain remedial purpose of TRIA, by which Congress explicitly promulgated a comprehensive scheme providing that any assets blocked under the CACRs or similar OFAC regulations

34

are to be subject to judgment execution for the benefit of victims of terrorist states -- most fittingly, as in this case, when the crime victim was an American citizen.

B.  **EXECUTION AGAINST BLOCKED ASSETS PRESENTS DISTINCT CIRCUMSTANCES FROM ATTACHMENT AGAINST MIDSTREAM EFTS**

1.  **The Court has in rem jurisdiction over the blocked funds**

The jurisdictional underpinnings of Jaldhi and its progeny reveal a further distinction between the circumstance presented here and the cases upon which Respondents rely.  Jaldhi was based largely on a finding that maritime defendants did not have title or the requisite property interest -- there the equivalent of ownership -- in EFTs passing through intermediary banks located in the jurisdiction.  "As a remedy quasi in rem, the validity of Rule B attachment depends entirely on the determination that the res at issue is the property of the defendant at the moment the res is attached."  Jaldhi, 585 F.3d at 69.  In contrast, here, by operation of the CACRs, the EFT proceeds are indisputably in bank accounts located within the Court's territorial reach, and the Court thus has in rem jurisdiction.[14]

---

[14]  Unlike quasi in rem jurisdiction, where the defendant's interest in the property is critical, a court has in rem jurisdiction regardless of the ownership of the property at issue, as long as the property in question is found within the court's territorial reach.

In fact, jurisdiction in this case arises not because of any claim brought by Hausler, but because of a legal determination made by Respondents themselves pursuant to the CACRs that Cuba has an interest in the EFTs at issue. As noted above, any person holding property blocked pursuant to the CACRs, including any bank deposits or bank accounts subject to CACR § 201, must place the property in an interest-bearing account in a domestic bank. See 31 C.F.R. § 515.205(a), (h). Since Respondents have placed the blocked funds into accounts located in this District, the Court has jurisdiction over disputes arising out of those funds.

The Court's finding is consistent with Jaldhi's repudiation of Winter Storm and the jurisdictional distinctions that supported the Second Circuit's reversal. Winter Storm relied heavily on United States v. Daccarett, 6 F.3d 37 (2d Cir. 1993), which permits the seizure of EFTs for the purpose of satisfying a forfeiture judgment. Similar to Respondents' argument here, the claimants in Daccarett argued that EFTs do not qualify as seizable property for purposes of forfeiture because they are merely electronic communications, and the intermediary banks, as mere messengers, never hold the funds. The Daccarett Court rejected this argument, finding that "[o]n receipt of EFTs

- 36 -

from the originating banks, the intermediary banks possess the funds, in the form of bank credits, for some period of time before transferring them on to the destination banks," and that, "while [an EFT] takes the form of a bank credit at an intermediary bank[,] it is clearly seizable res under the forfeiture statutes." 6 F.3d at 54; see also United States v. Banco Carefetero Pan., 797 F.2d 1154, 1158 (2d Cir. 1986). In fashioning a rule permitting attachment of Midstream EFTs under Rule B, Winter Storm drew "significant guidance" from Daccarett, without considering the distinction between in rem and quasi in rem jurisdiction. Winter Storm, 310 F.3d at 276.

Upon reversal of Winter Storm, the distinction between in rem and quasi in rem jurisdiction served as a "principled basis for allowing EFTs to be subject to forfeiture but not attachment," Jaldhi, 585 F.3d at 69, and constitutes a critical distinction between the circumstances presented here and in Jaldhi. Under both the civil forfeiture statutes and OFAC regulations, ownership of the res is irrelevant, and Executive Branch determinations to seize or block property located within a court's territorial reach results in jurisdiction.

> 2. **Respondents Challenge Hausler's Execution Against Previously Blocked Funds**

Despite jurisdictional similarities with Daccarett, the Court notes that another consideration distinguishes the instant dispute from all challenges to the initial seizure or attachment of Midstream EFTs. Similar to Jaldhi and Asia Pulp, where petitioners challenged the propriety of intermediary banks' attachment of Midstream EFTs, the relevant challenge in Daccarett was to the government's actual seizure of the EFTs. Yet, here, the blocking of the EFTs has already occurred and the proceeds now sit in domestic bank accounts. Respondents do not challenge their own blocking of the funds pursuant to the CACRs, but instead challenge the execution of a judgment against the proceeds of EFTs they themselves previously blocked. On this basis, Hausler argues that the execution she seeks is not against Midstream EFTs and thus subject to Article 4-A, but rather targets domestic bank accounts pursuant to CPLR § 5201. The Court agrees and finds this argument an equally persuasive ground for dismissing Respondents' motion.

