UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEANNETTE FULLER HAUSLER as *Successor Personal Representative of the Estate of* ROBERT OTIS FULLER, ("BOBBY FULLER"), *Deceased*, on behalf of THOMAS CASKEY as Personal Representative of the Estate of LYNITA FULLER CASKEY, surviving daughter of ROBERT OTIS FULLER, The ESTATE OF ROBERT OTIS FULLER, FREDERICK FULLER, FRANCIS FULLER, GRACE LUTES, JEANNETTE FULLER HAUSLER, and IRENE MOSS, <br><br>                     Petitioner, <br><br>          - against - <br><br> JP MORGAN CHASE BANK, N.A, CITIBANK, N.A., UBS AG, THE ROYAL BANK OF SCOTLAND N.V. (FORMERLY KNOWN AS ABN AMRO, N.V.), BANK OF AMERICA, N.A., and NATIONAL BANK OF CANADA, <br><br>                     Garnishee-Respondents. | 09 Civ. 10289 (VM) <br><br> (Related to the JPM Chase/Citibank Turnover Proceeding -- Tranche III) <br><br><br><br> RE: Fidel Castro Ruz, Raul Castro Ruz, The Republic of Cuba, and The Cuban Revolutionary Armed Forces <br><br> [JUDGMENT DEBTORS] |

**MEMORANDUM OF LAW IN SUPPORT OF
PETITIONER'S MOTION FOR JUDGMENT ON THE
<u>PLEADINGS AND FOR TURNOVER CONCERNING PETITION III</u>**

| GREENBERG TRAURIG, LLP | GREENBERG TRAURIG, LLP | COLSON HICKS EIDSON |
|---|---|---|
| James W. Perkins | David A. Baron | Roberto Martinez |
| Bryn K. Haffey | 2101 L Street, N.W., | Ronald W. Kleinman |
| 200 Park Avenue, 38th Floor | Suite 1000 | 255 Aragon Avenue, |
| New York, New York 10166 | Washington DC 20037 | Second Floor |
| Phone: (212) 801-3188 | Phone: (202) 331-3100 | Coral Gables, FL. 33134 |
| Fax:   (212) 801-6400 | Fax: (202) 331-3101 | Phone: (305) 476-7400 |
| | | Fax:  (305) 476-7444 |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ......................................................................................................................... 2

    POINT I    PETITIONER IS ENTITLED TO JUDGMENT ON THE INTERPLEADER ............................................................................................. 2

        A.    The Originators and Beneficiaries Are Not Properly Interpled ................. 3

        B.    Originating Banks Are Not Proper Interpleader Parties ............................ 4

            1.    Respondents Are Not Exposed to Any Claim For the Same *Res* .................................................................................................. 5

            2.    Respondents Can Have No "Reasonable and Credible" Fear of Double Liability ............................................................................ 7

                (a)    Respondents Have Performed Their Obligations Under Applicable Law ........................................................ 7

                (b)    Any Claims For Unwinding the Blocking Must Be Made against OFAC, Not Respondents. ............................. 9

                (c)    Any Claims Against Respondents Are Time-Barred Under the UCC Statute of Repose. ..................................... 9

                (d)    The Statute of Limitation Bars Claims Regarding 22 of the 28 Petition III Accounts. ......................................... 10

        C.    No Beneficiary Bank Is A Proper Interpleader Party .............................. 10

    POINT II    PETITIONER IS ENTITLED TO JUDGMENT ON PETITION III ............ 11

        A.    Petitioner is Entitled to Judgment against the Respondents ..................... 11

        B.    Petitioner is Entitled to Judgment Against the Judgment Debtors .......... 11

        C.    Enforcement of the Tranche III Petition is Fully Consistent With Constitutional Provisions ......................................................................... 13

CONCLUSION .................................................................................................................... 15

# TABLE OF AUTHORITIES

Page

**Federal Cases**

*Ashton v. Josephine Bay Paul and C. Michael Paul Found., Inc.*,
918 F.2d 1065 (2d Cir.1990) ................................................................................ 2

*Banco Nacional de Cuba v. Chemical Bank New York Trust Co.*,
594 F. Supp. 1553, 1556 (S.D.N.Y. 1984) .......................................................... 13

*Bandes v. Harlow & Jones, Inc.*, 852 F.2d 661 (2d Cir. 1988) ................................ 6

*Confecciones Zuny Ltda. v. Banco Atlantico*,
No. 93 Civ. 2137 (LMM), 1994 WL 533563 (S.D.N.Y. 1994) ........................... 7

*Cuba v. Chemical Bank New York Trust Co.*, 594 F. Supp. 1553 (S.D.N.Y. 1984) ... 13

*Dames & Moore v. Regan*, 453 U.S. 65 (1981) ....................................................... 14

*E-Systems, Inc. v. United States,* 2 Cl. Ct. 271 (Claims Ct. 1983) ......................... 14

*EM Ltd. v. Republic of Argentina*, 473 F.3d 463 (2d Cir. 2007) ............................. 5

*Eitzen Bulk A/S v. Ashapura Minechem, Ltd.*,
No. 10-0976-cv, 2011 WL 503714 (2d Cir. 2011) .............................................. 3

*Filler v. Hanvit Bank*, 378 F.3d 213 (2d Cir. 2004) ................................................ 12

*Global Relief Foundation, Inc. v. O'Neill*, 315 F.3d 748 (7th Cir. 2002) ............... 15

*Grain Traders, Inc. v. Citibank, N.A.*, 160 F.3d 97 (2d Cir. 1998) ..................... 3, 8, 11

*In re Ames Dept. Stores, Inc.*, 274 B.R. 600 (Bkrtcy. S.D.N.Y. 2002) ................... 5

*Industrial Bank of Wash. v. Techmatics Tech,, Inc.*,
763 F. Supp. 629 (D.D.C. 1991), *aff'd,* 955 F.2d 764 (D.C. Cir. 1992). .............. 2

*Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841 (5th Cir. 2000) ................. 12

*Levin v. Bank of New York*,
No. 09 CV 5900 RPP, 2011 WL 812032 (S.D.N.Y. March 4, 2011) .................. 2

*Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
597 F.3d 84 (2d Cir. 2010) .................................................................................. 9

*Manufacturas Int'l Ltd. v. Manufacturers Hanover Trust Co.*,
792 F. Supp. 180 (E.D.N.Y. 1992) ...................................................................... 7

*Nielsen v. Secretary of Treasury*, 424 F.2d 833 (D.C. Cir. 1970) ........................... 15

*Orvis v. Brownell*, 345 U.S. 183 (1953) .................................................................. 14

*Paradissiotis v. Rubin*, 171 F.3d 983 (5th Cir. 1999) ............................................. 15

*Propper v. Clark*, 337 U.S. 472 (1949) ........................................................... 10, 13, 14

*Alejandre v. Telefonica Larga Distancia de Puerto Rico, Inc.*,
183 F.3d 1277, 1285. n.19 (11th Cir. 1999) ........................................................ 12

*Sardino v. Federal Reserve Bank of New York*,
   361 F.2d 106 (2d. Cir. 1966), *cert. denied*, 385 U.S. 898 (1966) .......... 14

*Sheerbonnet, Ltd. v. Amer. Exp. Bank, Ltd.*, 951 F. Supp. 403 (S.D.N.Y. 1995) .......... 4, 8

*Shipping Corp. of India Ltd. v. Jahldi Overseas Pte Ltd.*, 585 F. 3d 58 (2d Cir. 2009) .......... 3

*State Farm Fire & Casualty Co. v. Tashire*, 386 U.S. 523 (1967) .......... 2

*Teague v. Regional Commissioner of Customs*, 404 F.2d 441 (2d Cir. 1968) .......... 14

*Tole v. Miller*, 530 F. Supp. 999 (S.D.N.Y. 1981) .......... 15

*United States v. $79,000 in Account Number 2168050/6749900 at Bank of New York*, No.
   96 CIV. 3493 (MBM), 1996 WL 648934 (S.D.N.Y. 2006) .......... 5

*United States v. BCCI Holdings (Luxembourg), S.A.*,
   977 F. Supp. 12 (D.D.C. 1997), *aff'd per curiam*, 159 F.3d 637 (D.C. Cir. 1998) .......... 3, 6, 8

*United States v. Daccarett*, 6 F.3d 37 (2d Cir. 1993) .......... 5

*United States v. Pink*, 315 U.S. 203 (1942) .......... 15

*USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190 (3d Cir. 2003) .......... 12

*W.R. Hough v. DeLoitte & Touche*, 549 F.3d 100 (2d Cir. 2008) .......... 13

*Warth v. Seldin*, 422 U.S. 490 (1975) .......... 13

*Weininger v. Castro*, 462 F. Supp. 2d 457 (S.D.N.Y. 2006) .......... 13

*Zarmach Oil Svcs Inc. v. Dep't of Treasury*,
   No. 09-2164 (ESH), 2010 WL 4627838 (D.D.C. Nov. 16, 2010) .......... 4, 6, 9

*Zittman v. McGrath*, 341 U.S. 446 (1951) .......... 14

**State Cases**

*Bank of New York v. Norilsk Nickel*,
   14 A.D.3d 140, (1st Dep't 2004) .......... 7

**Federal Statutes**

5 U.S.C. §§ 701-06 .......... 9

5 U.S.C. App. § 5 .......... 13

28 U.S.C. § 1491 .......... 15

28 U.S.C. § 1610 .......... 1, 2

28 U.S.C. § 1603 .......... 12

28 U.S.C. § 1608(e) .......... 12

50 U.S.C. § 1701 .......... 13

**State Statutes**

| | |
|---|---|
| N.Y. C.P.L.R. § 213 | 10 |
| N.Y. U.C.C. Part 4A | 9 |
| N.Y. U.C.C. § 4-A-402 | 8 |
| N.Y. U.C.C. § 4-A-403 | 11 |
| N.Y. U.C.C. § 4-A-503 | 3 |
| N.Y. U.C.C. § 4-A-507(1)(a) | 7 |
| NY Abandoned Property Law § 300 | 7 |

**Federal Rules**

| | |
|---|---|
| Fed. R. Civ. P. Rule 8(b)(6) | 12 |
| Fed. R. Civ. P. Rule 22 | 2 |

**Federal Regulations**

| | |
|---|---|
| 31 C.F.R. Part 515 | 1 |
| 31 C.F.R. § 201(e) | 9 |
| 31 C.F.R. § 203 | 6 |
| 31 C.F.R. § 203(a) | 9 |
| 31 C.F.R. § 310 | 6 |
| 31 C.F.R. § 508 | 5 |
| 31 C.F.R. § 806 | 9 |

**Secondary Sources**

| | |
|---|---|
| 10 Am. Jur. 2d Banks and Financial Institutions § 647 | 5 |
| 9 C.J.S. Banks and Banking § 280 | 5 |
| 9 C.J.S. Banks and Banking § 281 | 5 |
| 9 C.J.S. Banks and Banking § 291 | 5 |
| C. Wright and A. Miller, Federal Practice and Procedure § 49:2 | 5 |

Petitioner Jeannette Hausler, by her undersigned attorneys, respectfully submits this memorandum in support of her motion for judgment on the pleadings concerning the interpleader petition of Bank of America, Citibank, JPMorgan Chase, Royal Bank of Scotland, and UBS (referenced jointly as "Respondents"), and for judgment granting her Petition III for Turnover (Dkt. 31) ("Petition III").

