UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
JEANNETTE HAUSLER, :
:
Petitioner, :
:
- against - : 09-cv-10289 (VM)
:
:
JP MORGAN CHASE BANK, N.A., CITIBANK, N.A., UBS AG, THE ROYAL BANK OF SCOTLAND, N.V. AND BANK OF AMERICA, N.A., :
:
Defendants. :
-----------------------------------X

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**


**I. BACKGROUND .......................................... 5**
- A. THE UNDERLYING FACTS ................................ 6
- B. THE CUBAN ASSET CONTROL REGULATIONS (THE "CACRS") AND THE OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ...... 7
- C. THE FOREIGN SOVEREIGN IMMUNITIES ACT ("FSIA") AND THE TERRORISM RISK INSURANCE ACT ("TRIA") .............. 8
- D. THE TRANCHE VI PETITION ............................ 10
- E. THE INTERPLEADER PETITION .......................... 14
- F. THE 2012 CORRESPONDENCE AND STATUS CONFERENCE ..... 19
- G. THE 2015 CORRESPONDENCE ............................ 20

**II. DISCUSSION ........................................ 31**
- A. THE IMPACT OF THE VILLOLDO FLORIDA PROCEEDINGS AND THE FLORIDA ORDER ................................. 31
  - 1. The Florida Order: Legal Findings and Context .... 33
  - 2. Estoppel, Admissions, and Standing: The Effect of the Villoldo Florida Proceedings and the 2015 Correspondence ................................. 34
    - a. Judicial Estoppel .............................. 35
    - b. Judicial Admissions ............................ 41
    - c. Standing ....................................... 49
  - 3. Hausler's Request that the Court Strike the Fundacion Claimants Interpleader Answer from the Record ............................................ 53
  - 4. Request of Counsel for the Fundacion Claimants to Withdraw .......................................... 54
  - 5. The (Lack of) Preclusive Effect of the Florida Order on the Fundacion ................................. 56

6. Request of JPM Chase for Leave to Amend the Interpleader Petition ... 58
7. Request of the Fundacion Claimants and JPM Chase for a Stay ... 60
8. Request for the Fundacion Claimants and JPM Chase Pre-Motion Conference ... 61
B. INTERPLEADER PETITION ... 62
1. The Appropriateness of Interpleader Relief ... 65
a. Interpleader as to the Fundacion Trustees ... 66
b. Interpleader as to the Fundacion ... 67
2. Adjudication of Adverse Claims ... 70
C. TRANCHE VI PETITION ... 71
1. Are the Blocked Assets "Assets of That Terrorist Party" Under TRIA? ... 72
a. Was the Fundacion Nationalized? ... 76
b. Are the Blocked Assets Property of the Republic of Cuba? ... 84
2. Hausler's Right to Execute Upon the Blocked Assets 96
D. OFAC AS A NECESSARY PARTY ... 96
**III. ATTORNEY'S FEES AND COSTS ... 99**
**IV. ORDER ... 100**

Petitioner Jeannette Hausler ("Hausler") brought the underlying action as the successor and personal representative of the Estate of Robert Otis Fuller ("Fuller") pursuant to Section 201(a) of the Terrorism Risk Insurance Act of 2002, 28 U.S.C. Section 1610 note ("TRIA"). Hausler now seeks to execute a default judgment for $100,000,000 in compensatory damages obtained by Hausler in Florida state court (the "Florida Judgment") against the Republic of Cuba, Fidel and Raul Castro, and the Cuban Revolutionary Armed Services (collectively, the "Judgment Debtors") in an action alleging the torture and

extrajudicial killing of Fuller, Hausler's brother. To enforce the Florida Judgment in this Court, Hausler has brought multiple turnover petitions against various garnishee banks.

On July 13, 2011, Hausler filed a notice of petition and petition (the "Tranche VI Petition," Dkt. No. 421), pursuant to Rule 69 of the Federal Rules of Civil Procedure as incorporating Section 5225(b) of the New York Civil Practice Law and Rules. In the Tranche VI Petition, Hausler requested an order to compel respondent JPMorgan Chase Bank, N.A. ("JPM Chase") to turn over to the United States Marshal for the Southern District of New York (the "Marshal") identified funds in accounts currently in the possession of JPM Chase, together with an award of the costs of this proceeding in favor of Hausler, and for such other and further relief as may be just. JPM Chase answered ("JPM Chase Tranche VI Answer," Dkt. No. 431) on August 18, 2011.

JPM Chase then filed a third-party petition alleging claims in the nature of interpleader (the "Interpleader Petition," Dkt. No. 440) on September 1, 2011, seeking to interplead Hausler and adverse claimants/respondents Fundacion Benefica Nicolas S. Acea (the "Fundacion"), and

Pablo Alcazar, Mayra Bustamante, and Rene Silva, Jr., as Trustees of the Fundacion (collectively, the "Fundacion Trustees" and, collectively -- the Fundacion Trustees and the Fundacion together -- the "Fundacion Claimants")[1] pursuant to Rule 22 of the Federal Rules of Civil Procedure, Sections 5239 and 6221 of New York's Civil Practice Law and Rules, and Section 134 of New York's Banking Law with regard to the Tranche VI Petition. Hausler answered ("Hausler Interpleader Answer," Dkt. No. 449) on September 22, 2011, and the Fundacion Claimants answered ("Fundacion Claimants Interpleader Answer," Dkt. No. 505) on January 24, 2012.

In recent months, further correspondence from the parties has brought to light additional issues for the Court's consideration related to the Tranche VI Petition and the Interpleader Petition. Taking into account all relevant correspondence and filings, the Court now considers the Tranche VI Petition, the Interpleader Petitions, and various other requests from the parties.

---

[1] The Court notes that the phrase "Fundacion Trustees" is misnomer, because -- as will be discussed in detail in infra Section II(A)(2)(c) of this Decision and Order -- the Fundacion Trustees are not in fact trustees of the Fundacion. Although the Fundacion Trustees initially claimed to be trustees of the Fundacion (see infra Section I(E)), they are actually trustees of a different foundation, the Nicolas S. Acea Eleemosynary Foundation, which was founded in Miami in 1970.

## I. BACKGROUND[2]

Familiarity with the basic facts from which this action arises, as discussed in greater detail in previous Orders from this Court[3] and from the Second Circuit Court of Appeals,[4] is presumed. However, the Court will briefly outline the underlying facts, as well as discuss the facts

[2] The factual summary below is derived primarily from the following documents and any exhibits attached thereto: Notice of Petition for Turnover Order Pursuant to Federal Rule of Civil Procedure 69 and CPLR § 5225(b) ("Tranche VI Petition"), dated July 13, 2011, Dkt. No. 421; Answer of Garnishee-Respondent JPMorgan Chase Bank, N.A., to the Petition for Turnover Pursuant to Federal Rule of Civil Procedure 69 and CPLR § 5225(b) ("JPM Chase Tranche VI Answer"), dated August 18, 2011, Dkt. No. 431; Third-Party Petition Alleging Claims in the Nature of Interpleader ("Interpleader Petition"), dated September 1, 2011, Dkt. No. 440; Answer to Third-Party Petition Alleging Claims in the Nature of Interpleader (Tranche VI) ("Hausler Interpleader Answer"), dated September 22, 2011, Dkt. No. 449; Answer and Affirmative Defenses to Third-Party Petition Alleging Claims in the Nature of Interpleader ("Fundacion Claimants Interpleader Answer"), dated January 24, 2012, Dkt. No. 505; Letter dated March 2, 2012 ("Hausler March 2, 2012 Letter") (Dkt. No. 509); Letter dated March 15, 2012 ("Hausler March 15, 2012 Letter"), Dkt. No. 515; Letter dated March 19, 2012 ("Fundacion Claimants March 2012 Letter"), Dkt. No. 529; and the 2015 Correspondence (see infra note 10). Except where specifically referenced, no further citation to these sources will be made.

[3] See Hausler v. JP Morgan Chase Bank, N.A., 740 F. Supp. 2d 525, 526 (S.D.N.Y. 2010) ("Hausler I," Dkt. No. 85); Hausler v. JP Morgan Chase Bank, N.A., 845 F. Supp. 2d 553, 557-58 (S.D.N.Y. 2012) ("Hausler II," Dkt. No. 508). Hausler I denied a motion to dismiss "Petition III," an earlier turnover petition in this matter. Hausler II granted Hausler's motions for judgment on the pleadings regarding "Petition I," another earlier turnover petition in this matter, and Petition III. Hausler II was reversed and remanded by the Second Circuit in Hausler v. JP Morgan Chase Bank, N.A., 770 F.3d 207, 210 (2d Cir. 2014) ("Hausler III"), which held that TRIA does not preempt state law. The instant Decision and Order cites to Hausler II in multiple places, but only with regard to factual background of import to the case at hand and legal analysis that was not the subject of the Second Circuit's reversal. Hausler III has been appealed to the Supreme Court of the United States. See Petition for Writ of Certiorari, Hausler v. JP Morgan Chase Bank, N.A. (No. 15-125).

[4] See Hausler III, 770 F.3d 207.

specific to the Tranche VI Petition and Interpleader Petition.

## A. THE UNDERLYING FACTS

In 2005, Hausler sued the Judgment Debtors under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 et seq. ("FSIA"), in the Eleventh Judicial District, Miami-Dade County, Florida. The Florida state court rendered the Florida Judgment, awarding Hausler $100,000,000 in compensatory damages and $300,000,000 in punitive damages for the torture and extrajudicial killing of Fuller. None of the Judgment Debtors appeared in the Florida proceedings. Hausler then sought a full faith and credit determination for the Florida Judgment in the United States District Court for the Southern District of Florida, and that request was granted on August 20, 2008. Hausler then registered the Florida Judgment in the United States District Court for the Southern District of New York on September 22, 2008.

Hausler, acting on her own behalf and as a representative of Fuller, now seeks to enforce the Florida Judgment for compensatory damages against the Judgment Debtors by requesting, pursuant to TRIA, the turnover of various assets held in the United States by various

garnishee banks and financial institutions that are in possession of funds blocked or frozen pursuant to the Cuban Asset Control Regulations (the "CACRs").

**B. THE CUBAN ASSET CONTROL REGULATIONS (THE "CACRS") AND THE OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")**[5]

The CACRs, 31 C.F.R. Part 515, were issued by the United States Treasury Department's Office of Foreign Assets Control ("OFAC") in 1963, and they remain in effect today. See Hausler I, 740 F. Supp. 2d at 527. The CACRs were enacted pursuant to the Trading with the Enemy Act ("TWEA"), and have been extended each year since 1977 pursuant to the International Emergency Economic Powers Act ("IEEPA"). See id.

Among other things, the CACRs seek to block transactions in which Cuba has "any interest of any nature whatsoever, direct or indirect." 31 C.F.R. § 515.201(a). The CACRs "plainly define" what constitutes Cuban property or interests in property for the purpose of blocking Cuba's assets (Hausler I, 740 F. Supp. 2d at 532), and the definition includes "money, checks . . . bank deposits,

[5] The Court has described the history and operation of the CACRs and OFAC in past decisions related to the case at hand, and will now briefly address their specific application only to the Tranche VI Petition. The Court refers the parties to Hausler I, 740 F. Supp. 2d at 527, for a more complete discussion of the CACRs and OFAC.

savings accounts . . . stocks, bonds, . . . and other financial securities" (31 C.F.R. § 515.311). Moreover, the CACRs impress that "[t]he term 'interest' when used with respect to property shall mean an interest of any nature whatsoever, direct or indirect." Id. § 515.312.

The CACRs also explicitly provide administrative procedures for unblocking transactions that have been blocked as the result of a mistake. See Hausler I, 740 F. Supp. 2d at 559; 31 C.F.R. § 515.201(e). When a party believes that "funds have been blocked due to mistaken identity," the party may submit a written request to release funds to OFAC, as prescribed by 31 C.F.R. Section 501.806, and the Director of OFAC then makes a determination regarding whether to release the funds. 31 C.F.R. § 515.201(e); 31 C.F.R. § 501.806.

## C. THE FOREIGN SOVEREIGN IMMUNITIES ACT ("FSIA") AND THE TERRORISM RISK INSURANCE ACT ("TRIA")

FSIA "provides the exclusive basis for subject matter jurisdiction over all civil actions against foreign state defendants, and therefore for a court to exercise subject matter jurisdiction over a defendant the action must fall within one of FSIA's exceptions to foreign sovereign immunity." Weinstein v. Islamic Republic of Iran, 609 F.3d

43, 47 (2d Cir. 2010). Section 1605A of FSIA

> abrogates immunity for those foreign states officially designated as state sponsors of terrorism by the Department of State where the foreign state commits a terrorist act or provides material support for the commission of a terrorist act and the act results in the death or personal injury of a United States citizen.[6]

Id. at 48. Cuba was continuously designated as a state sponsor of terrorism under Section 6(j) of the Export Administration Act of 1979 by the United States Department of State from March 1, 1982 to May 29, 2015. See Hausler III, 770 F.3d at 210; Cuba: Implementing Rescission of State Sponsor of Terrorism Designation, 80 Fed. Reg. 43314-01 (July 22, 2015) (to be codified at 15 CFR Parts 734, 736, 740, 742, 746, 748, 750, 758, 772, 774).

Furthermore, even where a valid judgment has been entered against a foreign sovereign pursuant to FSIA, property of that foreign state is still immune from attachment and execution except as provided by Sections 1610 and 1611 of FSIA. 28 U.S.C. § 1609; Levin v. Bank of New York, No. 09 CV 5900, 2011 WL 812032, at *6 (S.D.N.Y.

---

[6] This Weinstein excerpt actually describes 28 U.S.C. Section 1605(a)(7) rather than 28 U.S.C. Section 1605A, but, “[t]o the extent relevant to [the case at hand, and to the case before the Weinstein court] [Section] 1605A provides for the same exceptions to foreign sovereign immunity as the repealed [S]ection 1605(a)(7).” Weinstein, 609 F.3d at 48 n.4.

Mar. 4, 2011) (citing Weinstein, 609 F.3d at 48). TRIA, which is codified as a note to Section 1610 of FSIA, provides in relevant part:

> Notwithstanding any other provision of law . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under Section 1605(a)(7) of Title 28, U.S. Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a) (emphasis added). The dispute in the case at hand largely centers around whether the funds in question can properly be considered "the blocked assets of" the judgment debtor Republic of Cuba under TRIA.

**D. THE TRANCHE VI PETITION**

On March 26, 2009, the Clerk of this Court issued a writ of execution, permitting Hausler to proceed with execution to satisfy the compensatory component of the Florida Judgment in the amount of $99,000,000 against the Judgment Debtors. On or about May 12, 2009, the Marshal, in accordance with Section 201 of TRIA, levied the writ upon certain financial institutions, including JPM Chase, believed to be holding funds on behalf of the Judgment

Debtors. Hausler caused document and information subpoenas to be served on JPM Chase in or about October and November 2009 and June and December 2010. In response, JPM Chase produced copies of schedules it had filed with OFAC,[7] detailing property blocked pursuant to the CACRs, including the property (the "Blocked Assets") in the three blocked accounts (the "Blocked Accounts") that would later become the subject of the of Tranche VI Petition. JPM Chase took the position that the CACRs and FSIA prevented it from effecting a turnover of the relevant funds to the Marshal without a determination that the funds are subject to execution and turnover pursuant to TRIA.