The Court finds that this distinction undercuts Respondents' attempt to characterize the instant dispute as simply an issue of attachment against a Midstream EFT, analogous to Jaldhi and Asia Pulp. To accept such a characterization would ignore the explicit procedural step

- 38 -

requiring intermediary banks to place funds blocked pursuant to the CACRs in interest-bearing domestic accounts. This action decisively interrupts EFT transactions and renders the funds subject to execution. Hausler, as the judgment creditor, may execute against any property interest that Cuba has in a bank account in this jurisdiction. See CPLR § 5225(b) (providing that judgment creditor may commence proceeding against "a person in possession or custody of money or other personal property in which the judgment debtor has an interest ...."); id. § 5201 (providing that a money judgment may be enforced "against any property which could be assigned or transferred, whether it consists of a present or future right or interest and whether or not it has vested, unless it is exempt from application to the satisfaction of the judgment"); see also Rux, No. 08 Civ. 6588, Docket No. 213, at *6-*10. For the reasons described above, the Court finds that Cuba has an interest in the blocked EFT proceeds and Hausler may thus execute against the resulting bank accounts and initiate turnover proceedings.

C.   INTERPLEADER LITIGATION

In addition to its grounding in Article 4-A, Respondents' motion is also based on alleged inequities that would purportedly result to third parties and to

- 39 -

themselves as intermediary banks if contested funds were
subject to turnover proceedings. The Court is not
persuaded. First, the CACRs explicitly provide procedures
for transactions that have been mistakenly blocked. See 31
C.F.R. § 515.201(e) ("When a transaction results in the
blocking of funds at a banking institution pursuant to this
section and a party to the transaction believes the funds
have been blocked due to mistaken identity, that party may
seek to have such funds unblocked pursuant to the
administrative procedures set forth in § 501.806 of this
chapter."). Thirteen of the EFTs at issue here have been
blocked since the 1990s, and twenty have been blocked for
at least five years. In addition, banks blocking funds are
required to issue a report within ten business days
describing "the owner or account party, the property, its
location, any existing or new account number or similar
reference necessary to identify the property, actual or
estimated value and the date it was blocked ...." 31 C.F.R.
§ 501.603. It seems inconceivable that, after so many
years and published reports, any third parties possessing a
legitimate interest in the blocked proceeds held by
Respondents subject to these proceedings would be unaware
of the status of the funds in question and that they have
not had sufficient time or opportunity to assert any

remaining interest they may have in the assets. Nonetheless, though legal procedures are available, and despite notice through CACRs reports, such third parties apparently have not sought to, or have been unable to, unblock the funds. Insofar as any interested third party may not yet be on notice of the blocked EFTs held by Respondents, the initiation of turnover proceedings will provide ample additional opportunity for the assertion of any superior claims.[15]

Moreover, the Court finds that, at the end of the day, upon completion of the turnover proceedings and assuming Hausler were to prevail, by judgment of a federal court of law Respondents will be discharged from this action and amply protected from liability to third parties. Upon the initiation of turnover proceedings, Respondents indicate that they will interplead all known third parties to the blocked EFTs. Respondents will thus have the opportunity to seek discharge in interpleader pursuant to Rule 22 of the Federal Rules of Civil Procedure, as well as CPLR §§

---

[15] Contrary to Respondents' alarmism regarding inequities that would result to any third parties whose assets may be comingled in the blocked accounts, where a turnover proceeding is commenced by a judgment creditor pursuant to CPLR § 5225(b) against a person in possession or custody of money in which the judgment debtor has an interest, any adverse claimant may intervene in the proceeding in order to assert a superior claim to the blocked assets in question. Accordingly, third parties will be given notice and afforded time to provide written objections asserting any superior claims they may have to the blocked assets.

5209, 6204.   See  Fed.  R.  Civ.  P.  22(1)  (allowing
interpleader where a party "is or may be exposed to double
or multiple liability"); CPLR §§ 5209, 6204 (discharging
garnishee's obligation).  Interpleader litigation routinely
protects entities like Respondents which possess no interest
in potentially contested funds.  See, e.g., Weininger, 462 F.
Supp. 2d at 500.

Finally, the Court notes that, as was the case in
Weininger involving some of the same Respondents here,
attorneys' fees and costs are generally awarded to a
disinterested stakeholder who has "expended time and money
participating in a dispute 'not of his own making and the
outcome of which has no impact on him.'"  Fidelity Brokerage
Servs., LLC v. Bank of China, 192 F. Supp. 2d 173, 183
(S.D.N.Y. 2002) (quoting Companion Life Ins. Co. v. Schaffer,
442 F. Supp. 826, 830 (S.D.N.Y. 1977)).  As a result, with
respect to their efforts to secure interpleader, Respondents
will be entitled to submit an application for reasonable
attorneys' fees and costs.  See Weininger, 462 F. Supp. 2d at
501-02 (citing Fed. R. Civ. P. 54).

## III.  ORDER

For the reasons stated above, it is hereby

**ORDERED** that the motion to dismiss (Docket No. 53) of
garnishee-respondents JP Morgan Chase Bank, N.A., Citibank,

N.A., UBS AG, The Royal Bank of Scotland, N.V. (f/k/a ABN

AMRO Bank, N.V.), and Bank of America, N.A. is DENIED.

**SO ORDERED.**

Dated:     New York, New York
           10 September 2010

                                    VICTOR MARRERO
                                       U.S.D.J.