## PRELIMINARY STATEMENT

By Petition III, Petitioner seeks turnover of funds in 28 accounts at Respondent banks into which proceeds of electronic funds transfers ("EFT") have been deposited pursuant to the Cuban Assets Control Regulations ("CACR"), 31 C.F.R. Part 515 (hereinafter, "31 C.F.R." will be cited as "CACR"). When Respondents moved to dismiss the petition, this Court held, by Order dated September 10, 2010 (Dkt. 85), that under the specific terms of CACR and Section 201 of the Terrorism Risk Insurance Act or 2002, Pub. L. No. 107-297, 116 Stat. 2337, codified at 28 U.S.C. § 1610 note, ("TRIA"), the Cuban national or entity whose interests in these EFT's had led to their blocking had a sufficient property interest in the blocked account to allow garnishment and execution, *id.* at 17, and that, through TRIA, "Congress has explicitly promulgated a comprehensive scheme providing that any assets blocked under the CACRs or similar OFAC regulations are to be subject to judgment execution for the benefit of victims of terrorist states – most fittingly, as in this case, when the crime victim was an American citizen." *Id.* at 35.

Further, the Court observed that turnover of these accounts will not cause any inequity to third parties whose assets may be commingled with the blocked assets within those accounts – because "[i]t seems inconceivable that, after so many years and published reports, any third parties possessing a legitimate interest in the blocked proceeds held by the Respondents subject

to these proceedings would be unaware of the status of the funds in question and that they have not had sufficient time or opportunity to assert any remaining interest they may have in the assets," *id.* at 40-41 -- but granted Respondents leave to give notice to third parties whose assets may be commingled in the blocked accounts. *Id.* at 41 & n.15.[1]  Respondents, however, did not provide notice to any "commingled" parties, presumably because there are none.

Rather, Respondents interpleaded the originating and beneficiary parties and the originating and beneficiary banks to the EFT transactions.[2]  As shown below, none of the EFT parties are proper subjects of interpleader under Federal Rule of Civil Procedure 22, because, as a matter of law, none has a claim to the specific blocked accounts at issue.  And, as the Court's September 10 Order anticipated, any such claims also must fail because they are time-barred.

## ARGUMENT
### POINT I
### PETITIONER IS ENTITLED TO JUDGMENT ON THE INTERPLEADER

Interpleader is authorized under Fed. R. Civ. Proc. 22 only where "persons with claims that may expose a plaintiff [here, the Respondents] to double or multiple liability may be joined as defendants. . . ."  Such "double liability" must be based on claims ***to these exact same identifiable funds***.[3]  General, non-specific claims against the Garnishee-Respondent Banks that are not tied directly to the specific, identifiable *res* are insufficient to support an interpleader.

---

[1] In the Court's words, "[W]here a turnover proceeding is commenced by a judgment creditor pursuant to CPLR § 5225(b) against a person in possession or custody of money in which the judgment debtor has an interest, any adverse claimant may intervene in the proceeding in order to assert a superior claim to the blocked asses in question. Accordingly, third parties will be given notice and afforded time to provide written objections asserting any superior claims they may have to the blocked assets." *Id.* at 41 & n.15.

[2] While it would have been proper to interplead any other party claiming to garnish and execute against these blocked accounts under TRIA, *compare Levin v. Bank of New York*, No. 09 CV 5900 RPP, 2011 WL 812032 (S.D.N.Y. March 4, 2011), Respondents have not indicated that any such party has been interplead; no competing writs of garnishment have been filed in this docket, and Petitioner is unaware of any other TRIA judgment holder seeking to enforce against the Petition III accounts.

[3] *See State Farm Fire & Casualty Co. v. Tashire,* 386 U.S. 523, 530 (1967); *Ashton v. Josephine Bay Paul and C. Michael Paul Found., Inc.*, 918 F.2d 1065, 1067-68 (2d Cir. 1990); *Industrial Bank of Wash. v. Techmatics Tech,,*

2

A.     The Originators and Beneficiaries Are Not Properly Interpled

Despite their previous arguments that midstream EFT's are not the property of either the originators or beneficiaries while the EFT is in the possession of an intermediary bank, *see* September 10 Order at 9 (characterizing Respondents' assertions), Respondents have interpleaded all originators or intended beneficiaries of the Petition III accounts. Unlike Petitioner, whose claims arise under federal law, any claims by any such party necessarily arise under state law. Under New York law, while such parties may have an interest in the EFT, they have no property interest in the blocked interest-bearing accounts into which the EFT proceeds were required to be deposited under CACR.[4]

As Respondents must concede, in connection with an EFT transaction in which they serve as the intermediary bank, they are not in privity with either the originator or beneficiary. Hence, neither can claim against Respondents for misfeasance in implementing the EFT instructions or complying with U.S. law by blocking the transaction and depositing the proceeds into a blocked account in the name of a Cuban entity. *See Grain Traders, Inc. v. Citibank, N.A.,* 160 F.3d 97, 102 (2d Cir. 1998) ("no right to a refund otherwise exists between the originator and an intermediary bank"); *U.S. v. BCCI Holdings (Luxembourg), S.A.,* 977 F. Supp. 12, 18 (D.D.C. 1997), *aff'd per curiam*, 159 F.3d 637 (D.C. Cir. 1998) ("when a funds transfer is not

---

*Inc.,* 763 F. Supp. 629, 634 (D.D.C. 1991) ("To satisfy the adversity requirement for an interpleader action, the interpleader claims must be adverse to the fund and adverse to each other."), *aff'd,* 955 F.2d 764 (D.C. Cir. 1992).

[4] The Second Circuit recently held, as a matter of New York law, EFTs "**are not the property of either the originator or the beneficiary**." *Shipping Corp. of India Ltd. v. Jahldi Overseas Pte Ltd.*, 585 F. 3d 58, 71 (2d Cir. 2009) (emphasis added). The holding in *Eitzen Bulk A/S v. Ashapura Minechem, Ltd.,* No. 10-0976-cv, 2011 WL 503714 (2d Cir. 2011) is not to the contrary. *Eitzen* holds, at *2 n. 1 – consistent with this Court's September 10 Order, that an originator and beneficiary have property interests in an EFT transaction, and that this is sufficient to allow them to challenge judicially-ordered attachments that intercept completion of a midstream EFT transaction. *Eitzen* does not hold (or imply) that the originators and beneficiaries "own" the proceeds of the EFT. Nor does it hold or imply that they have standing to challenge execution of a judgment against the proceeds of a lawfully blocked (or attached) EFTs. It is undisputed that these EFTs were lawfully blocked, and no party has asserted that it has sought or received an OFAC license to unblock the funds. Affirmative pleading of such a license is required under Rule 8(c) of the Federal Rules of Civil Procedure.