On July 13, 2011,[8] Hausler filed the Tranche VI Petition (Dkt. No. 421) pursuant to Rule 69 of the Federal Rules of Civil Procedure as incorporating Section 5225(b) of the New York Civil Practice Law and Rules. Hausler sought turnover, pursuant to TRIA, of the Blocked Assets in Blocked Accounts, all of which are held by JPM Chase and have the Fundacion as the named account holder. The Blocked Accounts are:

---

[7] Hausler attached these schedules, filed under seal, as Exhibit C to the Tranche VI Petition.

[8] Hausler noted that, as of the date the Tranche VI Petition was filed, more than $95,000,000 of the $100,000,000 compensatory portion of the award from the Florida Judgment, plus an additional $30,000,000 in accrued post-judgment interest, remained unsatisfied.

1. Account Number 362511271, which JPM Chase alleges was established to benefit a hospice in the City of Cienfuegos, Cuba, and had a value of approximately $1,180,388.00 as of June 30, 2009;
2. Account Number 362511371, which JPM Chase alleges was established to benefit a school in the City of Cienfuegos, Cuba, and had a value of approximately $1,251,382.00 as of June 30, 2009; and
3. Account Number 362511471, which JPM Chase alleges was established to benefit a school in the City of Cienfuegos, Cuba, and had a value of approximately $848,572.00 as of June 30, 2009.

JPM Chase holds all three accounts in its capacity as corporate successor to the Chemical Bank New York Trust Company.

Hausler alleged that the Fundacion was "organized under the laws of Cuba prior to Judgment Debtor Fidel Castro taking power in Cuba but . . . was subsequently nationalized by the Judgment Debtor the Republic of Cuba." (Tranche VI Petition ¶ 22.) Therefore, Hausler asserted, the funds in the accounts are the property of an agency or instrumentality of a terrorist state, and thus subject to execution and turnover to Hausler pursuant to TRIA Section

201(a). Hausler asked that the Court issue an order directing JPM Chase to turn over to the Marshal all the funds in the Blocked Accounts in partial satisfaction of the Florida Judgment, together with all accumulated interest and marshal's fees, awarding fees and costs of this proceeding, and awarding any such other and further relief the Court deems just. Docket Numbers 432-39, dated August 24-25, 2011, reflect that proper service of the Tranche VI Petition was effectuated upon the Judgment Debtors.

JPM Chase answered (Dkt. No. 431) on August 18, 2011. JPM Chase asserted two counterclaims. First, JPM Chase averred that a judgment should be entered in its favor denying the Tranche VI Petition. In the alternative, however, JPM Chase argued that JPM Chase is entitled to a judgment making a number of findings that would insulate JPM Chase from further liability, including, among other things: the identity of the funds made subject to execution and turnover and the identity of the party to whom the funds should be turned over; a number of findings demonstrating that the blocked property can properly be executed upon by Hausler pursuant to TRIA; that service of the Florida Judgment was properly made on the Judgment

Debtors; and that JPM Chase would be discharged from further liability or obligation to all parties, as well as the Judgment Debtors, in respect to the amount turned over; and that JPM Chase would be discharged in interpleader pursuant to Rule 22 of the Federal Rules of Civil Procedure with respect to any adverse claimants named in any third-party petition filed by JPM Chase. Second, JPM Chase averred that it is entitled to an award of costs and reasonable attorney's fees incurred in responding to Hausler's enforcement efforts, any such amount to be awarded out of the amount turned over pursuant to judgment -- if any -- entered under TRIA in Hausler's favor.

**E. THE INTERPLEADER PETITION**

JPM Chase filed the Interpleader Petition (Dkt. No. 440) on September 1, 2011. JPM Chase stated that it was aware of additional claimants to the Blocked Assets, and sought to "bring before the Court all known parties with claims to these funds and to obtain discharge in interpleader" (Interpleader Petition ¶ 17) pursuant to Rule 22 of the Federal Rules of Civil Procedure, Section 5239 and 6221 of New York's Civil Practice Law and Rules, and Section 134 of New York's Banking Law. The adverse claimants/respondents JPM Chase sought to bring into the

suit were the Fundacion Claimants. JPM Chase named the Fundacion itself, as the named account holder of the Blocked Accounts, and each of the Fundacion Trustees, describing the Fundacion Trustees as "the three known trustees of the Fundacion, who reside in the United States." (Id. ¶ 3.) JPM Chase further alleged that "these three trustees and their predecessors have maintained contact with JPM Chase -- and their claim to the blocked accounts that are targeted for turnover -- for several decades." (Id.)

JPM Chase argued that "there may be conflicting claims to the funds in the Blocked Accounts, thereby exposing JPM Chase to the risk of double or multiple liability," and asserted that, under such circumstances, "federal and state law recognize JPM Chase as a disinterested or neutral stakeholder and provide mechanisms for it to bring before the Court any person or adverse claimant with a claim to the same funds who may not already be a party to the action." (Interpleader Petition ¶ 18.) JPM Chase sought an order making various findings that would insulate it from future liability, many of which overlap with the findings it sought in its answer to the Tranche VI Petition. (Compare Interpleader Petition pp. 9-12 with JPM

Tranche VI Answer ¶ 35.) JPM Chase asked that judgment be entered in its favor pursuant to Rule 22 of the Federal Rules of Procedure, restraining and enjoining any of the Fundacion Claimants from pursuing any claim against JPM Chase related to any of the Blocked Assets if the Blocked Assets are turned over pursuant to court order, and dismissing JPM Chase as a party to the proceeding and requiring the Fundacion Claimants and Hausler to litigate amongst themselves regarding the Blocked Assets to the extent necessary. JPM Chase also asked for an award of reasonable attorney's fees and costs, with such award to be paid out of any amount turned over pursuant to the Tranche VI Petition, as well as any such other and further relief as may be appropriate.

Hausler answered (Dkt. No. 449) on September 22, 2011. Hausler asserted two affirmative defenses: (1) that Hausler is entitled to full relief and recovery under TRIA; and (2) that Hausler reserves the right to amend or supplement Hausler's answer to the Interpleader Petition "on account of the fact that much of the Interpleader [Petition] is overly vague, non-specific, and subject to competing interpretations." (Hausler Interpleader Answer ¶ 24.)

On January 17, 2012, the Fundacion Claimants submitted

a letter ("Fundacion Claimants January 2012 Letter," Dkt. No. 502) to the Court, indicating that they anticipated filing a motion to dismiss the Interpleader Petition for failure to join a required party. The Fundacion Claimants sought either (a) confirmation from the Court that the time to respond to the Interpleader Petition had been stayed by their filing of a pre-motion letter, or (b) an extension of time to respond. (Fundacion Claimants January 2012 Letter 1-2.) By endorsement, the Court denied the request, stating that "[t]he Court believes that it would serve judicial economy if any further motions in the actions involved in this case are withheld until after the Court's ruling as rendered on various motions pending. That decision may clarify remaining issues or obviate further proceedings herein." (Id. 2.)

The Fundacion Claimants then submitted an answer ("Fundacion Claimants Interpleader Answer," Dkt. No. 505) to the Interpleader Petition on January 24, 2012. The Fundacion Claimants "affirmatively state[d] that they have a claim to the funds in the [Blocked Accounts], of which the Fundacion is the named account holder, and that the funds in the [Blocked Accounts] are not funds that are subject to execution by [Hausler]." (Fundacion Claimants

Interpleader Answer ¶ 17.) The Fundacion Claimants also represented that the Fundacion Trustees were, indeed, trustees of the Fundacion. (Id. 14(b)-(d).) The Fundacion Claimants asserted six affirmative defenses: (1) that the funds in the Blocked Accounts are not subject to execution pursuant to TRIA; (2) that the funds in the Blocked Accounts were not confiscated by the Republic of Cuba following the Cuban Revolution, and thus do not constitute assets of the Republic of Cuba or any agency or instrumentality thereof as provided by TRIA; (3) that, because "the public policy of the United States is that it does not recognize confiscatory takings . . . the purported confiscation by the Cuban government of the assets of the Fundacion should not be given effect"; (4) that the Tranche VI Petition should be dismissed for failure to join a necessary party, because OFAC is a required party to the suit as per Rule 19(a) of the Federal Rules of Civil Procedure; (5) that the funds in question "were improperly blocked, as they did not constitute 'transactions' and/or 'transfers' as defined by the [CACRs]"; and (6) that the Fundacion Claimants reserve the right to amend or supplement their answer and affirmative defenses based upon information obtained in discovery.

**F. THE 2012 CORRESPONDENCE AND STATUS CONFERENCE**

In response to Hausler II,[9] Hausler submitted a letter to the Court on March 2, 2012. ("Hausler March 2, 2012 Letter," Dkt. No. 509.) Discussing the status of the Tranche VI Petition, Hausler asserted that the affirmative defenses raised by the Fundacion Claimants in the Fundacion Claimants Interpleader Answer "are not well grounded in law" and indicated that Hausler would "address these accounts in a separate submission seeking dispositive relief." (Hausler March 2, 2012 Letter 4.)

On March 15, 2012, Hausler submitted a letter ("Hausler March 15, 2012 Letter," Dkt. No. 515) to the Court, raising arguments in opposition to the defenses raised in the Fundacion Claimants Interpleader Answer, declaring Hausler's intention to file a motion for summary judgment with regard to the Tranche VI Petition, and requesting a pre-motion conference. The Fundacion Claimants then submitted a letter on March 19, 2012 ("Fundacion Claimants March 2012 Letter," Dkt. No. 529), maintaining that "[t]he Fundacion Claimants will oppose any motion for summary judgment filed by Petitioner."

[9] Hausler II ordered Hausler to "submit a letter . . . describing the posture of the case as it pertains to the remaining adverse claimants." 845 F. Supp. 2d at 579.

(Fundacion Claimants March 2012 Letter 1.)

The Court held a status conference via telephone on April 10, 2012, with Hausler, JPM Chase, and the Fundacion Claimants present, in order to discuss the correspondence between the parties related to the Tranche VI Petition and the Interpleader Petition. (See Dkt. Minute Entry dated April 10, 2012.) Following the status conference, the parties were to "confer regarding the scope and timing of discovery necessary to develop a full factual record supporting disposition of the dispute between petitioner and the Fundacion adverse claimants." (Id.)

Following the April 10, 2012 status conference, the docket reflects no further filings related to the Tranche VI Petition or the Interpleader Petition until February 13, 2015.

### G. THE 2015 CORRESPONDENCE[10]

On February 13, 2015, the Fundacion Claimants wrote a letter ("Fundacion Claimants February 13 Letter," Dkt. No. 621) to the Court requesting a status conference with regard to the funds, currently held in accounts at JPM Chase, which are the subject of the Tranche VI Petition.

[10] The phrase "2015 Correspondence" will be used to refer collectively to all the correspondence discussed in Section I(G) of this Decision and Order.

The Fundacion Claimants reported that judgment creditor Gustavo Villoldo, an individual involved in separate but related proceedings before the Honorable Judge Hellerstein in the Southern District of New York, had filed a motion (the "Villoldo Application"), individually and on behalf of the Estate of Gustavo Villoldo, to commence supplementary proceedings in Alfredo Villoldo, et al. v. Fidel Castro Ruz, et al., Case No. 08-14505 CA 25, a Florida state court proceeding in Miami-Dade County, against the Fundacion Trustees, challenging their standing to act as trustees of the Fundacion. (Fundacion Claimants February 13 Letter 2.) By memo endorsement, the Court directed Hausler to respond by February 20, 2015. (Fundacion Claimants February 13 Letter 2.)

Hausler then submitted a letter to the Court dated February 20, 2015. ("Hausler February 20 Letter," Dkt. No. 622.) Hausler attached Orders showing that the Villoldo court had denied the Fundacion Trustees' motion to dismiss the Villoldo Application, and had "scheduled an evidentiary hearing to determine whether the Fundacion Trustees have any authority to proceed on behalf of the Fundacion, including with respect to the blocked assets that are the subject of the Tranche VI Turnover Petition." (Hausler

February 20 Letter 2, Ex. D.) Hausler also attached the transcript (the "Villoldo Transcript") of a hearing before the Villoldo court in the Florida proceedings, during which counsel for the Fundacion Trustees in Florida stated on the record that his clients are trustees not of the Fundacion, but of a separate foundation established in Miami in 1970, called the Nicolas S. Acea Eleemosynary Foundation. (Hausler February 20 Letter Ex. A, at 4-5.) Counsel for the Fundacion Trustees further stated in the hearing that the Fundacion was established to benefit a number of properties that were ultimately taken over by the Cuban government. (Id. at 5.) By memo endorsement, this Court indicated that it was "persuaded that no action is necessary at this time" and directed the parties to "inform the Court of any material developments and ultimate resolution of the Florida proceedings described above." (Hausler February 20 Letter 2.)

On March 4, the Fundacion Claimants submitted another letter ("Fundacion Claimants March 4 Letter," Dkt. No. 624) to the Court, attaching a copy of the Notice of Consent to Relief ("Notice of Consent to Relief") the Fundacion Trustees had filed in the Villoldo Florida proceedings on February 26, 2015 to "give notice of their consent to the

imposition of the relief . . . determining that Alcazar, Bastamante and Silva have no authority to act on behalf of the Fundacion controlled by Defendant Cuba." (Fundacion Claimants March 4 Letter 2-4.) Counsel for the Fundacion Claimants also requested a pre-motion conference, stating that they "intend[ed] to seek leave of court to withdraw from the representation of the Fundacion [Claimants] and also to seek a stay of the action in order for an appropriate representative to appear on behalf of the Fundacion going forward." (Fundacion Claimants March 4 Letter 2.) Counsel for the Fundacion Claimants further explained that they "underst[oo]d there [we]re discussions underway with the U.S. Attorney's Office in that regard and that the New York State Attorney General's Office may be approached." (Id.)

Later in the day on March 4, Hausler submitted a letter to the Court ("Hausler March 4 Letter," Dkt. No. 625), arguing that "the Court should deny the Fundacion Claimants' request for a pre-motion conference, strike the Fundacion Claimants' answer to [the] interpleader petition, and grant Petitioner's Tranche VI turnover application." (Hausler March 4 Letter 1.) Hausler explained that the Villoldo court in Florida had issued an Order (the "Florida

Order”), which Hausler attached to the Hausler March 4 Letter as Exhibit 1,

> holding that the Fundacion Claimants: (a) are not Trustees of the Fundacion; (b) have no authority to act on behalf of the Fundacion; (c) have no interest in the assets of the Fundacion; and (d) have no relationship with the Fundacion. The court further ruled, based on proof presented to it, that the Fundacion and its assets, including the funds in the blocked accounts that are the subject of this proceeding were nationalized by the Republic of Cuba and, thus, are Cuban assets.

(Id. 1.) Hausler asserted that, given the findings of the Villoldo court in the Florida Order, the Fundacion Claimants have no interest at stake and no standing in the current proceedings. The Court should not consider the motion of counsel for the Fundacion Claimants’ to withdraw, Hausler argued, because consideration of the motion “assumes that there is a client properly before the court.” (Id. 2.) Hausler also characterized motion of counsel for the Fundacion Claimants to withdraw and the request for a stay as an “improper delay tactic.” (Id.) Hausler requested that the Court deny the requests of counsel for the Fundacion Claimants and grant the Tranche VI Turnover Petition. (Id.) By endorsement, the Court ordered “[c]ounsel for the Fundacion Claimants, as well as any other party to this litigation having any interest in the

matter" to respond by March 10, 2015. (Id.)