3

completed, an intermediary bank receiving payment [of the proceeds of an EFT] . . . owed nothing to [the Claimant] as beneficiary **since an intermediary bank has no legal obligation to the beneficiary.**") (emphasis added)).  No originator or beneficiary, merely by reason of this status, meets the criteria of Rule 22.  Thus, Respondents cannot be liable to them as a matter of law.  *See Sheerbonnet, Ltd. v. Amer. Exp. Bank, Ltd.*, 951 F. Supp. 403 (S.D.N.Y. 1995).

For these reasons, Respondents' interpleader of originators and beneficiaries fails to meet the standard under Rule 22.  Petitioner is entitled to judgment on the interpleader as directed to these parties or, alternatively, they should be dropped under Rule 21 as "misjoined."

### B.   Originating Banks Are Not Proper Interpleader Parties

Respondents' interpleader of originating banks also fails to meet Rule 22 as a matter of law.  These banks undertook, on behalf of non-U.S. customers, to arrange payment to blocked Cuban entities via an EFT.  Each voluntarily issued instructions to one of the Respondents, located in the United States, to debit funds from U.S.-located accounts for credit onward to another bank for further credit to a blocked Cuban entity.  In this process, these originating banks voluntarily committed their performance in this transaction to U.S. law, including CACR.[5]

For these Originating Banks to be properly interpleaded, Respondents must demonstrate that they have a "reasonable and credible" basis to assert that they may be liable to them if, in accordance with TRIA, this Court were to order execution against the Petition III accounts.  As noted above, such potential "double liability" can serve as the basis for interpleader only if it is the result of credible claims **to these exact same identifiable funds**. *See* footnote 3, *supra*.  Moreover, that threat of double liability must relate entirely to the disposition of the *res* that has

---

[5] Some originating banks have asserted that, because their instructions to pass the EFT through the United States were issued by mistake, the proceeds were not properly blocked and may not be subject to execution under TRIA. This argument is without merit.  OFAC does not recognize "mistakes" in transmitting an EFT to and through the U.S. as any basis to release funds, including EFT proceeds.  *See* Letters attached as Exh. T to the Declaration of James W. Perkins dated April 15, 2011 ("Perkins Decl.") (produced in discovery and filed under seal). *See also* OFAC Director Szubin Declaration ("Szubin Decl."), ¶¶ 22-24, filed in *Zarmach*, *infra*, n.8, at Perkins Decl. Exh. S.

4

been deposited into the blocked accounts (in this case, the amenability of that *res* to execution under TRIA in satisfaction of judgments issued against the Republic of Cuba), and not to the Respondents' potential liability for tortious conduct or breaches of contract unrelated to such disposition. *See, e.g.,* C. Wright and A. Miller, Federal Practice and Procedure § 49:2 ("The function of interpleader is to resolve claims for designated assets based on mutually exclusive theories, rather than to adjudicate rival claims that are mutually exclusive only because of the limited size of the assets. Therefore, a prerequisite to interpleader is the existence of a single, identifiable fund or property, rather than money generally."). Respondents' interpleader of the originating banks cannot meet this test.

    1.    <u>Respondents Are Not Exposed to Any Claim For The Same *Res*</u>

These banks have no cognizable property interest in the *res* held on deposit in the blocked interest-bearing accounts (which Respondents are required to hold in the name of the designated Cuban national). *See* CACR § 515.508; *United States v. Daccarett,* 6 F.3d 37, 54 (2d Cir. 1993) (holding that wire transfer is seizable *res,* as defined by forfeiture statute, in which banks involved in transaction do not have interest sufficient to interfere with forfeiture). Under New York and common law, the account is presumptively owned by the party in whose name it is held, which is by operation of law ***not*** the originating bank.[6] Nor can any originating bank claim to possess any of the attributes of "ownership" – they do not have title to the blocked accounts, and by reason of CACR, they do not control those accounts, have no right of

---

[6] "Once the funds are deposited in an account under an individual's name, the account holder is presumed to have title to and control over those funds." *United States v. $79,000 in Account Number 2168050/6749900 at Bank of New York*, No. 96 CIV. 3493 (MBM), 1996 WL 648934 (S.D.N.Y. 2006) (citing 9 C.J.S. Banks and Banking §§ 280, 281 (1996); *EM Ltd. v. Republic of Argentina,* 473 F.3d 463 (2d Cir. 2007); *In re Ames Dept. Stores, Inc.,* 274 B.R. 600, 616 (Bkrtcy. S.D.N.Y. 2002)("As a general rule, once funds are deposited in a bank account, the account holder is presumed to have title to and control over those funds."); 10 Am. Jur. 2d Banks and Financial Institutions § 647 (2010) ("A certificate of deposit is presumed to belong to a person whose name appears on the certificate."); 9 C.J.S. Banks and Banking § 291 ("The name on a bank account is prima facie proof of ownership of the account. The law presumes that a deposit, or the right to reclaim it, belongs to the person in whose name it is entered, and the bank cannot question such person's right thereto.").

5

enjoyment of the accounts, cannot exclude others from access to the accounts, and cannot dispose of (or transfer ownership) of those accounts. Rule 56.1 Statement ¶ 4.