On March 5, 2015, JPM Chase submitted a letter ("JPM Chase March 5 Letter," Dkt. No. 634) to the Court. JPM Chase joined in the request of counsel for the Fundacion Claimants' for a pre-motion conference regarding their application to withdraw as counsel. (JPM Chase March 5 Letter 1-2.) JPM Chase expressed that it had "not had the opportunity to evaluate the evidence" that led to the Villoldo court's Florida Order and had also not yet had the

> opportunity to evaluate the procedural posture of the pending turnover proceeding should this court determine that the trustees of the trust in the name of Fundacion Benefica Nicolas S. Acea . . . named as third-party Respondents do not have standing to defend the turnover proceeding, whether on the basis of the order now submitted to the court or otherwise.

(Id. 1.) JPM Chase further stated that it "needs an opportunity to evaluate any further responsibilities it may have in respect to the Fundacion's deposits" in light of the recent developments in the Villoldo Florida court proceeding. (Id.)

Counsel for the Fundacion Claimants then submitted a letter to the Court dated March 10, 2015 ("Fundacion Claimants March 10 Letter," Dkt. No. 627), in further support of their request for a pre-motion conference and again seeking leave to withdraw as counsel for the

Fundacion Claimants. Counsel for the Fundacion Claimants explained that, given the developments in the Villoldo Florida case, “the Fundacion has no trustee with whom we can confer, [and] we believe that the Rules of Professional Conduct do not allow us to take any steps with respect to the Fundacion.” (Fundacion Claimants March 10 Letter 1.) The letter also reiterated that “[a] stay is necessary to allow time for an appropriate representative to appear for the Fundacion because a trust does not fail for want of a trustee.” (Id. 2.) Counsel for the Fundacion Claimants attached an affidavit from

> Kai Jacobs, counsel of record for Impleader Defendants Pablo Alcazar, Maya Bustamante and Rene Silva Jr. [(the Fundacion Trustees)] in the Villoldo Matter, . . . attesting that he has recently been in touch with the United States Attorney’s Office regarding whether that office or some other appropriate representative may appear on behalf of the Fundacion going forward. We understand that the New York Attorney General’s Office may be interested in appearing for the Fundacion as well. A period of 90 days should be sufficient for these determinations to be made.

(Id.)

Also on March 10, JPM Chase submitted another letter (“JPM Chase March 10 Letter,” Dkt. No. 629) to the Court. In this letter, JPM Chase asserted that it is a “neutral stakeholder” and “takes no position as to whether [Hausler] -- as judgment-creditor[] of the Republic of Cuba -- or the

Fundacion and its beneficiaries -- are entitled to the funds held in the Accounts." (JPM Chase March 10 Letter 1.) However, JPM Chase questioned the findings of the Villoldo court in Florida in a number of ways, suggesting that the Fundacion's interests may not have been properly represented in the Villoldo proceeding, and arguing that

> neither the Florida Orders nor any of the papers made available to this Court and JPM Chase establish the evidentiary basis supporting the court's findings that the Trustees represent a separate, U.S.-based charity -- the Nicolas S. Acea Foundation -- and not the Fundacion . . . . Nor do the papers made available to this Court and JPM Chase reflect the evidentiary basis for the Florida court's determination that the Fundacion accounts were expropriated by the Castro Government.

(Id. 2.) JPM Chase argued that "these legal and factual issues should be presented to and resolved by this Court . . . in the context of a motion on notice, brought by [Hausler], for partial summary judgment or to strike the answer of the Fundacion and the Trustees." (Id.) Furthermore,

> should the Court determine that the Trustees lack standing to represent the Fundacion, JPM Chase respectfully request[ed] leave to file, within a reasonable time, an Amended Third-Party Petition naming either the proper successor representatives of the Fundacion or the beneficiaries of the accounts opened by the Fundacion for their benefit.

(Id. 3.) JPM Chase explained that

> JPM Chase has had a good-faith basis for believing that the Trustees were the Fundacion's representatives since the 1960s and before. If that is not correct, equity and the interests of justice should permit JPM Chase to amend its Third-Party Petition and to locate the Fundacion's true representatives, if any, and its beneficiaries.

(Id.)

Counsel for Alfredo Villoldo, individually, and Gustavo E. Villoldo, individually and as Administrator, Executor, and Personal Representative of the Estate of Gustavo Villoldo Argilagos (collectively, the "Villoldo Plaintiffs") also submitted a letter to the Court on March 10, 2015 ("Villoldo Plaintiffs Letter," Dkt. No. 626). The Villoldo Plaintiffs wrote in response to the Court's endorsement of the Hausler March 4 Letter, which had directed all parties with an interest in the matter to respond. (Villoldo Plaintiffs Letter 1.) The Villoldo Plaintiffs explained that they had entered into a sharing agreement with other judgment creditors of Cuba, including Hausler, such that the turnover of any blocked assets in the instant action would also benefit the Villoldo Plaintiffs. (Id.) The Villoldo Plaintiffs also asserted that counsel for the Fundacion Claimants should have withdrawn their pleadings in the instant action in order to comply with the Florida Order. (Id. 2.) Echoing Hausler's

entreaty that the Fundacion Claimants' request for a stay and the request of the Fundacion Claimants' counsel to withdraw be denied, the Villoldo Plaintiffs argued that the requests from the Fundacion Claimants' counsel "were wholly inappropriate and should be rejected outright," given the injunction imposed by the Florida Order and considering that the Fundacion Trustees, "[b]y their own admission . . . are not, nor do they any longer claim to be, trustees of the [Fundacion]." (Id. 2.)

On March 12, 2015, Hausler submitted a letter ("Hausler March 12 Letter," Dkt. No. 630), responding to the JPM Chase March 10 Letter and the Fundacion Claimants March 10 Letter. Hausler stressed that, despite JPM Chase's statements to the contrary, there are no legal or factual issues to be resolved by the Court, given that counsel for the Fundacion Trustees in the Villoldo Florida proceedings have confirmed on the record in those proceedings that (1) the Fundacion Trustees are not actually trustees of the Fundacion; and (2) that the Fundacion was nationalized. (Hausler March 12 Letter 2 (citing Hausler February 20 Letter, Ex. A at 4-5; Fundacion Claimants Interpleader Answer ¶ 25).) Hausler also attached an affidavit from Jaime Suchlicki, submitted in

the Villoldo proceedings, purporting to convey an expert opinion that the Fundacion has indeed been nationalized. (Hausler March 12 Letter 2, Ex. B. ("Suchlicki Affidavit").) Hausler again asserted that there was no longer any basis to delay disposition of the Tranche VI Petition, since there are "no other bona fide claimants and there is no serious question whether Cuba nationalized the blocked assets at issue." (Hausler March 12 Letter 3.)

JPM Chase responded on March 13, 2015 ("JPM Chase March 13 Letter," Dkt. No. 628), reiterating its position that, "[g]iven the[ir] complexity, . . . these issues should be properly and fully briefed in a motion on notice brought by Petitioner." (JPM Chase March 13 Letter 1.)

On June 10, 2015, Hausler submitted a letter ("Hausler June 15 Letter," Dkt. No. 635) to the Court. Hausler noted that more than 90 days had passed since the Fundacion Claimants requested a 90-day stay in the Fundacion Claimants March 10 Letter, and no new appearances had been entered in this matter. (Hausler June 15 Letter 1.) Hausler also stated that Hausler is "being seriously prejudiced by the delay," because "[a]s Judge Hellerstein recently recognized in the Vera, 12 CV 01596, enforcement proceedings, in view of the Executive branch's recent

rapprochement with Cuba, there is a 'risk of diplomatic change affecting the judgment creditors.'" (Id. 2 (citing Vera v. Republic of Cuba, 12-cv-01596, Dkt. No. 767 (S.D.N.Y. May 8, 2015).) Hausler also attached the referenced Order from Judge Hellerstein to the Hausler June 15 Letter. Hausler again urged that the Court grant the Tranche VI Petition. (Id. 2.)

In light of all the filings in the public record of this matter, the Court now considers the Tranche VI Petition, the Interpleader Petition, and the requests from various parties presented by the 2015 correspondence.

## II. DISCUSSION

### A. THE IMPACT OF THE VILLOLDO FLORIDA PROCEEDINGS AND THE FLORIDA ORDER

As is clear from the factual background described above, the parties sharply dispute the impact of the Florida Order, as well as the Villoldo proceedings from which the Florida Order stemmed, on this Court's adjudication of the Turnover Petition and the Interpleader Petition.

Specifically, counsel for the Fundacion Claimants requests a conference and a stay of the proceedings "in order for an appropriate representative to appear on behalf

of the Fundacion going forward," and seeks to "withdraw from the representation of the Fundacion [Claimants]" (Fundacion Claimants March 4 Letter 2; see also Fundacion Claimants March 10 Letter); Hausler argues that, in light of the Florida Order, the Court should "strike the Fundacion Claimants' answer to [the] Interpleader Petition and grant the Petitioner's Tranche VI turnover application" (Hausler March 4 Letter 1.), deny the Fundacion Claimants' request for a stay, and decline to even consider the request of counsel for the Fundacion Claimants to withdraw, because consideration of the request "assumes that there is a client properly before the Court (id. 2); the Villoldo Plaintiffs aver that the actions of counsel for the Fundacion Claimants, in requesting to withdraw as counsel and asking for a stay of proceedings and failing to withdraw the Fundacion Claimants Interpleader Answer, are actually violating the injunction imposed by the Florida Order (Villoldo Plaintiffs Letter 2); and JPM Chase not only joins in the request of counsel for the Fundacion Claimants' for a stay and a conference, but also entreats the Court to have the factual and legal issues decided upon by the Villoldo court "presented to and resolved by this Court . . . in the context of a motion . . . brought by

Petitioners, for partial summary judgment or to strike the answer of the Fundacion and the Trustees" (JPM Chase March 5 Letter 2; see also JPM Chase March 10 Letter).

### 1. The Florida Order: Legal Findings and Context

Broadly speaking, the Florida Order made two legal findings that are of particular import to the case at hand. First, the Florida court found that the Fundacion Trustees "are not trustees of the Fundacion Benefica Nicolas S. Acea and have never had any authority to act on behalf of the Fundacion." (Florida Order 3.) The Villoldo court further elaborated that "[t]he [Fundacion Trustees] are not and have never been trustees of the Fundacion Benefica Nicolas S. Acea" and "have no legal authority to act on behalf of the Fundacion." (Id.) Second, the Villoldo court found that "[t]he Fundacion . . . was a Cuban foundation nationalized by the Cuban government in 1959" and "[t]he assets of the Fundacion, wherever located, including the funds in the accounts located in New York at JP Morgan Chase, N.A., which have been blocked pursuant to the Cuban Assets Control Regulations, 31 C.F.R. Part 55, are owned by the Republic of Cuba." (Id. 2.) The Villoldo court ordered that the Fundacion Trustees

are hereby restrained and enjoined from interfering

> with any effort by the Plaintiffs to execute on their judgment against the Republic of Cuba entered in Case No. 08-14505 CA 25 by this Court in the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, which has been given full faith and credit by the United States District Court for the Southern District of New York in Aldo Vera, et. al. v. The Republic of Cuba, No. 1:12-cv-01496 (AKH) (S.D.N.Y), by its Order of August 22, 2014, including restraining and enjoining the [Fundacion Trustees] from asserting or further pursuing any claims to the Accounts in the name of the Fundacion Benefica Nicolas S. Acea.

(Florida Order 3-4.)

The Villoldo Plaintiffs have described the supplementary proceeding in which the Florida Order was issued as "a precursor to a suit for tortious interference with judgment collection." (Villoldo Plaintiffs Letter 2.) Notably, although the Villoldo Plaintiffs have entered into a sharing agreement with other judgment creditors of Cuba including Hausler (id. 1), Hausler was and is not a party to the Villoldo Florida proceedings. While the three Fundacion Trustees were named as third-party defendants in the Villoldo proceeding, the Fundacion itself was also not a party, nor was JPM Chase.

### 2. Estoppel, Admissions, and Standing: The Effect of the Villoldo Florida Proceedings and the 2015 Correspondence

The Fundacion Claimants Interpleader Answer, though filed years before the rendering of the Florida Order,

remains on the docket and is before the Court for consideration. In that document, the Fundacion Trustees repeatedly assert that they do have an interest in the Blocked Accounts, that they are the trustees of the Fundacion and represent the Fundacion's interests, and that the Fundacion was not nationalized. (See generally Fundacion Claimants Interpleader Answer.) These circumstances present the question: given the Villoldo Florida proceedings, are the Fundacion Trustees estopped or otherwise precluded or barred from making such assertions, and from making claims that depend upon such assertions?

a. Judicial Estoppel

"Judicial estoppel 'prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by [that party] in a prior legal proceeding.'" Robinson v. Concentra Health Servs., Inc., 781 F.3d 42, 45 (2d Cir. 2015) (quoting Bates v. Long Island R.R. Co., 997 F.2d 1028, 1037 (2d Cir. 1993)). The doctrine has "two distinct objectives": "First, . . . to preserve the sanctity of the oath by demanding absolute truth and consistency in all sworn positions . . . . Second, . . . to protect judicial integrity by avoiding the risk of inconsistent results in two proceedings." Bates,

997 F.2d at 1038 (footnote omitted). See also Simon v. Safelite Glass Corp., 128 F.3d 68, 71-72 (2d Cir. 1997). "Judicial estoppel is an equitable doctrine invoked by a court at its discretion." New Hampshire v. Maine, 532 U.S. 742, 750 (2001) (internal quotation marks and citations omitted).

There are no "inflexible prerequisites [and there is no] exhaustive formula for determining the applicability of judicial estoppel"; rather, the inquiry into its application depends heavily on the "specific factual context[]." New Hampshire, 532 U.S. at 751. However, as a general rule, the application of judicial estoppel requires that

> (1) the party against whom the estoppel is asserted took an inconsistent position in a prior proceeding and (2) that position was adopted by the first tribunal in some manner, such as by rendering a favorable judgment.

Mitchell v. Washingtonville Cent. Sch. Dist., 190 F.3d 1, 6 (2d Cir. 1999) (internal citations omitted) (quoted by Robinson, 781 F.3d at 45). A typical application of judicial estoppel also "requires showing unfair advantage against the party seeking estoppel," but the Second Circuit has not required this element in all circumstances. Adelphia Recovery Trust v. Goldman, Sachs & Co., 748 F.3d

110, 116 (2d Cir. 2014) (quoting New Hampshire, 532 U.S. at 751). However, because the primary purpose of judicial estoppel is to protect the judicial process, "relief [under the doctrine of judicial estoppel] is granted in the Second Circuit only when the risk of inconsistent results with its impact on judicial integrity is certain." Republic of Ecuador v. Chevron Corp., 638 F.3d 384, 397 (2d Cir. 2011) (internal quotation marks omitted).

The Court finds that the Fundacion Trustees are judicially estopped from asserting that they are the trustees of the Fundacion and attempting to act on behalf of the Fundacion in any way.[11] In the course of the Villoldo Florida proceedings, the Fundacion Trustees clearly asserted on the record that they are not and never were trustees of the Fundacion, but instead are merely Cuban exiles who started their own foundation in the United States after the Cuban Revolution. In explaining the history of the Fundacion and his clients' role in the Villoldo dispute, Kai Jacobs, counsel for the Fundacion Trustees in the Villoldo Florida proceedings, averred,

---

[11] The Court notes that the Fundacion Trustees may also be judicially estopped from asserting that the Fundacion was not nationalized. However, the Court will not address this issue, since whether or not the Fundacion Trustees are estopped from asserting the Fundacion was not nationalized has no practical effect on the adjudication of the matters before the Court.