Nor can these banks claim that they recaptured some interest in the account through any post-blocking actions or transactions. CACR expressly prohibits any such transactions and directs that any such post-blocking transaction is "null and void and shall not be the basis for the assertion or recognition of any interest in or right, remedy, power or privilege in respect to such property." CACR § 515.203. *See also* § 515.310 (defining "transfer"). Thus, originating banks cannot invoke such theories as accord and satisfaction, subrogation, or absolution by subsequent payment.[7] *See Zarmach Oil Svcs Inc. v. Dep't of Treasury,* No. 09-2164 (ESH), 2010 WL 4627838, at *6 (D.D.C. Nov. 16, 2010) (OFAC regulations "contain no provision" by which an asset can be "unblocked" except by license).[8]

In any event, even when an originating bank may have a claim against an intermediary bank based on some argument that the intermediary has improperly executed the EFT instructions, this merely means that "the originator's bank was left with a cause of action against [the intermediary bank] – **although not a right to return of the specific funds.**" *U.S. v. BCCI Holdings (Luxembourg), S.A.,* 977 F. Supp. at 18 (emphasis added) (holding that no EFT party had right to claim ownership or title to proceeds of EFT deposited into frozen account). Thus, this is merely a general cause of action which cannot relate to the same *res* deposited in the Petition III accounts, and therefore, it does not meet the Rule 22 standard.[9]

---

[7] In fact, any such admissions as to subsequent payments to a Cuban party are merely further admissions that these parties have been trading with the enemy in violation of TWEA such that they have unclean hands are not entitled to the equitable relief of interpleader in a federal court. *See Bandes v. Harlow & Jones, Inc,.* 852 F.2d 661, 668 (2d Cir. 1988).

[8] *See also* Szubin Decl. at 5-7 (explaining OFAC's policy and rationale regarding non-recognition of subsequent attempts to extinguish sanctions targets' interests in blocked property), attached as Exhibit S to Perkins Decl.

[9] Further, without having made a written claim to ownership within five years, the originating banks would be deemed under New York law to have abandoned any claim to such an account. *See* NY Abandoned Property Law §

6

2.      Respondents Can Have No "Reasonable and Credible" Fear of Double Liability

Nor can Respondents demonstrate that any such cause of action exposes them to some "***reasonable and credible***" fear of double liability.  Indeed, the historical practice of New York banks in allowing EFT transactions to be attached and their proceeds to be garnished without interpleading any originating banks demonstrates that the possibility of an action by the originating banks presents no objectively reasonable or credible fear of any type.[10]  More specifically as to the accounts at issue here, the originating banks could not, as a matter of law, prevail on any such general cause of action for at least four reasons.

(a)     Respondents Have Performed Their Obligations Under Applicable Law

None of the originating banks could have any reasonable and credible basis to assert that the Respondents are liable to them for some failure to perform the EFT instructions issued by the originating banks.  To the contrary, the Respondents have fully executed their instructions issued by the originating banks in connection with each EFT transaction, to the fullest extent allowed by U.S. law (which governs these transactions) precisely because the originating banks voluntarily committed the EFTs to payment through the Respondents in the United States.  *See* N.Y. U.C.C. § 4-A-507(1)(a)).  Merely because U.S. law requires Respondents to debit the U.S.-located

---

300.  Respondents have produced no correspondence from any originating bank claiming ownership of a Petition III account.  And discovery provided to date demonstrates that no Respondents took any action internally which suggested that any originating bank was characterized as appearing to be "entitled to" the proceeds of any account.

[10] Respondents' interpleader of originating banks in this proceeding stands in stark contrast to the actions they (and other New York-based banks) have taken in literally hundreds of attachment and garnishment proceedings brought in the Southern District of New York to execute judgments against EFTs.  Case law databases include hundreds of published decision in proceedings in which issues relating to the amenability of EFTs to execution in satisfaction of a judgment have been decided **without interpleader or other involvement of any originating bank or any beneficiary bank**.  Even in the context of blocked EFT accounts, the intermediary banks did not interplead the originating or beneficiary banks.  *See Bank of New York v. Norilsk Nickel*, 14 A.D.3d 140, 145-47  (1st Dep't 2004).  The only context in which ***any*** intermediary banks have sought to interplead any originating or beneficiary bank relates to TRIA enforcement.  Nothing related to a court-ordered turnover under TRIA warrants any heightened concern regarding exposure to liability for an intermediary bank, or injury to an originating bank (or a beneficiary bank for that matter*).  Compare* case law regarding enforcement of seizure orders directed at EFT proceeds: *Manufacturas Int'l Ltd. v. Manufacturers Hanover Trust Co.,* 792 F. Supp. 180 (E.D.N.Y. 1992); *Confecciones Zuny Ltda. V. Banco Atlantico*, No. 93 Civ. 2137 (LMM), 1994 WL 533563 (S.D.N.Y. 1994).

accounts specified by the originating banks, and deposit the proceeds into an account to which they have no access, control or ownership cannot provide those banks with any reasonable or credible claim against the Respondents. *See BCCI,* 977 F. Supp. at 17.

Nor can Respondents argue, as they did in support of their Motion to Dismiss, that the so-called "money back guarantee" in N.Y. U.C.C. § 4A-402 gives the originating banks a claim of interest in the blocked account. Clearly, this argument cannot be extended to any originator, beneficiary bank, or beneficiary. *See Grain Traders,* 160 F.3d at 102. As to originating banks, the Second Circuit also held in *Grain Traders* that the reference to a "money back guarantee" is effectively a misnomer, providing no relief to an originating bank where it has directed payment through an intermediary bank that cannot complete payment or is required to make payment into a frozen account. Rather, the originating bank bears the risk of loss, not the intermediary bank:

> Where a right to refund has been triggered because a transfer was not completed, but one of the banks that received payment is unable to issue a refund because it has suspended payments, the orderly unraveling of the transfer is prevented and the risk of loss will be borne by some party to the transfer. **Article 4-A allocates that risk of loss to the party that first designated the failed bank to be used in the transfer, i.e., the originating bank**. (emphasis added).