> [t]he brief history is that Nicolas S. Acea, who died in the 1920s, probated his will there in New York. That will provided for the establishment of the Fundacion Benefica Nicolas S. Acea. The money for that foundation . . . [is] now in stocks or housed in the account at JP Morgan Chase in New York. In or about 1970, certain Cuban exiles here in Miami established the Nicolas S. Acea Eleemosynary Foundation, to carry on the Foundation's work, to work on protecting those funds and try to provide aid to those persons that the Fundacion was initially established to assist.

(Villoldo Transcript 4.) Those Cuban exiles, counsel went on to explain, are the three individuals identified by this Court as the Fundacion Trustees. (Id. at 4-5.) Counsel for the Fundacion Trustees later elaborated, stating,

> I don't think we ever disputed that we -- as to the actual Fundacion, itself, we are the trustees of the -- I call it the Foundation, the one that was created by the exile community. Nicolas Acea did not name these three persons as you will be my successor trustees, and I don't want to lead the Court down that path, and that is where we have gone. These are persons who said there is this foundation. It's intended to benefit these people and these properties and these assets are in New York, and we are part of the exile community, too. These people -- this money is there for a purpose. We would like to see it applied to that purpose. So they established this Foundation to make that happen.

(Id. at 10-11.) The Fundacion Trustees then submitted the Notice of Consent to Relief to the Villoldo Florida court, stating that the Fundacion Trustees

> hereby give notice of their consent to . . . a restraining order . . . preventing [them] from interfering with Plaintiffs' judgment collection

> efforts and determining that [the Fundacion Trustees] have no authority to act on behalf of the Fundacion controlled by Defendant Cuba.

(Notice of Consent to Relief 1-2.) The Villoldo court then clearly "adopted" the position put forth by the Fundacion Trustees in issuing the Florida Order, which found -- in relevant part -- that the Fundacion Trustees: "have not acquired any interest in the assets of the Fundacion, and have no legal authority to act on behalf of the Fundacion"; "are not and never have been trustees of the Fundacion"; and "are not trustees of the Fundacion . . . and have never had any authority to act on behalf of the Fundacion." (Florida Order 3.)

It bears mention that the Florida Order, while "adopting" the position of the Fundacion Trustees as described above, was not a "favorable judgment" for the Fundacion Trustees. See Mitchell, 190 F.3d at 6. To the contrary, the Florida Order granted the relief sought by the Villoldo Plaintiffs against the Fundacion Trustees. In this sense, the case at hand presents somewhat unusual circumstances for the application of judicial estoppel. Judicial estoppel is frequently justified as a means to "prevent[] a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument

to prevail in another phase." Pegram v. Herdrich, 530 U.S. 211, 227 n. 8 (2000) (emphasis added). The doctrine seeks to "protect[] the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." New Hampshire, 532 U.S. at 749-50 (internal quotation marks and citations omitted).

However, as discussed above, judicial estoppel is a flexible doctrine, and its application depends upon an inquiry into the specific factual context presented. New Hampshire, 532 U.S. at 751. Moreover, the primary purpose of judicial estoppel is to protect the judicial process, and "the risk of inconsistent results with its impact on judicial integrity is certain" in the case at hand. Republic of Ecuador, 638 F.3d at 397. The Fundacion Trustees have indisputably taken an "inconsistent position" in the Florida proceedings, as described above, as compared to the Fundacion Claimants Interpleader Answer submitted to this Court. Mitchell, 190 F.3d at 1. See generally Fundacion Claimants Interpleader Answer. The Villoldo court in Florida, adopting the position asserted by the Fundacion Trustees in that matter, issued the Florida Order, finding that the Fundacion Trustees are not the

trustees of the Fundacion and have no authority to act on the Fundacion's behalf. If this Court were now to entertain the widely differing position -- put forth by the Fundacion Trustees in the Fundacion Claimants Interpleader Answer -- that the Fundacion Trustees are the trustees of the Fundacion and do have the authority to act on behalf of the Fundacion in asserting an interest to the Blocked Assets, judicial inconsistency would clearly result.

The Court therefore finds the Fundacion Trustees are now estopped, pursuant to the doctrine of judicial estoppel, from asserting that they are or ever were the trustees of the Fundacion, from claiming any interest in the purported assets of the Fundacion, and from in any way attempting to act on behalf of the Fundacion in the course of the instant action.

b. Judicial Admissions

Judicial admissions are

> formal concessions . . . by a party or counsel that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact. Thus, a judicial admission . . . is conclusive in the case.

Hoodho v. Holder, 558 F.3d 184, 191 (2d Cir. 2009) (quoting 2 McCormick on Evid. § 254 (6th ed. 2006) (footnote omitted)). Judicial admissions "obviate the need for

debate, discussion or discovery regarding particular factual issues because the parties make concessions or stipulations regarding those issues that remove them from dispute." Banks v. Yokemick, 214 F. Supp. 2d 401, 405-07 (S.D.N.Y. 2002) (citing Keller v. United States, 58 F.3d 1194, 1198 n.8 ("The significance of a judicial admission is precisely that it has the effect of withdrawing a fact from contention.")). Judicial admissions must be "clear and unambiguous admission[s] of fact" (Kregler v. City of New York, 821 F. Supp. 2d 651, 656 (S.D.N.Y. 2011) aff'd, 604 F. App'x 44 (2d Cir. 2015)) and must

> relate to factual assertions made by one party concerning matters peculiarly within its knowledge or control, that is, facts the declarant is best situated to know and attest to in managing its affairs, as opposed to facts uniquely known or controlled by an adversary party.

Banks, 214 F. Supp. 2d at 406-07.

When a party makes a judicial admission, that party "normally is bound [by that admission] throughout the course of the proceeding" (Bellefonte Re Ins. Co. v. Argonaut Ins. Co., 757 F.2d 523, 528 (2d Cir. 1985) (quoting White v. Arco/Polymers, Inc., 720 F.2d 1391, 1396 (5th Cir. 1983)), a practice that "facilitate[s] resolution of disputes and promote[s] judicial economy" (Banks, 214 F.

Supp. 2d at 406). However,

> while research discloses no Second Circuit authority on point, the general rule seems to be that a judicial admission only binds the party that makes it in the action in which it is made, not "in separate and subsequent cases."

Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp., 351 F. Supp. 2d 79, 96 (S.D.N.Y. 2004) (quoting State Farm Mut. Auto. Ins. Co. v. Worthington, 405 F.2d 683, 686 (8th Cir. 1968); citing Universal Am. Barge Corp. v. J-Chem, Inc., 946 F.2d 1131, 1142 (5th Cir. 1991)). See also Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l B.V., 56 F. Supp. 3d 383, 387 n.22 (S.D.N.Y. 2014). Nevertheless, "a court may [still] consider a judicial admission as evidence in another case. Such evidence may, however, be contradicted by other evidence when presented." In re United Mine Workers of Am. Employee Ben. Plans Litig., 782 F. Supp. 658, 674 (D.D.C. 1992), amended on denial of reh'g sub nom. United Mine Workers of Am. 1974 Pension Trust v. Pittston Co., 793 F. Supp. 339 (D.D.C. 1992), aff'd and remanded sub nom. United Mine Workers of Am. 1974 Pension v. Pittston Co., 984 F.2d 469 (D.C.C. 1993) (emphasis added) (internal citations omitted) (citing Universal American Barge Corp. v. J-Chem, Inc., et al., 946 F.2d 1131 (5th Cir. 1991); State Farm Mutual Auto Ins. Co.

v. Worthington, 405 F.2d 683 (8th Cir. 1968)). See also In re Budnick, 469 B.R. 158, 170 (Bankr. D. Conn. 2012) ("[A] judicial admission only binds the party that makes it in the action in which it is made. Unless the elements of estoppel are present, in the later action the judicial admission in the earlier action is treated as an evidentiary admission." (internal quotation marks and citations omitted)).

There is some discussion in the case law regarding in which form judicial admissions may be made. It is clear that under federal law, "stipulations and admissions in the pleadings are generally binding on the parties and the Court" as judicial admissions. PPX Enterprises, Inc. v. Audiofidelity, Inc., 746 F.2d 120, 123 (2d Cir. 1984). "A court can [also] appropriately treat statements in briefs as binding judicial admissions of fact." Purgess v. Sharrock, 33 F.3d 134, 144 (2d Cir. 1994). Some courts have taken a broader approach, explaining that "parties to a lawsuit generally make and are held to judicial admissions expressed as formal acts by means of affirmative concessions or stipulations." Banks, 214 F. Supp. 2d at 406. This Court has held that, "'absent egregious circumstances, a distinct and formal admission made before,

during, or even after a proceeding by an attorney acting in his professional capacity binds his client as a judicial admission.'" Kregler, 821 F. Supp. 2d at 656 (quoting Haywood v. Bureau of Immigration, 372 F. App'x 122, 124 (2d Cir. 2010)).

In the case at hand, the Fundacion Trustees have clearly made multiple admissions, both in the Villoldo Florida proceedings and in the case at hand. The Court must examine whether these admissions are judicial admissions and, if they are, what binding effect they have on the current proceedings.

(i) Admissions in the Villoldo Florida Proceedings[12]

The statements made in the Villoldo Florida proceedings and the Notice and Consent to Relief submitted in those proceedings, discussed in the preceding section of this Decision and Order, clearly represent judicial admissions. The statements were "clear and unambiguous admissions of fact." Kregler, 821 F. Supp. 2d at 656. The factual assertions made also relate to matters that are "peculiarly within [the] knowledge or control" of the

[12] The Court notes that statements made in the Villoldo Florida proceedings by the Fundacion Trustees regarding the nationalization of the Fundacion do not qualify as judicial admissions, since such statements do not relate to matters "peculiarly within [the] knowledge or control" of the Fundacion Trustees, given that -- as discussed in infra Section II(A)(2)(c) -- the Fundacion Trustees are not actually trustees of the Fundacion.

Fundacion Trustees (Banks, 214 F. Supp. 2d at 406-407); it would seem that no one is more equipped to say whether or not the Fundacion Trustees are the trustees of the Fundacion than the Fundacion Trustees themselves.

Furthermore, though not made in briefs, stipulations, or pleadings (see PPX Enterprises, 746 F.2d at 123; Purgess, 33 F.3d at 144), the statements made by the Fundacion Trustees in the Villoldo Florida proceedings certainly constitute "affirmative concessions" (Banks, 214 F. Supp. 2d at 406). Counsel for the Fundacion Trustees affirmatively came forward in court in the Florida proceedings and made the statements described above on the record, and the Notice of Consent to relief was affirmatively submitted to the Villoldo Florida court of the Fundacion Trustees' own accord. The statements made in court (see Villoldo Transcript 4-5, 10-11) are "distinct and formal admissions [that] were made . . . during . . . a proceeding by an attorney acting in his professional capacity," and the Notice of Consent to Relief was made by the Fundacion Trustees' counsel "after . . . [such] a proceeding." Kregler, 821 F. Supp. 2d at 656.

Yet, because the judicial admissions made in the Florida proceedings were made in a prior proceeding, they

are not binding on the parties and the Court in the instant action, but rather may be considered as evidentiary admissions. See Am. Tissue, 351 F. Supp. 2d at 96; In re United Mine, 782 F. Supp. at 674.

(ii) Admissions in the Current Proceedings

In the case at hand, counsel for the Fundacion Trustees have now affirmatively come forward and effectively admitted to the Court that the Fundacion Trustees are not actually the trustees of the Fundacion. The Fundacion Claimants March 4 Letter provided the Court with a copy of the "Notice of Consent to Relief" filed by the Fundacion Trustees in the Villoldo proceeding and discussed above. In the same letter, counsel for the Fundacion Claimants stated that they wish to withdraw as counsel "in light of" the Notice of Consent to Relief. (Fundacion Claimants March 4 Letter 2.) Fundacion Counsel then further explained in the Fundacion Claimants March 10 Letter that they are seeking withdrawal because "the Fundacion has no trustee with whom we can confer," making clear that the Fundacion Trustees are not trustees of the Fundacion. Like the admissions made in the Florida proceedings, these letters constitute "affirmative concessions" (Banks, 214 F. Supp. 2d at 406) that make

"clear and unambiguous admissions of fact" (Kregler, 821 F. Supp. 2d at 656) regarding matters that are "peculiarly within [the] knowledge or control" of the Fundacion Trustees (Banks, 214 F. Supp 3d at 406-07).

Although counsel for the Fundacion Claimants is seeking to withdraw as counsel, they are currently the counsel of record for the Fundacion Trustees. Normally, the Court can impute the actions and statements of an attorney to his or her clients and, "[a]s a general matter, 'statements made by an attorney concerning a matter within his employment may be admissible against the party retaining the attorney.'" Ceglia v. Zuckerberg, 287 F.R.D. 152, 162 (W.D.N.Y. 2012) (quoting Purgess, 33 F.3d at 144). However, because counsel for the Fundacion Claimants is seeking to withdraw from representation on the basis that counsel has "no client representative with whom [counsel] can confer," it is not entirely clear that the statements in the Fundacion Claimants March 4 and March 10 letters were actually made with the consent of the Fundacion Trustees. (Fundacion Claimants March 10 Letter.) It is also not entirely clear to the Court whether such statements, made in support of an attorney's application for withdrawal due to that attorney's own concerns --

rather than at the behest of the client -- are statements made "within [that attorney's] employment" (Ceglia, 287 F.R.D. at 162) or while "acting in [that attorney's] professional capacity" (Kregler, 821 F. Supp. 2d at 656).

Given that guidance from case law is not clear as to whether the Fundacion Claimants March 4 and March 10 Letters constitute binding judicial admissions, and because -- as will be discussed in the following section of this Decision and Order -- the ultimate effect on the current proceedings remains the same regardless of the outcome of such a determination, the Court declines to resolve whether or not the Fundacion Claimants March 4 and March 10 Letters constitute judicial admissions binding on this Court.

c. Standing

As discussed above in Section II(A)(2)(a) of this Decision and Order, the Fundacion Trustees are estopped by means of the doctrine of judicial sestoppel from asserting that they are the trustees of the Fundacion and from purporting to act on behalf of the Fundacion in any way. Accordingly, the Fundacion Claimants Interpleader Answer, which is conditioned entirely on such assertions, will not be considered by this Court.

Furthermore, regardless of whether the Fundacion

Claimants March 4 and March 10 Letters constitute judicial admissions binding on this Court, as discussed above, the judicial admissions made by the Fundacion Trustees in the Villoldo Florida proceedings may be considered as evidentiary admissions by this Court. Considering those evidentiary admissions, along with the multitude of other materials now in the record regarding the Fundacion Trustees' relationship -- or lack thereof -- with the Fundacion, the Court finds it abundantly clear that the Fundacion Trustees are not trustees of the Fundacion and therefore have no standing to act on the Fundacion's behalf.

It is of great significance that, in a contested proceeding in which the Fundacion Trustees were present and seemingly fully litigated their position, the Villoldo court issued the Florida Order, specifically finding that the Fundacion Trustees "are not trustees of the Fundacion Benefica Nicolas S. Acea and have never had any authority to act on behalf of the Fundacion." (Florida Order 3.) Furthermore, the Fundacion Claimants, despite having ample opportunity -- given that the 2015 Correspondence began more than five months before the date of this Decision and Order -- have not voiced any objection to or disagreement

with the repeated statements submitted to this Court in letters from Hausler, the Villoldo Plaintiffs, and their own counsel expressing that the Fundacion Trustees are not trustees of the Fundacion.