*Id.* at 102. In any event, Section 4-A-402 does not create any property interest in the *res* deposited into a blocked account to hold the proceeds of the EFT. It would merely create a general, non-property-specific claim addressed to the intermediary's general liability, which is not recoverable from the blocked account. *See also Sheerbonnet, Ltd. v. American Express Bank, Ltd.,* 951 F. Supp. 403, 414-17 (S.D.N.Y. 1996) (discussing effect of payments of EFT proceeds into "frozen" account as ordered by court through turnover order).[11]

---

[11] In *Sheerbonnet,* Judge Preska addressed whether the party holding a frozen account in which the proceeds of an EFT originated by plaintiff had been deposited had to be joined as a party based on the purported fear of the defendant (which was both the originating and beneficiary bank) to double or multiple liability in his absence. As Judge Preska held, in terms that apply with equal force here, the bank's "fear of exposure to multiple and conflicting judicial determinations stems from its mischaracterization of the nature of this action. Properly characterized, this action does not require the joinder of the Superintendent for just adjudication." *Id.* A claim that is about the specific

8

  (b) Any Claims For Unwinding the Blocking
    <u>Must be Made Against OFAC, Not Respondents</u>

  Nor do Respondents have any reasonable or credible bases to fear any liability on any claim by the originating banks that the blocking of an EFT must be unwound because the proceeds have been deposited into an account not in their name. Rather this claim can only be addressed to the discretion of OFAC, which has exclusive authority to direct that the funds to be returned to the originating banks, subject to appeal under the Administrative Procedure Act, 5 U.S.C. §§ 701-06. *See Zarmach*, 2010 WL 4627838, at *8. CACR includes explicit procedures under which any EFT party, including the originating banks, may seek relief for an improper blocking or based on mistaken identity of the real owner. *See* §§515.201(e); 501.806. None has pursued this remedy, and more particularly none has obtained a license or a judgment under the APA. Any claim under this theory would necessarily falter for failure to exhaust administrative remedies, and because litigation against specific blocked assets is expressly prohibited unless otherwise licensed. *See Dames & Moore v. Regan,* 453 U.S. 654 (1981); CACR § 515.203(e).

  (c) Any Claims Against Respondents Are
    <u>Time-Barred Under the UCC Statute of Repose</u>

  Under N.Y. U.C.C. Part 4A, those originating banks which, upon notice of the blocking, failed to object in writing to the payment of the EFT into the blocked account within one year would be subject to the statute of repose enacted in Section 4A-505. Any such failure by an originating bank extinguishes its claim as a matter of law. *See Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 597 F.3d 84, 88 & n.4 (2d Cir. 2010). Respondents have produced no documentation that any originating banks provided the requisite notice. All Petition III accounts

---

funds frozen in accounts in accordance with federal law – such as that brought by Petitioner – is distinct from a general claim seeking non-specific relief from allegedly tortious conduct in banking practices. A determination in one of these claims "will neither impair nor impede" the ability for the banks involved in executing an EFT to defend in the other, "nor will it subject the [Bank] to multiple, inconsistent judicial outcomes by reason of" the other claim(s). *Id.* at 417. On this basis, Judge Preska held that the action could continue without the joinder of the representative of the non-party Bank involved in the EFT transaction.

were blocked more than one year ago. By reason of the statute of repose, Respondents could not have any reasonable and credible basis to fear double liability to any of the originating banks.

      (d)      The Statute of Limitation Bars Claims Regarding 22 of the 28 Petition III Accounts

Lastly, any claim asserted by the originating banks against Respondents concerning any blocking action taken beyond the applicable statute of limitations (which, at most, would be six years under New York law, *see* N.Y. C.P.L.R. § 213) would be time-barred and therefore not really a claim at all. *See Ma,* 597 F.3d at 88-89.[12] As to any claim based on an EFT blocking prior to April 15, 2005 (and counting), Respondents could have no reasonable and credible basis to fear double liability. Perkins Decl. Exh. T listing the 22 (of 28) accounts blocked for more than 6 years without initiation of a lawsuit by an originating bank.

      C.      No Beneficiary Bank Is A Proper Interpleader Party

Nor could the Respondents have any reasonable or credible basis to fear liability to any beneficiary banks. In addition to all of the grounds cited above with respect to originating banks (which apply with equal force to beneficiary banks), under CACR, as explained *supra*, the EFT proceeds are required to be paid into the account of the ultimate beneficiary that is a national of Cuba. In this respect, under the positions taken by the representatives of the New York banking industry, whatever rights a beneficiary bank may have with respect to the intermediary bank's

---

[12] Neither TWEA nor CACR precludes any party from pursuing a judgment for liability under state law concerning a bank's handling of property that it blocked or froze pursuant to CACR. *See Dames & Moore*, 453 U.S. at 675 ("We conclude that although the IEEPA authorized the nullification of the attachments, it cannot be read to authorize the suspension of the claims. The claims of American citizens against Iran are not in themselves transactions involving Iranian property or efforts to exercise any rights with respect to such property. An *in personam* lawsuit, although it might eventually be reduced to judgment and that judgment might be executed upon, is an effort to establish liability and fix damages and does not focus on any particular property within the jurisdiction."); *see also Propper v. Clark,* 337 U.S. 472, 483 (1949) ("Nothing in the Trading with the Enemy Act or regulations specifically forbids *eo nomine* litigation in state courts."). Thus, the statute of limitations is not tolled merely because the accounts have been blocked or frozen.

performance of the EFT instructions have been satisfied.[13]  Accordingly, there can be no reasonable and credible basis to believe that compliance with CACR by payment to the credit of the beneficiary (followed by execution against those credits to satisfy a judgment for which the beneficiary is required to pay) could possibly expose Respondents to double liability to the beneficiary banks.

## POINT II
## PETITIONER IS ENTITLED TO JUDGMENT ON PETITION III

A.  <u>Judgment Against Respondents</u>.  Respondents have disclaimed any interest in the blocked interest-bearing accounts which are the subject of Petition III (and therefore have no standing to challenge turnover).  *See* Interpleader Petition attached as Exhibit E to the Perkins Decl., at ¶32. Hence, Petitioner is entitled to judgment as against Respondents.