Of all the parties currently involved in this litigation, only stakeholder JPM Chase has continued to question whether the Fundacion Trustees are or are not the trustees of the Fundacion. Though purporting to be neutral and disinterested in the outcome of the dispute between Hausler and the Fundacion Claimants, JPM Chase essentially has transformed itself as an advocate for the Fundacion Claimants' position by urging this Court, in the face of the Fundacion Trustees' admissions, to ignore and effectively set aside the state court's Florida Order and resolve the same issues differently. In particular, JPM Chase claims that

> According to records in JPM Chase's possession, the Trustees' predecessors, some of whom claimed to have been the original trustees appointed before the Castro Revolution, have administered the Accounts through JPM Chase's predecessors since the 1960s. These records indicate that the Trustees were purporting to act on behalf of the Fundacion -- not the Nicolas S. Acea Eleemosynary Foundation allegedly founded in 1970. Nor do the papers made available to this Court and JPM Chase reflect the evidentiary basis for the Florida court's determination that the Fundacion accounts were expropriated by the Castro Government.

(JPM Chase March 10 Letter 2.) JPM Chase further argues that "these issues should be presented to the Court in the context of a motion on notice, brought by [Hausler], for partial summary judgment or to strike the answer of the Fundacion and the Trustees." (Id.)

JPM Chase's arguments are unavailing. It bears little import that JPM Chase has in its possession documentation from the Fundacion Trustees and/or their predecessors contradicting the Fundacion Trustees' own more recent judicial admissions that they are not the trustees of the Fundacion. The docket itself contains contradicting information from the Fundacion Trustees as well. (Compare, e.g., Fundacion Claimants Interpleader Answer with Fundacion Claimants March 2012 Letter.) However, the position that the Fundacion Trustees maintained for years, that they are the trustees of the Fundacion, has now been revealed -- again, by their own admissions -- as false. The Court does not draw any conclusions as to whether these former misrepresentations were the result of intentional deception, mistake, or confusion.

It is unnecessary to go through the dilatory process of requiring additional motion practice in order to resolve the question of whether the Fundacion Trustees are or are

not the trustees of the Foundation. The Court's view is clear: they are not.

From the finding that the Fundacion Trustees are not only estopped from claiming to be the trustees of the Fundacion, but also are in fact not the trustees of the Fundacion, it follows that the Fundacion Trustees have no standing to represent the Fundacion's interests in this matter.

### 3. Hausler's Request that the Court Strike the Fundacion Claimants Interpleader Answer from the Record

Following the Florida Order, Hausler and the Villoldo Plaintiffs now urge the Court to strike the Fundacion Claimants Interpleader Answer from the record in this matter. (Hausler March 4 Letter 1; Villoldo Plaintiffs Letter 2.)

As discussed in the preceding section of this Decision and Order, the Fundacion Trustees have no standing to represent the interests of the Fundacion, and therefore had no standing to file the Fundacion Claimants Interpleader Answer. Accordingly, the request of Hausler and the Villoldo Plaintiffs that the Court strike the Fundacion Claimants Interpleader Answer from the record is granted.[13]

[13] The Court notes that it strikes the Fundacion Claimants' Interpleader

4. **Request of Counsel for the Fundacion Claimants to Withdraw**

In the Fundacion Claimants March 4 Letter, and then again in the Fundacion Claimants March 10 Letter, counsel for the Fundacion Claimants have expressed their intention to seek leave to withdraw from representation of Fundacion Claimants "[i]n light of the filing in Florida." (Fundacion Claimants March 4 Letter.) Fundacion Counsel have explained that "[b]ecause the Fundacion has no trustee with whom we can confer, we believe that the Rules of Professional Conduct do not allow us to take any steps with respect to the Fundacion." (Fundacion Claimants March 10 Letter 1.) Counsel for the Fundacion Claimants further elaborated that "[n]ow that we have determined that we have

---

Answer due to the Fundacion Claimants' lack of standing, not because -- as the Villoldo Plaintiffs argue -- the Fundacion Trustees' actions in failing to withdraw the Fundacion Claimants Interpleader Answer violate the injunction imposed by the Florida Order. (Villoldo Plaintiffs Letter 2.) The Florida Order restrained and enjoined the Fundacion Trustees from "interfering in any efforts by the [Villoldo] Plaintiffs to execute on their judgment against the Republic of Cuba," and included in the definition of such interference "asserting or further pursuing any claims to the [Blocked] Accounts in the name of the Fundacion Benefica Nicolas S. Acea." (Florida Order 3-4.) Thus the Florida Order enjoined the Fundacion Claimants from pursuing any claims to the Blocked Assets to the extent that such actions interfere with the attempts of the Villoldo Plaintiffs to execute on the Villoldo Plaintiffs' judgment against The Republic of Cuba. (Id.; see also Fundacion Claimants March 10 Letter 2 n.1.) Although the Villoldo Plaintiffs have entered into a sharing agreement with Hausler, the case at hand is completely separate from the Villoldo proceeding, and the Villoldo Plaintiffs are not parties to this suit. The Fundacion Trustees' actions in the context of the instant action are therefore outside the reach of the Florida Order's injunction.

no client representative with whom we can confer, we properly seek the Court's permission to withdraw as counsel for the Fundacion [Claimants]." (Id. 2.)

Given that, as discussed above in Section II(A)(2)(C) of this Decision and Order, the Fundacion Trustees are not trustees of the Fundacion, counsel for the Fundacion truly do not have a client with whom to confer. Moreover, counsel for the Fundacion are correct that with no way of conferring with an actual representative of the Fundacion, it is a violation of the Rules of Professional Conduct for them to continue representing the Fundacion and its trustees. See Carter v. United States, No. 91 CR. 586, 1999 WL 228407, at *3 (S.D.N.Y. Apr. 19, 1999) ("[D]ecisions on fundamental matters are reserved for the client, [and] trial tactical decisions are to be made by counsel on the basis of his or her professional judgment exercised after consultation with the client.") (citing Jones v. Barnes, 463 U.S. 745, 753 n.6 (1983) (citing ABA Model Rule of Professional Conduct 1.2(a))). Furthermore, if continued representation would violate counsel for the Fundacion Claimants' ethical responsibilities, it is appropriate for the Court to grant counsel's request to withdraw. See Whiting v. Lacara, 187 F.3d 317, 321-23 (2d

Cir. 1999) (reversing a district court's denial of withdrawal of counsel pursuant to Rule 1.4 of the Civil Rules of the United States District Court for the Southern and Eastern Districts of New York where continued representation would require counsel to violate his ethical duties or face a (meritless) malpractice suit from his client).

Under Rule 1.4 of the Civil Rules of the United States District Court for the Southern and Eastern Districts of New York,

> [a]n attorney who has appeared as attorney of record for a party may be relieved or displaced only by order of the Court and may not withdraw from a case without leave of the Court granted by order. Such an order may be granted only upon a showing by affidavit or otherwise of satisfactory reasons for withdrawal or displacement . . . .

Counsel for the Fundacion Claimants have clearly provided satisfactory reasons for withdrawing as counsel. The Court therefore grants the request of counsel for the Fundacion Claimants to withdraw.

**5. The (Lack of) Preclusive Effect of the Florida Order on the Fundacion**

JPM Chase has raised the question of whether or not the Fundacion itself may be legally bound by the Florida Order, "in particular the Florida court's holding that the

Fundacion's assets belong to Cuba as a result of the purported extraterritorial expropriation of the Fundacion's assets," given that "[a]fter reviewing the Florida Orders, it does not appear that the Florida court recognized anyone as having standing to represent the Fundacion's interest in those proceedings." (JPM Chase March 10 Letter 1-2.)

In this respect, JPM Chase's concerns may raise valid issues. The Fundacion was not a party to the Villoldo proceedings, and the Villoldo court in the Florida proceedings, in determining that the Fundacion Trustees had no standing to represent the interests of the Fundacion, a finding this Court now makes as well (see supra Section II(A)(2)(c)), apparently did not recognize anyone as having standing to do so. Thus, the Fundacion, insofar as it may still exist,[14] was not involved in litigating its interests, if any, in the Villoldo Florida court proceedings.

As a general rule, "'[a] judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings.'" Richards v. Jefferson Cnty., Ala., 517 U.S.

[14] See infra Section II.C.1.a). The Court finds that the Fundacion was nationalized by the Republic of Cuba, and so effectively no longer exists as a private organization. However the Court may revisit this finding following the submissions from the parties as required by infra Section IV of this Decision and Order.

793, 798 (1996) (quoting Martin v. Wilks, 490 U.S. 755, 762 (1989)). This proposition obtains because "[a] person who was not a party to a suit generally has not had a full and fair opportunity to litigate the claims and issues settled in that suit." Taylor v. Sturgell, 553 U.S. 880, 892-93 (2008) (internal quotation marks omitted). The Florida Order therefore has no preclusive effect on the Fundacion.

That said, the Court may nevertheless consider the documents related to the Villoldo Florida proceedings -- all matters of public record -- submitted to this Court, as well as all other relevant submissions made by the parties, in making its own factual findings regarding the Fundacion, including regarding the question of whether the Fundacion has or has not been nationalized by the Republic of Cuba.[15]

### 6. Request of JPM Chase for Leave to Amend the Interpleader Petition

JPM Chase has asked that

> should the Court determine that the Trustees lack standing to represent the Fundacion, JPM Chase [be granted] leave to file, within a reasonable time, an Amended Third-Party Petition naming either the proper successor representatives of the Fundacion or the beneficiaries of the accounts opened by the Fundacion for their benefit. This will allow JPM Chase time to investigate whether any person or successor has standing to represent the Fundacion's interests in this proceeding, to identify addresses of the hospice

[15] See infra Section II.C.1.a).

> and the school that are the Fundacion's intended beneficiaries, and to join all such parties if they can be located.

(JPM Chase March 10 Letter 3.)

The Court denies this request. More than four years have passed since Hausler filed the Tranche VI Petition; JPM Chase has had ample time in which to come forward and identify all adverse claimants to the Blocked Assets. Additionally, JPM Chase has been aware of the Florida Order since at least March 4, 2015, when Hausler submitted the Hausler March 4 Letter, attaching the Florida Order as an exhibit. In the more than four months that have passed, JPM Chase has not brought any additional adverse claimants to the Court's attention or given any indication -- aside from the speculation expressed in the JPM Chase March 10 Letter as to "whether" any other person or entity has standing to represent the Fundacion, and whether it might be possible to "identify" the contact information for the Fundacion's intended beneficiaries –- that, in fact, there are actually any additional bona fide adverse claimants to be named. Meanwhile, Hausler alleges that the Blocked Assets are subject to execution pursuant to TRIA and has waited years for a ruling on the merits, and "the Executive branch's recent rapprochement with Cuba" poses a "risk of

diplomatic change affecting the judgment creditors." (Hausler June 10 Letter 2 (internal quotation marks and citations omitted).)

In the interest of justice and judicial efficiency, the Court therefore denies JPM Chase's request for leave to amend the Interpleader Petition.

**7. Request of the Fundacion Claimants and JPM Chase for a Stay**

The Fundacion Claimants "seek a stay of the action in order for an appropriate representative to appear on behalf of the Fundacion going forward." (Fundacion Claimants March 4 Letter 2.) The Fundacion Claimants allege that "there are discussions underway with the U.S. Attorney's Office in that regard and that the New York State Attorney General's Office may be approached" (id.), and that "[a] period of 90 days should be sufficient for these determinations to be made" (Fundacion Claimants March 10 Letter 2). JPM Chase joins in the Fundacion Claimants' request for a stay. (See JPM Chase March 5 Letter 1; JPM Chase March 10 Letter 2.)

More than 90 days have passed since the Fundacion Claimants made the request for a 90-day stay and no state or federal government agencies have entered an appearance

in this matter. The Fundacion Claimants and JPM Chase have had more than enough time to identify a representative of the Fundacion, public or private, and yet have failed to do so. Furthermore, the circumstances in which the parties find themselves -- that only now, years into the litigation, has it become apparent that the Fundacion Trustees are not actually trustees of the Fundacion -- is the Fundacion Claimants' own doing. The Court will not force Hausler to endure further delays and risk substantial prejudice on account of the Fundacion Trustees' mistake, inaction, or deception. "In sum, there is no longer any basis to delay disposition of the Tranche VI Turnover Petition." (Hausler March 12 Letter 3.)

Accordingly, the Court denies the request of the Fundacion Claimants and JPM Chase for a stay.

**8. Request for the Fundacion Claimants and JPM Chase Pre-Motion Conference**

For essentially the same reasons discussed in the preceding section, the Court denies the request of the Fundacion Claimants and JPM Chase for a pre-motion conference. The Court is disposing of all the varied requests in the 2015 Correspondence within this Decision and Order, and the Court declines to hold an unnecessary

conference that will further and needlessly delay disposition of the Tranche VI Petition.

**B. INTERPLEADER PETITION**

In the past, this Court has chosen to address the question of whether funds at issue are executable under TRIA prior to examining whether interpleader relief is warranted,

> because only if execution is authorized by TRIA, as determined by this Court, can the blocked deposits that are subject to turnover be paid into the Court's registry, and only then will the need for discharge of JPM Chase be presented.

Weininger v. Castro, 462 F. Supp. 2d 457, 500 (S.D.N.Y. 2006). In the instant action, however -- as will be discussed in greater detail below -- the question of whether or not the Blocked Assets are executable under TRIA turns on whether the Fundacion was nationalized by the Republic of Cuba, and the adverse claimants identified by JPM Chase are the Fundacion and its three alleged trustees. This unique fact pattern, in which the strength of the interpleader claims and the eligibility of the Blocked Assets for execution under TRIA are integrally linked, necessitates that the Court address the Interpleader Petition before addressing the Tranche VI Petition. The analysis of whether the Court sees fit to grant the

Interpleader Petition, recognizing and adjudicating claims adverse to Hausler's, potentially has great bearing on whether the Blocked Assets are executable under TRIA in the first place. The Court will therefore examine the Interpleader Petition prior to the Tranche VI Petition.

JPM Chase has moved for discharge in interpleader pursuant to Federal Rule of Civil Procedure 22, as well as discharge pursuant to Sections 5239 and 6221 of New York's Civil Practice Law and Rules, and Section 134 of New York's Banking Law. In relevant part, Rule 22 provides:

> Persons with claims that may expose a plaintiff to double or multiple liability may be joined as defendants and required to interplead . . . . A defendant exposed to similar liability may seek interpleader through a crossclaim or counterclaim.

Fed. R. Civ. P. 22(a)(1)-(2). JPM Chase, as defendant to the Tranche VI Petition, filed its request for interpleader in the form of a third-party petition, seeking to interplead the Fundacion Claimants and for the Court to then adjudicate the competing claims asserted to the Blocked Assets and discharge JPM Chase, in order to insulate JPM Chase from the threat of multiple liability and/or litigation. (See generally Interpleader Petition.)