B.  <u>Judgment Against Judgment Debtors</u>.  Moreover, Petitioner served Petition III on the judgment debtors no later than September 2010.  Rule 56.1 Statement ¶ 9.  None has appeared, and each is now in default.  *Id*. As this Court has previously held, under these circumstances, Petitioner is entitled to entry of default judgment against the Judgment Debtors with respect to the blocked assets held in their names or in the names of their agencies or instrumentalities.  *See* Dkt. Nos. 91 & 92 (Tranche I), Dkt. Nos. 107, 115, 140, 159, & 160 (Tranche II).  Petition III properly asserts that the Cuban entities in whose names the blocked accounts are held in accordance with CACR are agencies or instrumentalities of the Republic of Cuba, and

---

[13] As the Second Circuit summarized arguments by *amicus curiae* The New York Clearing House Association in *Grain Traders, supra*:
> [A] credit to a frozen account constitutes payment because it reduces the indebtedness owed by the account holder to the bank, which, under elementary principles of contract law, is a valid form of consideration. The Clearing House further argues that Citibank's credit to BCIL's account also constituted payment in accordance with the terminology used in Section 4-A-403 because the funds were immediately withdrawn by virtue of the fact that they reduced [the beneficiary bank's] indebtedness.

The Second Circuit found these points to be "persuasive" and indicated that they "are inclined to agree with the Clearing House's argument that Citibank in fact paid BCIL," but concluded that it "need not decide the issue" in the context of *Grain Traders. Id.*

11

accordingly these allegations should be deemed to have been admitted by the judgment debtors. *See* Fed. R. Civ. P. Rule 8(b)(6).

Despite the judgment debtors' default, Respondents may assert, based upon Section 1608(e) of the Foreign Sovereign Immunities Act, 28 U.S.C. §1608(e), that this Court should not enter a default judgment against the judgment debtor Cuba (or any asserted agency or instrumentality of Cuba) without submission of "evidence satisfactory to the court." When read in context, this provision is intended to apply only to the entry of judgment on liability, not enforcement of such a judgment. Moreover, it has no application in light of the applicability of TRIA "notwithstanding any other provision of law," which necessarily overrides FSIA provisions which impede enforcement of TRIA-eligible judgments. Moreover, as this Court observed in *Weininger, supra* at note 8: "in assessing whether these entities are agencies or instrumentalities of Cuba, the Court is 'mindful that the instrumentality and its related government – not the plaintiff – will frequently possess most of the information needed to [make this determination]." *Id.* at 495 (quoting *Alejandre v. Telefonica Larga Distancia de Puerto Rico, Inc.*, 183 F.3d 1277, 1285. n.19 (11th Cir. 1999)).

Nonetheless, to eliminate any need to reach issues related to legal conclusiveness of the judgment debtors' defaults or the admissions by the Respondents of their lack of evidence to challenge the factual allegations in Petition III, Petitioner submits the following:

- By operation of CACR, each of the Petition III accounts is lawfully required to be held in the name of one of four entities: Banco Nacional de Cuba ("Banco Nacional"); Banco Financiero International, S.A. ("BFI"); Banco International de Comercio, S.A. ("BICSA"); or Banco Popular del Ahorro, S.A. ("Banco Popular").
- Each of these entities meets the standard for determining whether it is an agency or instrumentality of a foreign state, *see* 28 U.S.C. § 1603, including by reference to its status as an "organ" of a foreign state. *See, e.g., Filler v. Hanvit Bank,* 378 F.3d 213, 217 (2d Cir. 2004); *Kelly v. Syria Shell Petroleum Dev. B.V.,* 213 F.3d 841, 846-47 (5th Cir. 2000); *USX Corp. v. Adriatic Ins. Co.,* 345 F.3d 190, 209 (3d Cir. 2003). This standard directs consideration of the level of government financial support; the ownership

12

structure of the entity; whether the foreign state created the entity for a national purpose; whether the foreign state actively supervises the entity; whether the foreign state requires the hiring of public employees and pays their salaries; whether the entity holds exclusive rights in the foreign country; and how the entity is treated under foreign state law.

- To the extent that there remains any dispute, Petitioner submits the affidavit of Professor Jaime Suchlicki ("Suchlicki Decl."), attached as Exhibit U to the Perkins Decl., describing the bases upon which he concludes that each is properly found to be an agency or instrumentality of Cuba.[14]

- Banco Nacional. – Banco Nacional has been held to be the agency or instrumentality of the Republic of Cuba on numerous occasions, often at the behest of the Respondents (or their predecessors), *see, e.g., Banco Nacional de Cuba v. Chemical Bank New York Trust Co.,* 594 F. Supp. 1553, 1556 (S.D.N.Y. 1984); *see also Weininger,* 462 F. Supp. 2d at 498 ("JPM Chase states that Banco Nacional is 'engaged in central banking activities' and is an agency or instrumentality within the meaning of the FSIA." (*citing* Kerr Decl. ¶ 18(b))*;* Order of Sept. 21*,* 2010 (Dkt. No. 91) (turnover of Tranche I accounts).

- BFI. – this Court has already held that BFI is an agency or instrumentality of the Republic of Cuba. Order of Sept. 21, 2010 (Dkt. No. 91) (directing turnover of Tranche I accounts).

C. Enforcement is Constitutional. Finally, Respondents may assert that enforcement of the Petition under TRIA would violate the Constitutional rights of the Cuban entities in whose names the blocked accounts are held, in particular under the Fourth and Fifth Amendments. First, Respondents would have no standing to make these claims on behalf of those entities. These Constitutional rights are personal to those entities, and cannot be asserted by any other party. *See Warth v. Seldin,* 422 U.S. 490, 499 (1975); *W.R. Hough v. DeLoitte & Touche*, 549 F.3d 100, 109-10 (2d Cir. 2008).