"Rooted in equity, interpleader is a handy tool to protect a stakeholder from multiple liability and the

vexation of defending multiple claims to the same fund . . . . Accordingly, what triggers interpleader is a real and reasonable fear of double liability or vexatious, conflicting claims." Washington Elec. Co-op., Inc. v. Paterson, Walke & Pratt, P.C., 985 F.2d 677, 679 (2d Cir. 1993) (internal quotation marks and citations omitted). "As a remedial joinder device, interpleader is to be liberally construed." Weininger, 462 F. Supp. 2d at 500 (citing State Farm Fire & Cas. Co. v. Tashire, 386 U.S. 523, 533 (1967); 6247 Atlas Corp. v. Marine Ins. Co., 155 F.R.D. 454, 461 (S.D.N.Y. 1994)).

The merits of the alleged competing claims are generally not relevant to the question as to whether interpleader relief is appropriate. 6247 Atlas Corp., 155 F.R.D. at 462 (finding that interpleader is appropriate where a stakeholder "legitimately fears multiple [liability] directed against a single fund, regardless of the merits of the competing claims." (citing John v. Sotheby's, 141 F.R.D. 29, 33 (S.D.N.Y. 1992) (internal quotation marks omitted))). "Although it is possible that a claim may be so baseless to preclude a finding of a good faith belief in multiple liability" (Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Clemente, No. 98 CIV. 1756, 2001 WL

11070, at *6 (S.D.N.Y. Jan. 4, 2001)), interpleader is warranted where the stakeholder's "concern is real and not fancied" (Bache Halsey Stuart Shields Inc. v. Garmaise, 519 F. Supp. 682, 685 (S.D.N.Y. 1981)).

Interpleader litigation usually entails two steps; a court first determines whether interpleader relief is appropriate, and then adjudicates the adverse claims. Weininger, 462 F. Supp. 2d at 500 (citing New York Life Ins. Co. v. Connecticut Dev. Auth., 700 F.2d 91, 95 (2d Cir. 1983)). However, the Court may choose to dispose of the entire action at one time, rather than breaking the litigation into multiple phases. See id. In the interest of judicial efficiency, the Court will proceed through both stages of the interpleader analysis within this Decision and Order.

**1. The Appropriateness of Interpleader Relief**

JPM Chase has identified four parties as having potentially adverse claims to Hausler: the Fundacion, and each of the three Fundacion Trustees, whom JPM Chase identifies as the Fundacion's trustees. (See Interpleader Petition ¶¶ 14(a)-(d), 17.) According to JPM Chase, the Fundacion is the named account holder of all three Blocked Accounts. (Interpleader Petition ¶ 3.) Additionally, JPM

Chase alleges that the Fundacion Trustees "and their predecessors have maintained contact with JPM Chase -- and their claim to the blocked accounts that are targeted for turnover -- for several decades." (Id.) Although the Fundacion Claimants Interpleader Answer has now been stricken from the record (see supra Section II(A)(3)), in it the Fundacion Claimants, too, asserted that the Fundacion Trustees are trustees of the Fundacion and that the Fundacion Claimants have an interest in the Blocked Assets. (See Fundacion Claimants Interpleader Answer ¶¶ 14(a)-(d), 15.)

a. Interpleader as to the Fundacion Trustees

As has already been discussed in supra Section II(A)(2)(a) and (c), the Fundacion Trustees are not actually trustees to the Fundacion and are judicially estopped from claiming otherwise. Accordingly, JPM Chase's concern with regard to the Fundacion Trustees is now "so baseless to preclude a finding of a good faith belief in multiple liability." Merrill Lynch, 2001 WL 11070, at *6. Furthermore, although interpleader is "as much to protect a stakeholder from the expense of double litigation, as it is to protect him from the risk of double liability" (Stuyvesant Ins. Co. v. Dean Const. Co., 254 F. Supp. 102,

108 (S.D.N.Y. 1966), aff'd sub nom. Stuyvesant Ins. Co. v. Kelly, 382 F.2d 991 (2d Cir. 1967) (internal quotation marks and citations omitted)), given the Fundacion Trustees' multiple affirmative admissions, in this proceeding and in the Villoldo Florida proceedings (see supra Sections II(A)(2)(a)-(b)) that they are not trustees of the Fundacion, it seems unlikely at best that the Fundacion Trustees will attempt any further suit against JPM Chase asserting interest in the Blocked Assets on behalf of the Fundacion. Accordingly, JPM Chase cannot be said to have "a real and reasonable fear of double liability or vexatious, conflicting claims" with regard to the Fundacion Trustees. Washington Elec., 985 F.2d at 679.

b. Interpleader as to the Fundacion

The Court notes that there is now a significant question as to whether service of the Interpleader Petition was properly effectuated on the Fundacion under the Federal Rules of Civil Procedure. While the Court has now found that the Fundacion Trustees are not trustees of the Fundacion and have no standing to represent the Fundacion (see supra Section II(A)(2)(c)), the record in the case at hand reflects that service of process as to the "Fundacion Beneficia, Nicolas S. Acea, c/o Paul Alcazar, as Trustee of

Fundacion Beneficia Nicolas S. Acea," was waived on November 10, 2011. (See Dkt. No. 463.) Therefore, the Fundacion was served through one of its alleged trustees who, the evidence now shows, is not actually a trustee of the Foundacion at all. There is no indication on the docket that service was made upon the Fundacion in any other way or at any other time.

If the Fundacion has not been served pursuant to Rule 4 of the Federal Rules of Civil Procedure, this Court cannot exercise jurisdiction over the Fundacion, and therefore cannot grant JPM Chase's request for interpleader relief with regard to the Fundacion. See Zherka v. Ryan, 52 F. Supp. 3d 571, 576 (S.D.N.Y. 2014) ("Federal courts lack jurisdiction over a defendant unless the procedural requirement of service of summons has been satisfied.") (citing Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., 484 U.S. 97, 104 (1987)); see also Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 110 (1969) ("It is elementary that one is not bound by a judgment in personam resulting from litigation . . . to which he has not been made a party by service of process. The consistent constitutional rule has been that a court has no power to adjudicate a personal claim or obligation unless it has

jurisdiction over the person of the defendant." (internal citations omitted)).

The Court notes there is a significant question as to whether the Fundacion has any existing representative,[16] as well as to whether, should a purported representative come forward, such a representative could assert any cognizable legal claim to the Blocked Assets.[17] Nonetheless, given that the Fundacion is the named account holder of the Blocked Accounts and undisputedly had a property interest in the Blocked Assets at one time, and given that the Fundacion was also not represented, noticed, or named as a party in the Villoldo Florida proceedings, the Court finds that further submissions from the parties are warranted.

Accordingly, the Court orders the parties to provide submissions to the Court as detailed in infra Section IV of this Decision and Order. The Court reserves judgment at this time as to whether to grant or deny JPM Chase's

[16] See infra Section II(C)(1)(a) of this Decision and Order. No bona fide representative of the Fundacion has yet surfaced, even though the Blocked Assets have been blocked pursuant to the CACRs for more than 40 years and have been the subject of litigation related to the Tranche VI Petition on the public record since 2011.

[17] See infra Section II(C)(1)(a) of this Decision and Order. The Court finds that the Fundacion has been nationalized, and according to the Suchlicki affidavit, after nationalization "no private citizen [of the Fundacion] would have been recognized by the Cuban government as a trustee, in any meaningful sense of the word," and "all decisions [regarding the Fundacion] w[ould have been] made and approved at the government-level. (Suchliciki Affidavit 1.)

request for interpleader relief with respect to the Fundacion.

**2. Adjudication of Adverse Claims**

At this time, the only claim the Court is able to adjudicate is Hausler's. The Court has determined that the Fundacion Trustees present no adverse claim to the Blocked Assets (see supra Section II(B)(1)(a)), and reserves judgment on whether to grant JPM Chase's petition for interpleader relief with regard to the Fundacion (see supra Section II(B)(1)(b)).

The merits of Hausler's claim to the Blocked Assets, which Hausler has asserted by means of the Tranche VI Petition, depend upon whether the Blocked Assets are or are not executable under TRIA. Although no other bona fide adverse claimant has asserted an interest in the Blocked Assets at this time, the Court must still satisfy itself that the requirements of TRIA are met before granting Hausler's request for turnover.

However, because at this time there are no other meritorious competing claims to the Blocked Assets, no adverse claimant ranks above Hausler in priority of interest. Consequently, if Hausler does have a right to execute under the Blocked Assets pursuant to TRIA,

Hausler's interest in the Blocked Assets will mandate an order of turnover as provided by TRIA and related federal statutes.[18] See Hausler II, 845 F. Supp. 2d at 569 (S.D.N.Y. 2012) (citing Smith ex rel. Estate of Smith, 346 F.3d 264, 271 n. 6 (2d Cir. 2003); Levin, 2011 WL 812032, at *6–10).

**C. TRANCHE VI PETITION**

At the outset, the Court notes that many of the elements required for Hausler to execute on the Blocked Assets pursuant to the Tranche VI Petition are clearly present in the facts at hand and are undisputed by the parties. Hausler has procured the Florida Judgment pursuant to FSIA, and the Florida Judgment plainly meets the definition of "a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under Section 1605(a)(7) of title 28, U.S. Code," under Section 201(a) of TRIA. (See supra Sections I(A)-(C).) Furthermore, the Florida Judgment awarded Hausler $100,000,000 in compensatory damages, and that award remains largely unsatisfied. (See supra note 8.) Finally, the Blocked Assets are

[18] As discussed in infra Section II.C.2), the Court will not issue an order of turnover at this time regardless, but will wait until review of the submissions from the parties required by infra Section IV of this Decision and Order.

unquestionably "blocked" pursuant to the CACRs within the meaning of Section 201(a) of TRIA.

The question of whether Hausler has a right to execute upon the Blocked Assets, then, depends upon whether the Blocked Assets are considered, under Section 201(a) of TRIA, to be the "assets of that terrorist party" against whom a judgment for compensatory damages has been obtained.

### 1. Are the Blocked Assets "Assets of That Terrorist Party" Under TRIA?

Under the standard required by Hausler III, this Court must look to state law to determine whether the Blocked Assets are "assets of that terrorist party" under TRIA, which includes the determination of whether the Judgment Debtors have a property interest in the Blocked Assets. Hausler III instructed that,

> as with FSIA § 1610(g), Congress did not define the "type of property interests that may be subject to attachment under" TRIA § 201(a). Calderon–Cardona[ v. Bank of New York Mellon], 770 F.3d [993,] 1001 [(2d Cir. 2014)] (interpreting FSIA § 1610(g)). [T]he [CACRs], for purposes of those regulations, include a non-exhaustive list of types of property that may be attached, 31 C.F.R. § 515.311(a) . . . . When Congress leaves a gap in a statute that "has not created any new property rights, but 'merely attaches consequences, federally defined, to rights created under state law,' we must look to state law to define the 'rights the judgment debtor has in the property the [creditor] seeks to reach.'" Calderon–Cardona, 770 F.3d at 1001 (quoting [Exp.-Imp. Bank of U.S. v. ]Asia Pulp[ & Paper Co.], 609 F.3d [111,] 117 (2d Cir.

> 2010)). Here, the banks at which the . . . blocked [assets are held] are in New York, so we look to New York property law to fill the gap.

Hausler III, 770 F.3d at 211-12. In Hausler III, the assets involved what were known as Electronic Fund Transfers ("EFTs"). EFTs are effectively an instruction to transfer funds from one account to another, so each EFT involves an originator, an intermediary bank, and a beneficiary. See id.; Shipping Corp. of India Ltd. V. Jaldhi Overseas Pte Ltd., 585 F.3d 58, 60 n.1 (2d Cir. 2009). The garnishee banks were the intermediary banks, and the Second Circuit held that the relevant assets were not executable under TRIA because

> under New York law 'EFTs are neither the property of the originator nor the beneficiary while briefly in the possession of an intermediary bank.' [Calderon-Cardona, 770 F.3d at 1001] (quoting Jaldhi, 585 F.3d at 71). As such, "the only entity with a property interest in the stopped EFT is the entity that passed the EFT on to the bank where it presently rests." Id. at 1002. Thus, in order for an EFT to be a "blocked asset of" Cuba under TRIA § 201(a), either Cuba "itself or an agency or instrumentality thereof (such as a state-owned financial institution) [must have] transmitted the EFT directly to the bank where the EFT is held pursuant to the block. Id.

Hausler III, 770 F.3d at 212. Because it was "undisputed that no Cuban entity transmitted any of the blocked EFTs in this case directly to the blocking bank," the Second Circuit found that the Cuban judgment debtors in Hausler

III had no property interest in the EFTs in question, and the assets were therefore not executable under TRIA. Id..

The facts in the case at hand are very different. The Blocked Assets are "cash deposits" and "equities" sitting in bank accounts at JPM Chase in New York. (Fundacion Claimants March 2012 Letter 2.v See also Interpleader Petition ¶¶ 15-16(c); Tranche VI Turnover Petition Ex. C.) Unlike EFTs, this type of property is specifically included in the non-exhaustive list of types of property that may be attached pursuant to the CACRs. See 31 C.F.R. § 515.311(a) (including "money, bank deposits, savings accounts . . . and other financial securities" within the list of property that may be attached pursuant to the CACRS).

More importantly, it is undisputed that the Blocked Assets were initially the property of the Fundacion and that the Fundacion is the named account holder of the Blocked Accounts. (See, e.g., Fundacion Claimants March 2012 Letter 1; Hausler March 2, 2012 Letter 2; Tranche VI Petition ¶ 22; Interpleader Petition.) There is no question that under New York law, the account holder of accounts containing assets belonging to the account holder has a property interest in those assets, and no parties

have suggested that New York law holds otherwise. (See generally Tranche VI Petition; Interpleader Petition; Fundacion Claimants Interpleader Answer; 2015 Correspondence.) Rather, Hausler alleges that the Fundacion was "nationalized" following the Cuban Revolution (Tranche VI Petition ¶ 22), and that pursuant to this nationalization, the Fundacion's "assets[, including the Blocked Assets,] are now Cuba's assets."[19] (Hausler March 12 Letter 2015.)

The question before the Court then, is whether assets that indisputably once belonged to the Fundacion under New York law now belong to the Judgment Debtors under New York law due to the purported nationalization of the Fundacion by the Cuban government. The question, however, cannot be resolved by looking at New York statutes and case law that interprets those statutes, as was the method the Second Circuit employed in Hausler III. This conclusion follows because in New York -- as in any state -- the question as to whether the Fundacion was nationalized by the Cuban government is not a question of state law, but rather of

---

[19] Importantly, Hausler is alleging that the Blocked Assets are actually Cuba's assets, and rather than alleging that the Fundacion is an "agent or instrumentality" of Cuba under TRIA Section 201(a). (Tranche VI Petition ¶ 22.) JPM Chase and Hausler agree that the Fundacion is not an "agent or instrumentality" of Cuba. (Interpleader Petition ¶ 14(a); Hausler Interpleader Answer ¶ 14(a).)

federal and international law. And, in New York -- as in every state -- the question of whether to recognize and give effect to an extraterritorial taking by a foreign sovereign of property located within the United States is a question not of state law, but of federal law.

The Court will therefore proceed to examine first whether the Fundacion was nationalized by the Cuban government and then, if the Fundacion has been nationalized, whether the Blocked Assets are now the property of Cuba.

a. Was the Fundacion Nationalized?[20]

According to Black's Law Dictionary, to "nationalize" means "[t]o bring (an industry) under governmental control or ownership." *Nationalize*, Black's Law Dictionary (10th ed. 2014). Following the Cuban Revolution, as discussed in numerous cases in this District and Circuit, the Cuban Government "nationalized" various private properties, corporations, and organizations. See, e.g., Garcia v. Chase Manhattan Bank, N.A., 735 F.2d 645, 647 (2d Cir. 1984); Banco Nacional de Cuba v. Chem. Bank New York Trust

[20] The Court recognizes that, should a representative of the Fundacion come forward pursuant to action taken following the submissions the parties are to make pursuant to infra Section IV of this Decision and Order, the Court may consider revisiting the analysis and findings discussed in this section of the Decision and Order. The Court shall do so as necessary.