Second, a long and unbroken line of Supreme Court cases has upheld the Constitutionality of the Trading with the Enemy Act, 50 U.S.C. App. §5 ("TWEA"), and the International Economic Emergency Powers Act, 50 U.S.C. §1701 ("IEEPA") (and the delegation of authority to the President to promulgate the CACR). *See, e.g., Propper v. Clark,* 337 U.S. 472

---

[14] Dr. Suchlicki is the director of the pre-eminent institute in the United States dedicated to the study of the Cuban government, its legal structures and its economic system. In turn, Dr. Suchlicki is one of the most prominent scholars of these topics, having dedicated his entire professional life to studying the legal actions and economic policies of the Castro Regime. Suchlicki Decl. U.

13

(1949); *Zittman v. McGrath,* 341 U.S. 446 (1951); *Orvis v. Brownell,* 345 U.S. 183 (1953), *Dames & Moore v. Regan,* 453 U.S. 654 (1981).

Third, in enacting TRIA, Congress has acted fully within its Constitutional authority to direct the disposition of the property of enemy states (including the nationals of those states) and of those who trade with those enemy states.[15] As the Claims Court stated in *E-Systems, Inc. v. United States*, "where the property of nationals of a hostile government [such as Cuba] is involved, there is no constitutional prohibition against confiscation without any compensation to the owners." 2 Cl. Ct. 271 (Claims Ct. 1983).

Fourth, once property is blocked under TWEA (or IEEPA), it may be held, and then utilized under Congress's authority, to serve U.S. national security interests, including "to compensate our citizens or ourselves for the damages done by the governments of the nationals affected." *Propper v. Clark,* 337 U.S. at 481; *see also Sardino*, 361 F.2d at 112 (rejecting claim of a Cuban national to a New York-located bank account blocked under CACR; holding "if Congress should ultimately choose to apply the blocked assets of Cuban nationals to that purpose [including compensation to victimized U.S. citizens], the Fifth Amendment would not stand in its way."). The application of these blocked assets for this purpose is fully consistent with

---

[15] *See Dames & Moore v. Regan,* 453 U.S. at 672 & n.5 ("Petitioner errs in assuming that the only power granted by the language used in both § 1702 and § 5(b) of the TWEA is the power temporarily to freeze assets. As noted above, the plain language of the statute defies such a holding. Section 1702 authorizes the President to 'direct and compel' the 'transfer, withdrawal, transportation, . . . or exportation of . . . any property in which any foreign country . . . has any interest. . . .'"); *Sardino v. Federal Reserve Bank of New York,* 361 F.2d 106, 112, 113 (2d. Cir. 1966), *cert. denied,* 385 U.S. 898 (1966) ("There is a long history of governmental action compensating our own citizens out of foreign assets in this country for wrongs done them by foreign governments abroad"; and "This would seem a rather clear intimation that if Congress should ultimately choose to apply the blocked assets of Cuban nationals to that purpose, the Fifth Amendment would not stand in its way. . . . To be sure, Congress has not yet chosen to invoke the ultimate sanction [with respect to blocked Cuban assets]. . . . Such commendable forbearance should not be understood as connoting lack of power.")*; Teague v. Regional Commissioner of Customs,* 404 F.2d 441, 445 (2d Cir. 1968) ("*Sardino* also provides a sufficient answer to plaintiffs' contention that [TWEA] and the regulations deprive them of property without due process of law.").

Constitutional principles without regard to any adverse property interests asserted by any other party.[16] This rule applies to property blocked under CACR.[17]

Fifth, no such unconstitutionality claim would provide any ground to enjoin the exercise of the execution authority enacted through TRIA against those accounts, *see, e.g.*, *Dames & Moore*, 453 U.S. at 672-674. At most, disposition of property under this authority could raise a claim against the United States, under the Tucker Act, 28 U.S.C. § 1491, *see Dames & Moore*, 453 U.S. at 688-89; *Paradissiotis v. Rubin*, 171 F.3d 983, 989 (5th Cir. 1999); *Global Relief Foundation, Inc. v. O'Neill*, 315 F.3d 748, 754 (7th Cir. 2002).

## CONCLUSION

For all the reasons stated herein, Petitioner is entitled to entry of judgment on the pleadings with respect to Respondents' interpleader and on Petition III. Accordingly, she respectfully requests that the Court grant her motion.

GREENBERG TRAURIG, LLP

By: _____
James W. Perkins (JWP 6684)

---

[16] Speaking particularly to claims by other creditors, but in terms which broadly address all forms of adverse claims, the Supreme Court explained in *United States v. Pink*, 315 U.S. 203, 227-28 (1942) that the United States can, as here, give priority to creditors who are U.S. nationals over property interests claimed by foreign nationals:

> To be sure, aliens as well as citizens are entitled to the protection of the Fifth Amendment. A State is not precluded, however, by the Fourteenth Amendment from according priority to local creditors as against creditors who are nationals of foreign countries and whose claims arose abroad. By the same token, the Federal Government is not barred by the Fifth Amendment from securing for itself and our nationals priority against such creditors. And it matters not that the procedure adopted by the Federal Government is globular and involves a regrouping of assets. There is no Constitutional reason why this Government need act as the collection agent for nationals of other countries when it takes steps to protect itself or its own nationals on external debts. There is no reason why it may not ... make itself and its nationals whole from assets here before it permits such assets to go abroad in satisfaction of claims of aliens made elsewhere and not incurred in connection with business conducted in this country.

[17] *See, e.g., Nielsen v. Secretary of Treasury*, 424 F.2d 833 (D.C.Cir. 1970); *Tole v. Miller*, 530 F. Supp. 999 (S.D.N.Y. 1981) (shareholders of Cuban corporation challenged enforcement of CACR by suit against Secretary of Treasury regarding claim to bank-held funds in which they claimed property interest. This Court addressed these claims without any suggestion that the shareholders could claim against the bank and without its intervention or involvement).

15