Co. ("Chemical Bank II"), 594 F. Supp. 1553, 1555 (S.D.N.Y. 1984). Such action was generally accomplished pursuant to the passage of a Public Law that would nationalize the relevant property or entities. See, e.g., Garcia, F.2d at 647; Banco Nacional de Cuba v. Chemical Bank New York Trust Co. ("Chemical Bank I"), 658 F.2d 903, 905-07 (2d Cir. 1981). The effect of the nationalizations was that "[o]nce those assets were expropriated, they came under the control of the Cuban government" (Chemical Bank II, 594 F. Supp. at 1557 n.6) and the "assets and liabilities" of entities seized by Cuba were "assumed" by the Cuban government (Garcia, 735 F.2d at 647).

Because the question of whether the Fundacion was nationalized is one of foreign law, "the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1.

Upon review of the material in the public record of this action, the Court is persuaded that the Fundacion was nationalized by the Cuban government following the Cuban Revolution. Other than neutral stakeholder JPM Chase, all parties acknowledge that there was confiscatory taking of the Fundacion by the Cuban government following the Cuban

Revolution, and the parties have actually agreed on this fact from a very early stage in the litigation. See Fundacion Claimants March 12 Letter 1-2 (The Fundacion "continued to operate without interruption under its original charter until the advent of the communist regime and the purported[21] confiscation of its physical assets in 1960," and "[f]ollowing the purported[22] confiscation of the Fundacion's physical assets in Cuba, the Fundacion's reserves in the bank accounts located in the United States were blocked, purportedly pursuant to OFAC regulations."); Fundacion Claimants Interpleader Answer ¶ 25 ("The subject funds in the three subject accounts, of which the Fundacion is the named account holder, are not subject to execution or garnishment pursuant to the public policy of the United States that it does not recognize confiscatory takings; thus, the purported confiscation by the Cuban government of the assets of the Fundacion should not be given effect."); Hausler March 15, 2012 Letter 1-2 ("[T]here is no dispute

---

[21] It is clear from the context of these statements that, in using the word "purported," the Fundacion Claimaints refer to the Cuban government's stance that it confiscated the assets of the Fundacion, rather than Hausler's claims that such a confiscation occurred. The Fundacion Claimants assert that Cuban government "purport[s]" to have confiscated the assets of the Fundacion, but that -- as discussed in infra Section II(C)(1)(b) -- the United States should not recognize that confiscation. The Fundacion Claimants do not dispute that, in the eyes of the Cuban government, the assets of the Fundacion were confiscated.

[22] See supra note 21.

and the Fundacion Claimants do not deny, that the Fundacion was the subject of a nationalization by the Castro regime . . . The Fundacion Claimants instead argue that United States public policy does not recognize confiscatory takings from U.S. nationals.”). The Fundacion Claimants initially demurred that despite acknowledging a confiscatory taking by the Cuban government of the Fundacion’s assets, “[t]he Fundacion Claimants have not admitted that the Fundacion was nationalized by the Republic of Cuba.” (Fundacion Claimants March 2012 Letter 1 n.1.) In the course of the Villoldo Florida proceedings, however, the Fundacion Trustees fully and openly conceded, that the Fundacion was indeed nationalized and made clear that the remaining question is not whether the Fundacion was nationalized, but whether under New York law, the extraterritorial expropriation of the Blocked Assets, located in the United States, will be recognized. At one point during the Villoldo proceedings, Kai Jacobs, counsel for the Fundacion Trustees, stated:

> And although the properties, themselves, are nationalized by the Cuban Government in Cuba, and we are not here to dispute that that has happened or that is what we are trying to protect, it is the money that is sitting in or [sic] the stocks, I call it money, the account that is sitting in New York.

(Villodo Transcript 11.) At another point, the following exchange took place, in which counsel for the Fundacion Trustees clearly admitted that the Fundacion itself was seized by the Cuban government in its entirety, and that the only question is whether the Blocked Assets are or are not considered Cuban property as a result:

> MR. JACOBS: Yes. The [Cuban] Government seized the school, the cemetery, and the hospital.
> THE COURT: And the foundation?
> MR. JACOBS: Yes.
> THE COURT: So this money now is out there, right?
> MR. JACOBS: Right.
> THE COURT: And so it was intended to benefit these schools -- well, the foundation was taken over by the Government, so the trustees now are acting as trustees of money that has been taken over by the Cuban Government.
> MR. JACOBS: But that is the very issue that is in debate, is that money an asset that belongs to the Cuban Government? . . . . Under the Terrorism Risk Insurance Act they said just what you said, that money belongs to the foundation, which was nationalized; therefore, even though it's in the U.S., and even though it's in New York, it belongs to the foundation. It's what they call a TRIA asset, Terrorism Risk Insurance Act, subject to that, and the foundation and other parties who have other interests in other assets say, 'No, it's not.' It's a matter to be determined under the property rights of the State of New York. The federal law does not create property rights, and under New York law it properly belongs not to a terrorist state.

(Villoldo Transcript 14-15.) Of course, the Fundacion Trustees also filed the Notice of Consent to Relief in the Villoldo proceedings in Florida, "giv[ing] notice of their

consent to the imposition of the relief . . . determining that [the Fundacion Trustees] have no authority to act on behalf of the Fundacion controlled by Defendant Cuba." (Fundacion Claimants March 4 Letter 2-4 (emphasis added).)

Hausler has also provided the expert testimony of Professor Jaime Suchlicki, Emilio Bacardi Distinguished Professor and Director of the University of Miami's Institute for Cuban and Cuban-American Studies, which was submitted to the Villoldo court in the Florida proceedings as well. This Court and others have frequently reviewed and credited expert affidavits in making determinations of international law related to TRIA. See, e.g., Hausler II, 845 F. Supp. 2d at 572-73; Levin, 2011 WL 812032, at *20–*21; Estate of Heiser v. Islamic Republic of Iran, 807 F. Supp. 2d 9, 17–20 (D.D.C. 2011). The information in the Suchlicki Affidavit is based upon Professor Suchlicki's "over forty years of experience in researching and writing about Latin American affairs, particularly about Cuba." (Suchlicki Affidavit 1.)

Professor Suchlicki explains that

> three possible general fates awaited private charitable foundations that existed in Cuba before the triumph of Fidel Castro's Revolution in 1959. 1) A private charitable organization could simply have been shut down by the Cuban Government, with all operations

> ceasing to exist; 2) In some cases the government nationalized the organization and started redirecting its social services in a way that the Cuban State found most beneficial; and 3) In other instances, the Cuban Government consolidated some private organizations into one large government controlled national-level institution.
>
> The Fundacion Benefica S. Acea suffered the second fate. The Fundacion Benefica Nicolas C. Acea Hospicio was converted into a state-run pediatric hospital, named "Paquito Gonzalez Cueto." The Fundacion Benefica Nicolas C. Acea San Lorenzo (A boy's [sic] school) and the Fundacion Benefica Nicolas C. Acea Santo Tomas (a girls school) have been converted into a State run secondary school, named "Secundaria Basica 5 de Septiembre.
>
> All of the assets of the Fundacion Benefica Nicolas S. Acea are now owned by the Republic of Cuba.

(Suchlicki Affidavit 1.) Professor Suchlicki further elaborates that

> [t]rustee-level positions within any private charitable foundation in Cuba would have been rendered insignificant, as all decisions were made and approved at the government-level. A private citizen would not have been recognized by the Cuban government as a trustee, in any meaningful sense of the word.

Id. Although JPM Chase, as a neutral stakeholder, continues to question whether the Fundacion has in fact been nationalized (see JPM Chase March 10 2015 Letter), no party at this point actually contests the information provided by Professor Suchlicki, and no party -- including JPM Chase -- has provided any evidence to contradict it.

Finally, it is of significant import that, in the

course of the supplementary proceeding filed by the Villoldo Plaintiffs, as discussed above at length, the Villoldo court made a specific finding, following public adversarial proceedings in which the Fundacion Trustees were represented, that the Fundacion was nationalized. While it is true that the Fundacion -- to the extent that it may still exist -- was not a party and does not appear to have been noticed regarding the Villoldo proceedings (see supra Section II(A)(5)), the hearing was still a contested proceeding. Additionally, though the Court recognizes the possibility that the Fundacion may not have been adequately served in the instant action,[23] no bona fide representative of the Fundacion has come forward in this Court claiming that the Fundacion was not nationalized by the Cuban government. In consequence, at this time, there is no reason to believe that -- had the Fundacion been added as a party in the Villoldo proceeding -- any representative would have come forward there. The Blocked Assets have been frozen for over forty years, and the Tranche VI Petition, which is a matter of public record, was filed in 2011. Thus, at this time, the circumstances

[23] The issue of whether or not the Fundacion has been properly served with the Interpleader Petition is discussed in detail in supra Section II.B.1.b) of this Decision and Order.

suggest that there is simply no representative of the Fundacion to be found.[24]

In the absence of a legitimate representative of the Fundacion claiming that the Fundacion was not nationalized and thus still exists, the Court does not see fit to further "repeat the exercise of determining . . . whether the blocked assets are nationalized Cuban government assets." (Hausler March 12 Letter.) The Villoldo court in the Florida proceedings held an evidentiary hearing, and reviewed evidence including the public orders through which the nationalization occurred, and firmly concluded that "[t]he Fundacion Benefica Nicolas S. Acea is a nationalized Cuban entity and its assets, including the Accounts, are owned by the Republic of Cuba." (Hausler June 15 Letter 2.) In the absence of any evidence to the contrary, and with a multitude of evidence in support, the Court finds that the Fundacion was indeed nationalized by the Cuban government.

b. Are the Blocked Assets Property of the Republic of Cuba?

[24] See supra note 20. Though the facts suggest there may be no existing representative of the Fundacion, the Court is requiring submissions from the parties as provided in infra Section IV of this Decision and Order related to the issue of service upon the Fundacion, and the Court will revisit the findings related to the Fundacion's nationalization as necessary should a representative of the Fundacion come forward pursuant to action taken at the Court's instruction following such submissions.

Under the long standing act of state doctrine,

> the courts of the United States, whether state or federal, "will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles . . . . " [Banco Nacional de Cuba v. ]Sabbatino,, 376 U.S. [398,] 428[.] (emphasis added). The doctrine "arises out of the basic relationships between branches of government in a system of separation of powers," and "expresses the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals . . . in the international sphere." Id. at 423.

Konowaloff v. Metro. Museum of Art, 702 F.3d 140, 145 (2d Cir. 2012). However, "The act of state doctrine does not . . . bar inquiry by the courts into the validity of extraterritorial takings." Chemical Bank I, 658 F.2d at 908 (emphasis added). The Second Circuit in Republic of Iraq v. First National City Bank explained

> [u]nder the traditional application of the act of state doctrine, the principle of judicial refusal of examination applies only to a taking by a foreign sovereign of property within its own territory . . . ; when property confiscated is within the United States at the time of the attempted confiscation, our courts will give effect to acts of state "only if they are consistent with the policy and law of the United States."

353 F.2d 47, 51 (1965) (emphasis added) (citations omitted).

The act of state doctrine therefore precludes this Court from engaging in an analysis of the legal validity of the nationalization discussed in the preceding section as it applies to the seizure of assets within Cuba by the Cuban government, but does not forbid the Court from undertaking -- as it has -- an analysis of whether a particular expropriation occurred within Cuba. See Konowaloff, 702 F.3d at 145. However, with regard to the alleged Cuban nationalization of the Blocked Assets, which were located in the United States, this Court -- if it determines that an attempted confiscation occurred -- must give effect to that confiscation only if doing so is "consistent with the policy and law of the United States." Republic of Iraq, 353 F.2d at 51.

In the present case, it is clear that an attempted confiscation occurred. As discussed in the preceding section, the Fundacion and all its assets were nationalized by the Cuban Government. However, the question of whether the recognition of that confiscation aligns with or contradicts United States policy is a more complicated one. The Fundacion Claimants point to Bandes v. Harlow & Jones, Inc., 852 F.2d 661, 667 (2d Cir. 1988), in the Fundacion

Claimants Interpleader Answer,[25] explaining that in Bandes "the court ruled that a foreign confiscation is shocking to our sense of justice and need not be enforced here." (Fundacion Claimants Interpleader Answer ¶ 25.) The Fundacion Claimants also cite Bandes in the Fundacion Claimants March 2012 Letter, along with a number of other cases, including Republic of Iraq, 353 F.2d at 51-52, all purportedly suggesting that the United States does not recognize extraterritorial confiscations of property on United States soil without just compensation. (Fundacion Claimants March 2012 Letter 2-3.)

JPM Chase has also brought to the Court's attention that "in similar cases, the United States has taken the position that the Republic of Cuba cannot expropriate property owned by Cuban nationals if that property, like the [Blocked Assets] held by JPM Chase, is located within the United States." (JPM Chase March 10 Letter 2.) JPM Chase has referred the Court to a "Statement of Interest" submitted by the United States in Alfredo Villoldo v. Fidel Castro Ruz, No. 4:13-MC-94014, a case currently before the

[25] Although their claim to the Blocked Assets fails due to lack of standing, the Court will address arguments raised by the Fundacion Claimants in exploring whether -- regardless of the existence or lack of meritorious competing claims to the Blocked Assets -- the Blocked Assets are executable under TRIA.

Federal District Court for the District of Massachusetts. (Id.) The Statement of Interest refers to many of the same cases to which the Fundacion Claimants refer, as well as to a number of cases in the First Circuit that are clearly not binding on this Court.

In contrast, Hausler relies on the Second Circuit case Chemical Bank I, 658 F.2d 903, for the premise that "the question of whether a foreign sovereign can nationalize assets of its own national on United States soil that can later be used to satisfy judgments against that sovereign has been definitively answered in this Circuit" in the affirmative. (Hausler March 12 Letter 2.) The facts in Chemical Bank I also specifically involve Cuban nationalization of assets following the Cuban Revolution; in 1960, a company called Cuban Electric Company ("Cuban Electric") was expropriated and nationalized by the Cuban government. Chemical Bank I, 658 F.2d at 905. At the time of nationalization, Cuban Electric had outstanding balances on loans from Chemical Bank New York Trust Company, Manufacturers Trust Company, and Irving Trust Company (the "Chemical Defendants"). Id.

Also in 1960, the Cuban government nationalized various private banks (the "Private Banks") and provided

that the nationalization would be "carried out through Banco Nacional." Chemical Bank I, 658 F.2d at 905-06, 910-11. Banco Nacional therefore acted as the "alter ego" of the Cuban Government with regard to the nationalization of the Private Banks. Id. at 905-06. At the time the Private Banks were nationalized, the Private Banks had placed amounts in deposit in the United States with the Chemical Defendants. Banco Nacional, as successor in interest to the Private Banks, then brought suit against the Chemical Defendants, seeking to recover the amounts deposited with them by the Private Banks before they were nationalized.[26] Each of the Chemical Defendants counterclaimed, seeking dismissal and asserting that the amount owed to it by Cuban Electric exceeded the amount of Banco Nacional's claims.

These facts meant that if the Chemical Bank I court were to recognize the expropriation of the Private Banks' property located in the United States by the Cuban government, Banco Nacional would be able to proceed with its claims as successor in interest against the Chemical Defendants. Somewhat counterintuitively, such a prospect would have benefited the Chemical Defendants, because they

[26] Banco Nacional also sought to recover in its own right a deposit withheld by Chemical Bank New York Trust Company. Chemical Bank I, 658 F.2d at 905.

would then have been able to assert their counterclaims against Banco Nacional, and potentially recover some or all of the money owed to them. In contrast, had the Second Circuit declined to recognize the extraterritorial seizure of property on United States soil in Chemical Bank I, Banco Nacional would not have been able to pursue its claims as successor in interest. The Chemical Defendants would then be unable to assert their counterclaims, and therefore unable to recover for the losses they sustained when Cuban Electric was nationalized.

The Chemical Bank I court ultimately allowed Banco Nacional to sue as successor to the Private Banks, thereby recognizing the extraterritorial expropriation by Cuba of assets located in the United States. The Second Circuit, in a statement that distinguishes the facts in Chemical Bank I from those in many of the cases cited by the Fundacion Claimants and JPM Chase, declared that

> the effect of a foreign state's attempt to expropriate property located in the United States has been found to violate United States law or policy when the prior owner of the property has not been compensated and he or his successor protests the taking or resists its judicial enforcement. See, e.g., Republic of Iraq, [353 F.2d 47]; Menendez v. Saks & Co., [485 F.2d 1355 (2d Cir. 1973)]; United Bank Ltd. v. Cosmic International Inc., 542 F.2d 868 (2d Cir. 1976).

Chemical Bank I, 658 F.2d at 908. In contrast, with regard

to the parties in Chemical Bank I, the Second Circuit found that

> there appears to be no reason at this late time to invoke the act of state doctrine to bar the court from recognizing Banco Nacional's right to sue as successor to the Private Banks. While United States law of course does not approve the taking of private property without compensation, the former owners of the Private Banks have lodged no protest, either by bringing suit to recover their United States property, or by seeking to intervene in Banco Nacional's suits. In the twenty years during which these suits have been pending, the former owners have not asserted any conflicting claim. Thus we cannot say that the effect in this case of recognizing the Cuban nationalization of the Private Banks would violate United States policy.

Id. at 909. The Chemical Bank I court went on to say,

> we conclude that allowing Banco Nacional to sue as successor here will further the goals of the United States, because it will assist in providing funds in the United States from which American nationals who have valid claims against the government of Cuba may be compensated, at least in part, for their claims.

Id. The Chemical Bank I court also explained that were it not to recognize the nationalization, and in the absence of any conflicting claims, the ultimate result would likely be escheatment of the funds at issue to the State of New York under New York law, "a result that cannot be said to further the established national policy." Id.

Importantly, the court in Bandes, which came later in time and is relied upon heavily by the Fundacion Claimants in their filings (Fundaction Claimants Interpleader Answer

¶ 25; Fundacion Claimants March 2012 Letter 2-3), declined to recognize an extraterritorial expropriation by a foreign sovereign of property in the United States (852 F.2d at 667-68.), but under very different circumstances than those present in Chemical Bank I. Bandes "involve[d] the expropriation of property following the Sandinista victory in Nicaragua's civil war." Id. at 663. The Bandes family members fled Nicaragua "in fear of their lives" in 1979, leaving behind Industria Nacional de Clavos y Alambres de Puas, Sociedad Anonima ("INCA"), a steel company the Bandes family largely owned and controlled. Id. The Bandes family then brought suit for title to a sum, representing the value of an undelivered shipment of steel billets produced by a Connecticut company and located within the United States. The billets had been ordered by INCA in 1978, prior to the company's expropriation by the Sandinista government. A representative of the Sandinista government also laid claim to the funds.

Finding that "the Sandinista Government ha[d] not presented a compelling reason for this Court to forego constitutional protections," the Bandes court refused to recognize the extraterritorial expropriation of the value of the property located in the United States, declining to

award the Sandinista government any portion of the funds. The Bandes court stressed that the Bandes family had not been compensated in any way by Nicaragua for its losses, and stated that "[w]ithout just compensation, such a taking is shocking to our sense of justice, and we need not enforce it here." Id. at 667. Critically, because the Bandes court refused to recognize the extraterritorial expropriation, the Bandes family -- the party seeking just compensation -- was able to recover at least some of its loss, furthering United States policy. Moreover, the Bandes court explicitly took note of Chemical Bank I and made clear that the two cases are distinguishable. See id. at 668 n.5. The court in Bandes explains that the court in Chemical Bank I,

> [r]easoning that the United States policy would be furthered by permitting recovery on the counterclaims . . . held that the act of state doctrine does not bar recognition of Banco Nacional's right to sue. The Court also realized that, if it had denied Banco Nacional's claims, the deposits would have escheated to New York, a result which would not have "further[ed] the established national policy."

Id.

Clearly, there are many parallels between the facts in Chemical Bank I and the case at hand, and the facts in Bandes are readily distinguishable. As in Chemical Bank

I, and unlike in Bandes, no bona fide prior owner has been identified as having been uncompensated in the instant action, and no such person or entity has come forward to protest judicial enforcement of the Fundacion's nationalization. (See Hausler March 12 Letter; Hausler June 10 Letter.) Furthermore, just as in Chemical Bank I, but in stark contrast to Bandes, in the case at hand it is the Court's recognition of the extraterritorial expropriation -- rather than a refusal to recognize it -- that will assist a wronged party (Hausler) in seeking just compensation for her loss. See Chemical Bank I, 658 F.2d at 909; Villoldo Plaintiffs Letter 3. Additionally, New York law still provides for escheatment of unclaimed bank accounts, so were the Court to decline recognition of the expropriation of the Blocked Assets, and if the CACRs were lifted at some point in the future but no one claimed the Blocked Assets, the Blocked Assets would indeed "escheat to the State of New York, a result that cannot be said to further the established national policy." Chemical Bank I, 658 F.2d at 909. See N.Y. Aband. Prop. Law § 300 (McKinney 2011).

The Court is persuaded that in the instant case "United States policy will be furthered rather than

violated" by recognizing Cuba's extraterritorial confiscatory taking of the Blocked Assets at the time the Fundacion was nationalized. Chemical Bank I, 658 F.2d at 909. Recognizing the expropriation of the Blocked Assets will allow Hausler, the aggrieved family member of a victim of extrajudicial torture and killing by Cuban armed forces, to recover some amount of the compensatory damages she was awarded in the Florida Judgment. On the other hand, if the Court declined to recognize the expropriation of the Blocked Assets, the Blocked Assets will simply sit in the Blocked Accounts indefinitely, likely escheating back to the State of New York at some future date. N.Y. Aband. Prop. Law § 300 (McKinney 2011). Congress passed TRIA

> to deal comprehensively with the problem of enforcement of judgments issued to victims of terrorism in any U.S. court by enabling them to satisfy such judgments from the frozen assets of terrorist parties . . . [TRIA] establishes, once and for all, that such judgments are to be enforced against any assets available in the U.S. . . . "

148 Cong. Rec. S11528 (daily ed. Nov. 19, 2002) (statement of Sen. Harkin) (quoted by Hausler I, 740 F. Supp. 2d at 535-36). United States policy would also be furthered by allowing Hausler to use TRIA in the way Congress intended: as a tool to access compensation for wrongs suffered by American citizens at the hands of a terrorist state.

### 2. Hausler's Right to Execute Upon the Blocked Assets

The Court therefore finds that Hausler has a right to execute upon the Blocked Assets pursuant to TRIA Section 201(a). Because no competing claims ranking above Hausler's have been identified at this time, an order of turnover as provided by TRIA and related federal statutes will be required. See Hausler II, 845 F. Supp. 2d at 569.

However, because the Court reserves judgment regarding JPM Chase's petition for interpleader relief as to the Fundacion, and because the Court awaits the submissions from the parties described in infra Section IV of this Decision and Order, the Court will not issue an order of turnover at this time. At a later date, following review of the submissions from the parties as described in infra Section IV of this Decision and Order, the Court may revisit the findings in this Decision and Order. At that time, should the facts still warrant an order of turnover allowing Hausler to execute upon the Blocked Assets, the Court will issue such an order.

## D. OFAC AS A NECESSARY PARTY

The Fundacion Claimants have argued[27] that OFAC is a

[27] See supra note 25.

necessary party to this suit, and that as a result the Tranche VI Petition must be dismissed for failure to join a necessary party. (Fundacion Claimants Interpleader Answer ¶ 27; Fundacion Claimants March 2012 Letter 3.)

In determining whether a suit must be dismissed for failure to join an indispensable party, a court must first determine whether a party is "necessary" under Rule 19(a)(1) of the Federal Rules of Civil Procedure ("Rule 19(a)(1)").[28] Rule 19(a) provides that

> [a] person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if: (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

The Fundacion Claimants reason that

> [b]ecause OFAC controls and regulates the CACRs (pursuant to which the subject accounts purportedly were blocked), OFAC is aware of the distinction between assets that belong to the Cuban government and

[28] "If the nonparty is necessary but joinder is not feasible for practical or jurisdictional reasons, the court then must consider the factors set forth in Rule 19(b) to determine whether to dismiss the case." <u>ConnTech Dev. Co. v. Univ. of Connecticut Educ. Properties, Inc.</u>, 102 F.3d 677, 681 (2d Cir. 1996).

> assets that do not and would not be subject to garnishment in this case. Thus, OFAC is a required party in this action.

(Fundacion Claimants March 2012 Letter.)

OFAC does not appear to meet any of Rule 19(a)'s criteria in the instant action. It is unclear from the Fundacion Claimants' various submissions what special knowledge of the CACRs' blocking mechanisms OFAC possesses that somehow requires OFAC to be a party to this suit. There is no support in the relevant statutes, regulations, or case law for the position that OFAC is a necessary party to this sort of action. Rather, the text of TRIA makes clear that the Court has the authority to determine whether TRIA applies to any claims before it. See TRIA Section 201(a).

Furthermore, as Hausler has pointed out, OFAC is aware of the Hausler case, is monitoring it, and even signed a Confidentiality Order related to one of Hausler's earlier turnover petitions. (Hausler March 15, 2012 Letter 2; Dkt. No. 482 at 17.) Hausler is correct that if OFAC believed itself to be a necessary party, it would have already intervened. (Hausler March 15, 2012 Letter 2.) Finally, the Court notes that the Fundacion Claimants may seek to bring OFAC into this action merely to quibble with OFAC

over whether the Blocked Assets are properly blocked. However, the administrative procedures laid out in the CACRs -- rather than this Court -- provide the appropriate venue for such a dispute. See supra Section I(B); 31 C.F.R. §§ 501.806, 515.201(e).

The Court therefore finds that OFAC is not a necessary party to this litigation, and that OFAC's absence from the suit does not bar adjudication of the Tranche VI Petition.

## III. ATTORNEY'S FEES AND COSTS

JPM Chase has also requested "reasonable attorney's fees and costs incurred in responding to [Hausler's] enforcement efforts, such award to be paid out of any amount turned over pursuant to [the Tranche VI] Petition." (Interpleader Petition 12. See also JPM Chase Answer ¶ 37.) "Attorney's fees and costs are generally awarded to a disinterested stakeholder who has 'expended time and money participating in a dispute not of his own making and the outcome of which has no impact on him.'" Weininger, 462 F. Supp. 2d at 501-02 (quoting Fidelity Brokerage Services, LLC v. Bank of China, 192 F. Supp. 2d 173, 183 (S.D.N.Y. 2002)) (citing Sparta Florida Music Grp., Ltd. v. Chrysalis Records, Inc., 566 F. Supp. 321, 322 (S.D.N.Y. 1983); Septembertide Publ'g, B.V. v. Stein & Day, Inc., 884 F.2d

675, 683 (2d Cir. 1989) ("A disinterested stakeholder who asserts interpleader is entitled to be awarded costs and attorney's fees.")). Because JPM Chase meets these criteria, the Court grants it reasonable attorney's fees and costs, subject to an application to the Court in accordance with Rule 54 of the Federal Rules of Civil Procedure. In this regard, the Court notes that to the extent JPM Chase may have crossed the line beyond that of a neutral party disinterested in the outcome of the parties' disputes, and sought to reopen issues sufficiently settled in the Florida court's proceedings, recovery of attorney's fees and costs may be unwarranted as to charges the Court finds to have stemmed from excessive or needless litigation.

## IV. ORDER

Accordingly, it is hereby

**ORDERED** that the request of petitioner Jeannette Hausler ("Hausler") to strike the "Answer and Affirmative Defenses to Third-Party Petition Alleging Claims in the Nature of Interpleader" (Dkt. No. 505) from the record is **GRANTED**; and it is further

**ORDERED** that the request of counsel for third-party defendants the Fundacion Benefica Nicolas S. Acea (the

"Fundacion"), Pablo Alcazar, Mayra Bustamante, and Rene Silva, Jr. to withdraw as counsel is **GRANTED**; and it is further

**ORDERED** that the request of defendant JP Morgan Chase Bank, N.A. ("JPM Chase") for leave to amend the "Third Party Petition Alleging Claims in the Nature of Interpleader" ("Interpleader Petition") is **DENIED**; and it is further

**ORDERED** that the request of defendant JP Morgan Chase and counsel for third-party defendants the Fundacion Benefica Nicolas S. Acea (the "Fundacion"), Pablo Alcazar, Mayra Bustamante, and Rene Silva, Jr. for a stay in this matter is **DENIED**; and it is further

**ORDERED** that the request of defendant JP Morgan Chase and counsel for third-party defendants the Fundacion Benefica Nicolas S. Acea (the "Fundacion"), Pablo Alcazar, Mayra Bustamante, and Rene Silva, Jr. for a pre-motion conference in this matter is **DENIED**; and it is further

**ORDERED** that JPM Chase's Interpleader Petition (Dkt. No. 440) is **DENIED** with regard to Pablo Alcazar, Mayra Bustamante, and Rene Silva, Jr.; and it is further

**ORDERED** that the parties shall make a joint submission of no greater than three (3) pages within thirty (30) days

of the date of this Decision and Order, or -- if the parties cannot agree on a joint submission -- separate submissions of no greater than two (2) pages each, describing: (1) affirmative measures the parties took, including by publication in a suitable newspaper of general circulation during a period of at least three separate or consecutive days, that were reasonably calculated to provide notice of and serve a copy of the Interpleader Petition and of this Decision and Order upon the Fundacion; (2) a declaration stating whether or not any legitimate entity purporting to be or represent the Fundacion has come forward and asserted a good faith claim averring that the Fundacion was not in fact nationalized by the Cuban government following the Cuban Revolution, and thus still legally exists and is entitled to ownership of interest in the funds at issue in this action; and it is further

**ORDERED** that the Court may revisit the findings of this Decision and Order if warranted by any of the submissions described above; and it is finally

**ORDERED** that in the event the parties report in their submissions that no legitimate entity responded to the notice and service provided for above asserting a good faith claim that it is or represents the Fundacion and thus

has any legal interest in the outcome of this action, the Court shall deem the Interpleader Petition **DENIED** as to the Fundacion, and Hausler's petition for a turnover order in respect to the funds at issue in this action **GRANTED** without further filings by the parties.

**SO ORDERED.**

Dated: New York, New York
4 August 2015

VICTOR MARRERO
U.S.D.J.